# United States Court of Appeals

## *for the*

# Eleventh Circuit

PETER PARNELL, JUSTIN RICHARDSON, B G, By and through her parent
Raymond Guillory,

*Plaintiffs-Appellants,*

E D B By and through her parent Whitney Morgan Donovan, et al.,

*Plaintiffs,*

— v. —

SCHOOL BOARD OF LAKE COUNTY, FLORIDA, et al.,

*Defendants,*

SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
IN NO. 4:23-CV-00414-AW-MAF, HONORABLE ALLEN C. WINSOR

## BRIEF FOR PLAINTIFFS-APPELLANTS

ANNA T. NEILL
SPERLING KENNY NACHWALTER, LLC
4 Seasons Tower, 1441 Brickell Avenue,
    Suite 1100
Miami, Florida 33131
(305) 373-1000

FAITH E. GAY
COREY STOUGHTON
LAUREN J. ZIMMERMAN
JOSHUA W. BEAN
JOSHUA M. COCKREAM
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Plaintiffs-Appellants*

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants respectfully request oral argument in this appeal so that the Parties may address any questions concerning the applicability of the First Amendment to public school libraries and the inapplicability of legislative privilege to this case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CITATIONS ........................................................................ iv

STATEMENT OF JURISDICTION ........................................................ ix

STATEMENT OF THE ISSUES .................................................................. 1

PRELIMINARY STATEMENT ................................................................... 2

STATEMENT OF THE CASE ...................................................................... 6

    A.    *Tango* Is Challenged Based on Its Positive Depiction of Same-Sex Parenting ........................................................................................ 6

    B.    The District Materials Review Committee Unanimously Votes to Retain *Tango* After It Was Challenged ................................................ 6

    C.    The Board Votes to Remove *Tango* Because of Its Viewpoint ........... 8

    D.    Procedural History ................................................................................ 9

STANDARD OF REVIEW ....................................................................... 11

SUMMARY OF THE ARGUMENT ....................................................... 12

ARGUMENT ............................................................................................ 14

I.    The First Amendment Prohibits Censoring Books in Public School Libraries Based on Viewpoint Discrimination ............................................. 14

    A.    Controlling Precedent Establishes That the First Amendment Prohibits Viewpoint Discrimination, Including in Public School Libraries ............................................................................................... 15

    B.    The District Court's Rationale for Creating a Public Library Exception to the First Amendment Is Wrong ...................................... 20

        1.    Public School Libraries Are a Forum for Private Speech in Which There Is a Right to Be Free from Viewpoint Discrimination ........................................................................ 20

2. The Right to Receive Information Is Well Established ............25

C. The Government Speech Doctrine Does Not Insulate Library Censorship from First Amendment Scrutiny ......................................27

1. Public Library Book Selection Is Government Regulation, Not Government Speech ..............................................................28

2. The Board Did Not Meet Its Burden to Prove Its Government-Speech Defense....................................................31

D. Allowing Viewpoint-Based Book Removals Would Sanction Dangerous and Unconstitutional Censorship ......................................34

II. The Undisputed Factual Record Warrants Summary Judgment in Plaintiffs-Appellants' Favor on Their Viewpoint Discrimination Claim.................................................................................................38

III. Legislative Privilege Does Not Shield School Board Members from Discovery About Their Decisions to Remove Individual Books .................41

CONCLUSION ..........................................................................................44

CERTIFICATE OF COMPLIANCE ......................................................46

CERTIFICATE OF SERVICE ...............................................................47

# TABLE OF CITATIONS

**Page(s)**

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ....................................................4, 19, 21, 24, 37

*Adderley v. Florida*,
385 U.S. 39 (1966) ..........................................................................................22

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ..............................................................................23, 30, 36

*Board of Education, Island Trees Union Free School District
No. 26 v. Pico*,
457 U.S. 853 (1982) ....................................................................3, 17, 18, 19, 25

*Brown v. Crawford Cnty.*,
960 F.2d 1002 (11th Cir. 1992) ........................................................................41

*Bryant v. Jones*,
575 F.3d 1281 (11th Cir. 2009) ...................................................................41, 42

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
115 F.4th 1266 (11th Cir. 2024),
*cert. denied*, 2025 WL 3198583 (Mem.) ...........................................................31

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ..............................................................................22, 36, 39

*Crymes v. DeKalb Cnty., Ga.*,
923 F.2d 1482 (11th Cir. 1991) ..................................................................42, 43

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) ........................................................................21

*FCC v. League of Women Voters of California*,
468 U.S. 364 (1984) ........................................................................................30

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ........................................................................................26

*Gravel v. United States*,
    408 U.S. 606 (1972)......................................................................41

*Greer v. Spock*,
    424 U.S. 828 (1976)......................................................16, 22, 24

*Hannegan v. Esquire, Inc.*,
    327 U.S. 146 (1946)...................................................................16

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988)..................................................17, 30, 34, 37

*Honeyfund.com Inc. v. Governor*,
    94 F.4th 1272 (11th Cir. 2024) ..............................16, 17, 23, 35

*In re Hubbard*,
    803 F.3d 1298 (11th Cir. 2015) .............................................11

*Iancu v. Brunetti*,
    588 U.S. 388 (2019)....................................................................15

*Jarrard v. Sheriff of Polk Cnty.*,
    115 F.4th 1306 (11th Cir. 2024) .............................20, 22, 30

*Khoury v. Miami-Dade Cnty. Sch. Bd.*,
    4 F.4th 1118 (11th Cir. 2021) .................................................11

*Kreimer v. Bureau of Police for Town of Morristown*,
    958 F.2d 1242 (3d Cir. 1992) .................................................21

*Lamb's Chapel v. Center Moriches Union Free School Dist.*,
    508 U.S. 384 (1993)......................................................15, 22, 36

*Leake v. Drinkard*,
    14 F.4th 1242 (11th Cir. 2021) .............................................29

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)..............................................................23, 26

*Little v. Llano County*,
    138 F.4th 834 (5th Cir. 2025) (en banc),
    *cert. denied*, No. 25-284, 2025 WL 3507000 (U.S. Dec. 8, 2025)...............20, 28

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003).......................................................................31

*Martin v. City of Struthers*,
319 U.S. 141 (1943).......................................................................25

*Matal v. Tam*,
582 U.S. 218 (2017)..........................................................28, 30, 33

*McDonough v. Garcia*,
116 F.4th 1319 (11th Cir. 2024) (en banc) .................................21, 22

*Moms for Liberty - Brevard Cnty. v. Brevard Pub. Schs.*,
118 F.4th 1324 (11th Cir. 2024) ...........................................11, 16, 17

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)..........................................................15, 23, 36

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)........................................................................36

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
938 F.3d 424 (3d Cir. 2019) ...........................................................37

*Neinast v. Bd. of Trs. of Columbus Metro. Libr.*,
346 F.3d 585 (6th Cir. 2003) ..........................................................21

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ........................................................16

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
711 F. Supp. 3d 1325 (N.D. Fla. 2024) ...........................................19

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
787 F. Supp. 3d 1292 (N.D. Fla. 2024),
*appeal docketed*, No. 25-13298 (11th Cir. Sept. 23, 2025)..............43

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983).........................................................................22

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009).......................................................................29

*Regan v. Tax'n With Representation of Wash.*,
461 U.S. 540 (1983)........................................................15

*Rosenberger v. Rector of the University of Virginia*,
515 U.S. 819 (1995)..............................26, 29, 35, 36, 37

*Searcey v. Harris*,
888 F.2d 1314 (11th Cir. 1989) ...............................17, 37

*Shelton v. Tucker*,
364 U.S. 479 (1960)........................................................17

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)..............................29, 31, 32, 33, 34

*Smith v. Lomax*,
45 F.3d 402 (11th Cir. 1995) ...............................41, 42, 43

*Stanley v. Georgia*,
394 U.S. 557 (1969)................................................25, 26

*Texas v. Johnson*,
491 U.S. 397 (1989)........................................................15

*This That And The Other Gift And Tobacco, Inc. v. Cobb Cnty., Ga.*,
439 F.3d 1275 (11th Cir. 2006) .........................................5

*Thornburgh v. Abbott*,
490 U.S. 401 (1989)................................................16, 22, 24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)................................................17, 35

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)........................................................16

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)........................................................31

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)........................................................25

*Vazzo v. City of Tampa*,
    No. 8:17-cv-2896, 2019 WL 1048294 (M.D. Fla. Jan. 30, 2019),
    *R & R adopted*, 2019 WL 1040855 (Mar. 5, 2019),
    *aff'd*, No. 19-14387, 2023 WL 1466603 (11th Cir. Feb. 2, 2023) ....................25

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).................................................................................38

*Waddell v. Valley Forge Dental Assocs.*,
    276 F.3d 1275 (11th Cir. 2001) .......................................................11

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015).............................................................................28, 29

*West Virginia Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)...........................................................................3, 35

## Statutes

28 U.S.C. § 1291 ...........................................................................................10

## Rules

Fed. R. Civ. P. 56(a)....................................................................................11

# STATEMENT OF JURISDICTION

The district court had jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction to review the district court's final order, ECF 261, granting summary judgment to Defendant-Appellee and denying summary judgment to Plaintiffs-Appellants, under 28 U.S.C. § 1291. This jurisdiction extends to review of the district court's earlier order, ECF 191, granting Defendant-Appellee's motion for protective order. *See Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Dist.*, 2025 WL 1937264, at *3 (11th Cir. July 15, 2025) (per curiam) ("'This final judgment rule requires that a party must ordinarily raise all claims of error in a single appeal following final judgment on the merits.'" (quoting *Flanagan v. United States*, 465 U.S. 259, 263 (1984))).

# STATEMENT OF THE ISSUES

1.     Whether the First Amendment's prohibition on viewpoint discrimination applies to the government's removal of public school library books, such that the district court's grant of summary judgment to Defendant-Appellee was in error.

2.     Whether undisputed facts establish that the Escambia County School Board's removal of *And Tango Makes Three* from school libraries constituted viewpoint discrimination, such that Plaintiffs-Appellants are entitled to summary judgment.

3.     Whether legislative privilege shields school board members from discovery about their reasons for removing specific books from public school libraries, such that the district court's protective order was in error.

# PRELIMINARY STATEMENT

This case concerns the censorship of *And Tango Makes Three* ("*Tango*"), a children's book based on the true story of two male penguins in New York City's Central Park Zoo who adopt, hatch, and raise a baby penguin together. The award-winning book offers a positive portrayal of same-sex, adoptive parenting and had been available in the Escambia County School District's public school libraries since at least 2006. In early 2023, however, the Escambia County School Board removed *Tango* because it disagreed with its message. The books' authors, joined by a young student who sought access to *Tango* (together, "Plaintiffs-Appellants"), brought this action challenging the Board's unconstitutional viewpoint discrimination.

Public school librarians may exercise broad discretion in curating library collections, but some reasons for removing books are unconstitutional. The line between lawful discretion and constitutional violation is drawn by the First Amendment's prohibition on viewpoint discrimination. A Democratic mayor could not order the removal of public library books because he disagrees with the books' Republican ideas. A city council could not ban public library books because its secular members disdain religious viewpoints. The Board cannot remove *Tango* because it disagrees with its message of tolerance for same-sex, adoptive parenting. The First Amendment prohibits any government official from "prescrib[ing] what shall be

orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Determining whether a government official's decision to remove a public school library book is permissible curation or impermissible viewpoint discrimination is well within the adjudicatory powers of the federal courts and is constitutionally required. Despite the Parties' development of a robust record in this case, including undisputed direct and circumstantial evidence that *Tango* was removed solely because government officials sought to suppress a disfavored viewpoint, the district court abdicated its responsibility to make this determination by declaring that the First Amendment has no application to government officials' decision to remove library books.

This endorsement of government censorship would have shocked the Founders. The First Amendment's prohibition on viewpoint discrimination is a foundational constitutional principle. The district court's novel application of a "public school library exception" to the First Amendment violates decades of well-established, binding precedent. That includes *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), in which eight Justices of the Supreme Court agreed that if a decision to remove a school library book was motivated by viewpoint discrimination it would violate the First Amendment. As this Court has acknowledged, the First Amendment speaks to the question of

"whether the . . . [removal] decision . . . was motivated by . . . a desire to promote political orthodoxy and by opposition to the viewpoint of the book." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* ("*ACLU*"), 557 F.3d 1177, 1227 (11th Cir. 2009). These core principles are grounded in longstanding precedent on viewpoint discrimination and the application of the First Amendment to public schools. The district court was required to follow that precedent, not overturn it *sub rosa* by holding that the First Amendment has no application in this context. That alone requires vacating the district court's judgment.

But the Court should not merely vacate and remand with instructions to apply the First Amendment. The undisputed facts establish that the Board's decision *was* motivated by viewpoint discrimination. The record shows that the Board removed *Tango* because it disapproved of the book's inclusive message about families with same-sex, adoptive parents. Board members' contemporaneous statements and the private petition that initiated their review all focused exclusively on the fact that *Tango* featured same-sex parents. The Board's post-hoc, made-for-litigation rationale for *Tango*'s removal—that it contained age-inappropriate "reproductive themes" and discussion of "where babies come from"—is flagrantly pretextual. The content of *Tango* is not in dispute and no reasonable person could conclude that it conveys any, let alone age-inappropriate, "reproductive themes" or discussions of "where babies come from." The book contains no sexual conduct or innuendo

whatsoever, and does not address reproduction other than to depict the fact that penguins hatch from eggs. Numerous books depicting indistinguishable stories of opposite-sex parental affection (including between penguin parents hatching an egg) remain on the District's elementary school library shelves. For these reasons, the Court should not merely vacate the grant of summary judgment to Defendant-Appellee but also exercise its authority to direct entry of summary judgment for Plaintiffs-Appellants. *See, e.g.*, *This That And The Other Gift And Tobacco, Inc. v. Cobb Cnty., Ga.*, 439 F.3d 1275, 1277, 1285 (11th Cir. 2006) (vacating the district court's entry of summary judgment for defendants and remanding with instructions to enter summary judgment for plaintiffs).

If the Court vacates the judgment but declines to direct entry of summary judgment for Plaintiffs-Appellants because it concludes that issues of fact remain, then the Court should also reverse the district court's ruling that legislative privilege bars discovery into the Board members' reasons for removing *Tango*. The Board's isolated, fact-specific decision to remove *Tango* was an administrative act, not a legislative pronouncement entitled to immunity. Plaintiffs-Appellants are therefore entitled to depose the Board members regarding their reasons for removing the book.

# STATEMENT OF THE CASE

The core facts underlying this appeal are undisputed: following a petition from a community member, the Board voted to remove *Tango* after stating its reasons on the record. What the Parties disagree on is whether the undisputed facts establish unconstitutional viewpoint discrimination as a matter of law.

## A. *Tango* Is Challenged Based on Its Positive Depiction of Same-Sex Parenting

On September 2, 2022, an individual community member challenged over 100 books in the District's libraries, including dozens of books expressing acceptance of LGBTQ+ identities, one of which was *Tango*. ECF 220-7 at 32–33 (121:9–18, 125:17–126:6); ECF 220-8 at 11. Up until then, *Tango* had been on the District's elementary school library shelves for almost two decades. *See* ECF 121-2–7. The challenger described *Tango* as promoting a "political gay agenda about two gay penguins who 'fall in love' and who adopt," and challenged the book on the sole ground of its "LGBTQ agenda using penguins." ECF 220-2 at 137, 158.

## B. The District Materials Review Committee Unanimously Votes to Retain *Tango* After It Was Challenged

In response to the challenge to *Tango*, the Escambia School District Materials Review Committee—composed of one elementary school Media Specialist, one teacher, one administrator, one parent, and one community member—initiated the required review process. ECF 220-2 at 152. The first step involved every District

elementary school assembling its Library Advisory Council ("LAC"), composed of (at least) the school's Media Specialist, two teachers, one parent, and one community member, to review the challenge and submit their feedback to the Committee. *Id.* at 185.

After reviewing *Tango* and considering the LACs' evaluations, the Committee members voted *unanimously* to retain *Tango*, finding there was "NO evidence of LGBTQ indoctrination" nor inappropriate sexual content. *Id.* at 152–153. In doing so, the Committee applied the Escambia School District's Media Policy, which instructs that library materials should "support the diverse interests, needs, and viewpoints of the school community," "foster respect for the diverse roles available to all people in today's society," and "reflect differing and/or opposing viewpoints." ECF 220-3 at 9–10; ECF 220-1 ¶¶ 22–23(e). Notably, at least two other picture books in the District's elementary school libraries contain information and imagery about "mating, nesting, and chick-rearing practices" indistinguishable from *Tango*, albeit without same-sex, adoptive parents. ECF 220-1 ¶ 30(a)–(b). The District also retains in its elementary school libraries numerous other books, such as *The Lion King* and *Beauty and the Beast*, depicting characters who are affectionate or who embrace in a manner indistinguishable from *Tango*'s drawing of two cuddling penguin parents. *Id.* at ¶ 40(c).

### C.    The Board Votes to Remove *Tango* Because of Its Viewpoint

*Tango*'s challenger appealed the Committee's unanimous decision to the Board based on the same anti-LGBTQ+ grounds as before. ECF 220-7 at 49 (189:10–191:8). Two Board members voted to retain *Tango*, ECF 220-24 at 87:11–17, and three Board members voted to remove *Tango*, *id.* at 87:19–89:14. Each of the three members who voted to remove the book spoke to their reasoning.

Then-Board Chair Kevin Adams stated that he voted to remove *Tango* because he felt that *Tango*'s authors were "really aggressive" in "targeting K-5 students," leaving no doubt that his decision was a response to the specific message of the book. *Id.* at 87:19–88:6. Prior to the vote, a constituent contacted Adams to complain that *Tango* and two other books "promote transexual decisions and homosexual ideas." ECF 220-21 at 3. Adams replied that he "agree[d]" with these "concerns" and would "vote accordingly." *Id.* at 2. The second member, David Williams, stated that the reason he voted to remove *Tango* was because "the fascination is still on, that it's two male penguins raising a chick." ECF 220-24 at 88:8–12. The third member, Paul Fetsko, explained his concern that *Tango*'s "verbiage" (but not its images) conveys "innuendo of sexualizing what was going on with the penguins" and suggested the book might be acceptable if it was "edited, rewritten, to make it less and less of a sexual or even a romantic thing and more of the compassion and nature that nature has." *Id.* at 88:13–89:14.

Other than these statements, the Board members provided no other rationale for their votes to remove *Tango*. In the district court proceedings below, Defendant-Appellee did not dispute any of these statements, disputing only Plaintiffs-Appellants' "characterizations" of them and stating that "the communications speak for themselves." ECF 225 at 3, ¶ 6.

### D.    Procedural History

Plaintiffs-Appellants filed their amended complaint (the "Complaint") in August 2023 in the United States District Court for the Middle District of Florida. ECF 61. The following month, the Middle District of Florida transferred the case to the Northern District of Florida. *See* ECF 79; 87; 88. In October 2023, Defendant-Appellee filed its motion to dismiss for failure to state a claim. ECF 108.

On April 25, 2024, the district court entered its order on the motion to dismiss, dismissing some defendants but allowing the case to proceed against the Escambia County School Board, finding that Plaintiffs-Appellants had plausibly alleged First Amendment claims. ECF 151 at 25–27.

On May 31, Plaintiffs-Appellants served notices on the Board members to obtain their deposition testimony. ECF 157 at 2; 157-1. The following month, Defendant-Appellee moved for a protective order to prevent the Board members from being deposed. *See* ECF 157. In July, the district court denied the protective order without prejudice, inviting Defendant-Appellee to "fil[e] a new motion asserting

legislative privilege . . . on behalf of its [Board members],'' along with their affidavits, rather than on behalf of the Board itself. ECF 163 at 4. Defendant-Appellee followed the district court's direction in filing a renewed motion for a protective order as to each Board member based on legislative privilege. *See* ECF 164 at 4–18. Following briefing and oral argument, the district court decided that the Board members' vote to remove *Tango* "was a quintessential policy decision about how to best educate Escambia County children" and, thus, legislative privilege applied. ECF 191 at 4–5.

On November 22, 2024, the Parties submitted cross-motions for summary judgment. ECF 216; 221. On September 30, 2025, the district court granted summary judgment to Defendant-Appellee and denied Plaintiffs-Appellants' cross-motion, ruling that "[t]he board's decision to remove *Tango* is not subject to First Amendment scrutiny." ECF 261 ("Final Order") at 17. The district court declined to adopt Defendant-Appellee's government speech argument, instead concluding that the First Amendment has no application whatsoever to public school library book removals. *Id.* at 12. Plaintiffs-Appellants timely appealed the district court's Final Order and the court's earlier order granting Defendant-Appellee's renewed motion for a protective order based on legislative privilege, pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment decision *de novo*. *Moms for Liberty - Brevard Cnty. v. Brevard Pub. Schs.*, 118 F.4th 1324, 1329 (11th Cir. 2024). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

This Court reviews the district court's ruling on the protective order for abuse of discretion. *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1125 (11th Cir. 2021). "A ruling based on an error of law or one that reflects a clear error of judgment is an abuse of discretion." *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

*First*, the district court's grant of summary judgment to Defendant-Appellee should be vacated because the First Amendment prohibits censoring public school library books based on viewpoint discrimination. The district court's contrary conclusion conflicts with binding Supreme Court and Eleventh Circuit precedent holding that the government may not suppress speech based on viewpoint. This principle applies in public school settings, including in public school libraries; the district court's creation of a "public library exception" to the First Amendment is wrong. Public school libraries are a government-managed forum for private speech, where viewpoint discrimination is prohibited, not a forum for government speech. Government selection and removal of library books is regulation of that forum, not speech. The only protected speech at issue in this case is that of *Tango*'s authors, Peter Parnell and Justin Richardson, supplemented by the corollary right of students like B.G. to receive information in such a forum. Permitting viewpoint-based book removals would open the door to widespread, dangerous, and unconstitutional censorship.

*Second*, the district court's denial of summary judgment in favor of Plaintiffs-Appellants should be reversed because the undisputed facts establish that the removal of *Tango* was unconstitutional viewpoint discrimination. That conclusion is compelled by the statements of the three Board members who voted to remove *Tango* and the fact that Defendant-Appellee's post-hoc effort to characterize the

removal as a valid content-based decision based on age-inappropriate "reproductive themes" is obvious pretext. Nothing in *Tango* depicts "reproductive themes" or discusses "where babies come from" in sexual terms. Numerous books containing indistinguishable images and themes remain on the District's elementary school library shelves. The only difference is those books' characters are opposite-sex.

*Third*, if the Court vacates the district court's judgment but declines to direct the entry of summary judgment in favor of Plaintiffs-Appellants, then this Court should also reverse the lower court's granting of Defendant-Appellee's protective order based on legislative privilege. Legislative privilege does not shield school board members from discovery about their reasons for decisions to remove individual books, because the act of voting to remove a book is purely administrative, not legislative.

# ARGUMENT

## I.     The First Amendment Prohibits Censoring Books in Public School Libraries Based on Viewpoint Discrimination

The First Amendment constrains public school officials' discretion to remove library books because they disagree with the ideas they contain. There is no "public library exception" to the Constitution's prohibition on viewpoint discrimination by government officials. The district court's contrary conclusion directly conflicts with binding Supreme Court and Eleventh Circuit precedent, which has long limited government regulation of forums like libraries to content-based regulations appropriate to the specific forum—*i.e.*, ensuring books in an elementary school library are age-appropriate and factually accurate—while consistently forbidding viewpoint discrimination—*i.e.*, regulations disfavoring particular perspectives or opinions. While the government can discriminate when it is expressing its own viewpoint, the removal of a library book is regulation of private speech within a forum established by the government, not government speech, and Defendant-Appellee did not meet its burden to prove otherwise. Allowing the district court's ruling to stand or adopting Defendant-Appellee's view of the government speech exception would unleash unprecedented censorship, exposing vulnerable but important ideas to the whims of political power and eroding fundamental rights not only in libraries but in a range of contexts where the government regulates private speech, from public broadcasting to public parks. By contrast, acknowledging that the First Amendment prohibits

viewpoint discrimination does not challenge school districts' broad latitude to engage in content-based curation of elementary school library books in a manner appropriate to the forum, including by removing factually inaccurate and age-inappropriate material.

**A.    Controlling Precedent Establishes That the First Amendment Prohibits Viewpoint Discrimination, Including in Public School Libraries**

The principle that the government may not favor or suppress speech based on viewpoint is longstanding and foundational. *See Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 393 (1993). Even in cases that have divided the Supreme Court, the Justices have always "found common ground in a core postulate of free speech law: The government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). A "bedrock principle underlying the First Amendment" is that officials cannot limit expression "simply because society finds [it] offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (government officials cannot engage in "invidious viewpoint discrimination" that seeks to "drive certain ideas or viewpoints from the marketplace." (marks and citation omitted)); *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 548 (1983) (government actors may not "discriminate invidiously . . . in such a way as to aim at the suppression of dangerous ideas." (marks and

citation omitted)). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994); *see also Hannegan v. Esquire, Inc*., 327 U.S. 146, 158 (1946) ("From the multitude of competing offerings the public," not the government, "will pick and choose.").

The Supreme Court has applied this rule universally, even in settings involving extensive government control over speech and where the rights of individuals are at their lowest ebb. *See, e.g.*, *Greer v. Spock*, 424 U.S. 828, 840 (1976) (military base may not regulate speech in a manner that discriminates based on viewpoint); *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (prison regulation "restricting inmates' First Amendment rights" valid only if advancing a "governmental interest unrelated to the suppression of expression").

This Court, following the Supreme Court's guidance, has recognized that "[t]he First Amendment generally 'forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Moms for Liberty*, 118 F.4th at 1331–32 (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (emphasis omitted)); *see also Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024). This type of "[v]iewpoint discrimination is . . .

'the greatest First Amendment sin.'" *Moms for Liberty*, 118 F.4th at 1332 (quoting *Honeyfund.com*, 94 F.4th at 1277).

The rule against viewpoint discrimination applies in the public school setting. "'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). Even when schools regulate student expression for pedagogical reasons, they may not do so based on viewpoint. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). This Court has emphasized that "*Hazelwood* provides reasons for allowing a school official to discriminate based on *content*," but it offers no "justification for allowing educators to discriminate based on viewpoint." *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989).

Both the Supreme Court and this Court have applied this rule to public school libraries. In *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), eight Justices of the Supreme Court recognized that the First Amendment limits a school board's authority to remove books because of partisan disagreement with their ideas. The Court's plurality opinion made clear that although school boards "possess significant discretion to determine the content of their school libraries," "that discretion may not be exercised in a narrowly partisan or political manner," *id.* at 870, nor may they remove books for disagreement with

the idea presented in those books, *id.* at 872. If a school board intends to deny students access to a book's ideas, and removes the book in accordance with that intention, that removal decision is subject to First Amendment scrutiny. *Id.* at 871.

Justice Blackmun joined the three-justice plurality in this view, holding that "we strike a proper balance here by holding that school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Id.* at 879–80 (Blackmun, J., concurring in part and concurring in the judgment). In his concurrence, Justice White urged a remand for further factual development regarding the government's reasons for removing the book, and by that action acknowledged that the government's reasons are crucial to understanding whether the removal violates the First Amendment. *Id.* at 883.

Even the three dissenting Justices "cheerfully concede[d]" that the First Amendment prohibits public library book removals based on political motivations. *Id.* at 907 (Rehnquist, J., dissenting). For the dissent, the decisive fact in *Pico* was that most of the books at issue "contained demonstrable amounts of vulgarity and profanity," which fell within schools' power to make content based decisions based on age-appropriateness, rather than viewpoint. *Id.* Thus, while *Pico* did not produce a controlling opinion on *how* to apply the First Amendment, it did produce a

controlling opinion that the First Amendment's prohibition on viewpoint discrimination *does* apply. Both this Court and the district court are bound by that holding.

When this Court stated that "*Pico* is of no precedential value," *ACLU*, 557 F.3d at 1200, it was referring to *Pico*'s lack of precedential value for determining *which* First Amendment standard applies. This Court was not called upon to articulate the precise First Amendment standard in *ACLU* because it determined that the nonfiction book in question was factually inaccurate, justifying its removal on content-based grounds consistent with binding precedent prohibiting viewpoint-based discrimination. *See id.* at 1227 (acknowledging that the First Amendment speaks to the question of "whether the . . . [removal] decision . . . was motivated by . . . a desire to promote political orthodoxy and by opposition to the viewpoint of the book."). A district court within this Circuit has likewise concluded that "school officials cannot remove library books solely because they disagree with the views expressed." *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024). That conclusion, grounded in the decades of Supreme Court precedent affirming that the government is not permitted to engage in viewpoint discrimination discussed above, is correct. The district court's failure to adhere to this precedent requires reversal.

**B.**     **The District Court's Rationale for Creating a Public Library Exception to the First Amendment Is Wrong**

Charting a new course inconsistent with binding precedent, the district court created a "public library exception" to the First Amendment. Relying on an outlier case from outside this jurisdiction, *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc), *cert. denied*, No. 25-284, 2025 WL 3507000 (U.S. Dec. 8, 2025), the court concluded that there is no "right to receive information" and thus no First Amendment principle implicated by Defendant-Appellee's decision to censor *Tango*.

This holding is wrong for at least two reasons: *first*, the district court's exclusive focus on a "right to receive information" ignores the First Amendment's separate and independent prohibition on viewpoint discrimination in government-run forums for private speech, including public school libraries; *second*, and regardless, there is a well-established right to receive information.

**1.**     **Public School Libraries Are a Forum for Private Speech in Which There Is a Right to Be Free from Viewpoint Discrimination**

Binding precedent governing the exchange of information and ideas in government-controlled spaces, including public school libraries, establishes that viewpoint discrimination is unlawful, regardless of whether there exists a freestanding right to receive information in that space. "In general, speech restrictions in government-owned spaces are subject to what courts have come to call a 'forum analysis.'"

*Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1316 (11th Cir. 2024). Following the Supreme Court's instruction, this Court has recognized four types of government-controlled spaces: traditional public forums, designated public forums, limited public forums, and nonpublic forums. *McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (en banc).

Several Courts of Appeal have classified public libraries as designated public forums, in which the "government may only impose content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1130–31 (10th Cir. 2012) (internal quotation marks omitted); *see, e.g.*, *id.* at 1128 ("reaffirm[ing]" that libraries are "a type of designated public forum"); *Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003) ("For the purposes of First Amendment analysis, the Library is a limited public forum."); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1259 (3d Cir. 1992) ("[T]he Library constitutes a limited public forum, a type of designated public fora."). This Court need not resolve whether public school libraries are limited or non-public forums because under either theory, reversal is required.

At the very least, public school libraries are nonpublic forums. *ACLU*, 557 F.3d at 1202; *see also* ECF 220-26 at 7 (Defendant-Appellee conceding in its

interrogatory response that "[t]his circuit has held that public school libraries should be characterized as nonpublic forums"). Even the most restrictive government settings where government has the greatest authority to regulate—military bases, prisons, and jails—are treated as nonpublic forums where viewpoint discrimination remains impermissible. *See Greer*, 424 U.S. at 840 (military base); *Thornburgh*, 490 U.S. at 415 (prison); *Adderley v. Florida*, 385 U.S. 39, 47 (1966) (jail).

In nonpublic forums, restrictions on speech must be reasonable in relation to the forum's purpose and remain viewpoint neutral. *Lamb's Chapel*, 508 U.S. at 392–93; *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983) (government may impose speech restrictions in nonpublic forums only when they are reasonable and not "an effort to suppress expression merely because public officials oppose the speaker's view."); *McDonough*, 116 F.4th at 1324 (government can only "impose 'reasonable' regulations on speech in order to 'reserve the forum for its intended purposes,' . . . if those restrictions are viewpoint neutral" (quotations omitted)); *see also Jarrard*, 115 F.4th at 1318–19 ("find[ing] that a rule common to *all* forums" is "that any regulation of speech based on the speaker's viewpoint is presumptively invalid and must, at the very least, satisfy strict scrutiny.").

Where the government creates institutions vested with a mandate to make information widely available to the public—like libraries—or grants them independent

academic, curatorial, or editorial judgment about what information to include and exclude—again, like libraries—it has long been established that those institutions cannot arbitrarily limit access to information "necessary to the proper functioning of those systems." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001). In such contexts, "[t]he First Amendment forb[ids] the Government" from using or regulating a government program "in ways which distort its usual functioning" and may only limit speech as "is necessary for the program's purposes and limitations." *Id.* at 543. Thus, even where "content-based considerations . . . may be taken into account" because of "the nature" of the program, those considerations must be closely tied to that program's nature and purpose. *Finley*, 524 U.S. at 585–86; *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (emphasizing the "nature" of public broadcasting in explaining what First Amendment restrictions apply to it).

Applying these longstanding legal principles to libraries, it is clear that although it may be appropriate for the government to remove a book from an elementary school public library for viewpoint-neutral reasons appropriate to the library's purpose—such as age-inappropriateness, factual inaccuracy, or a lack of appreciable interest from the library's readership—a book cannot be censored due to political pressure or because its views are disfavored by the government. *See Honeyfund.com*, 94 F.4th at 1281 ("Banning speech on a wide variety of topics is bad; banning speech on a wide variety of political viewpoints is worse."). Those justifications would be

unreasonable in light of the purposes of public school libraries, *see* ECF 220-3 at 9–10 (District Media Policy emphasizing a need for materials that "reflect differing and/or opposing viewpoints" as part of the "Purpose of the Library"); ECF 220-1 at ¶¶ 12, 22–23(e) (underscoring that the purpose of a school library includes providing materials reflecting the diverse views and experiences of the school district community and wider world), and impermissibly viewpoint based, *see ACLU*, 557 F.3d at 1227.

The court below denied Plaintiffs-Appellants an opportunity to establish that the removal of *Tango* fell into that category of unreasonable viewpoint-based removals and instead invented a First Amendment exception for public school libraries. The district court held that "when the government decides which books to choose, it is not creating a forum for others to speak." Final Order at 12. But that misses the point. The *library* is the forum, not the selection process. If a military base and a prison are nonpublic forums, *Greer*, 424 U.S. at 840; *Thornburgh*, 490 U.S. at 415, it defies logic to suggest that a public library—an institution dedicated to the dissemination of knowledge—creates no forum for speech at all. And because public libraries are a forum for the exploration and exchange of ideas, the government may only exercise its discretion to choose what ideas to include or exclude based on viewpoint-neutral reasons appropriate to the library's purpose.

Plaintiffs-Appellants' right to be free from viewpoint discrimination in this forum is a harm additional to and independent of the limitation on Plaintiffs-Appellants' ability to convey or receive information—the latter of which is discussed *infra*, Part I.B.2. *See Pico*, 457 U.S. at 879 (Blackmun, J., concurring); *see also Vazzo v. City of Tampa*, No. 8:17-cv-2896, 2019 WL 1048294, at \*8, \*10 (M.D. Fla. Jan. 30, 2019) (finding plaintiffs plausibly alleged a city ordinance was unconstitutional viewpoint discrimination in addition to, and as a separate count from, violating the First Amendment's right to receive information), *R. & R. adopted*, 2019 WL 1040855 (Mar. 5, 2019), *aff'd*, No. 19-14387, 2023 WL 1466603 (11th Cir. Feb. 2, 2023) (per curiam). Thus, the district court's rejection of a "right to receive information" was not a valid basis for granting summary judgment to Defendant-Appellee. Regardless of the right to receive information, the government cannot engage in viewpoint discrimination, and Plaintiffs-Appellants were entitled to a ruling on whether the removal of *Tango* was unlawful viewpoint discrimination or lawful content-based regulation consistent with the nature and purpose of public school libraries.

### 2. The Right to Receive Information Is Well Established

The district court's rejection of a right to receive information is also wrong. The First Amendment's protection of the "right to receive information and ideas" has long been "well established." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see*

*also, e.g.*, *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds," including by "telling a man . . . what books he may read." *Stanley*, 394 U.S. at 565. The First Amendment not only "foster[s] individual self-expression" but also "afford[s] the public access to discussion, debate, and the dissemination of information and ideas." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978).

The district court rejected this important principle on the basis that "there is a difference between asserting the right to receive information and demanding that the government provide that information." Final Order at 13. That underlying observation is correct, but it does not support the district court's conclusion that the First Amendment is inapplicable to library book decisions. The government is not obliged to create libraries, but if it does, it may not use them as a vehicle for viewpoint discrimination. That flows directly from the Supreme Court's holdings in *Velazquez*, 531 U.S. at 548 ("Congress was not required to fund" organizations "to represent indigent clients," but once it did so, it could not "define the scope of the litigation it funds to exclude certain vital theories and ideas"), and *Rosenberger v. Rector of the University of Virginia*, 515 U.S. 819, 829 (1995) (the university was not required to

fund student publications, but once it did so, it could not "discriminate" against certain publications "on the basis of [their] viewpoint.")

In sum, the district court was wrong on three independent levels: it refused to apply the settled rule that the First Amendment's ban on viewpoint discrimination applies in the public-school context, including to decisions about school library collections; it overlooked that the prohibition on viewpoint discrimination is independent of the right to receive information; and it ignored binding case law establishing that a right to receive information does exist. Its "public library exception" to the First Amendment should be rejected.

## C. The Government Speech Doctrine Does Not Insulate Library Censorship from First Amendment Scrutiny

In addition to the rationale the district court adopted, Defendant-Appellee argued below that the First Amendment does not apply because the speech at issue here is government speech. As established in Part I.B.1, *supra*, public school library book selection is government regulation of a forum for speech, not "government speech." The speech at issue in this case is not the speech of the government. It is the speech of *authors*, like the Plaintiffs-Appellants Peter Parnell and Justin Richardson, augmented by the corollary right of their audience to read their books. Thus, the government speech doctrine has no application here and the district court rightly declined to accept Defendant-Appellee's alternative argument. Final Order at 12. Additionally, the undisputed facts establish that Defendant-Appellee did not and

cannot meet its burden to establish that Escambia County's public-school libraries are forums for government speech.

### 1. Public Library Book Selection Is Government Regulation, Not Government Speech

Government decisions to curtail the ability of authors and readers to exchange ideas in a library are not government speech exempt from First Amendment scrutiny. Defendant-Appellee argued below that book selection and removal decisions express a government message about what "books are worth reading." Final Order at 10 (quoting *Little*, 138 F.4th at 837). That is government regulation, not government speech. Any government regulation could be said to convey a message that the permitted object or activity is appropriate for its intended purpose. Just as the government does not "speak" through selecting what trademarks are worthy of protection, *see Matal v. Tam*, 582 U.S. 218, 236 (2017), so the government does not "speak" through selecting the books available on public school library shelves. As the district court observed below, selecting books is only "expressive" in the sense that "any decision could be considered expressive." Final Order at 10.

Accepting Defendant-Appellee's argument would radically expand the government speech doctrine beyond its purpose. The reason the First Amendment does not constrain government speech is to ensure the government is free to express its own viewpoint. When the Supreme Court held that Texas's specialty license plate program was government speech, it did so because the *license plates themselves*

conveyed government speech, not because the government's *selection process* for the license plates was government speech. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("In our view, specialty license plates issued pursuant to Texas's statutory scheme convey government speech.").[1] Specifically, the Court reasoned that the history of license plates shows "they long have communicated messages from the States," the public closely associated license plate designs with the state, and Texas maintained direct control over the messages conveyed on the specialty license plates. *Id.* at 211–13. None of those things are true of the books in public school libraries.

Conceiving of government regulation as speech is also foreclosed by the Supreme Court's forum-analysis cases, which courts have consistently applied for decades. Decisions about library books no more convey a government message than do decisions about which student programs are worthy of public university funding,

---

[1] Other government speech cases even more clearly affirm that the doctrine is limited to the government's conveyance of specific messages and does not encompass regulatory decisions about private speech. *See Shurtleff v. City of Boston*, 596 U.S. 243, 262 (2022) (government speaks "when an official gives a speech in a representative capacity or a governmental body issues a report") (Alito, J., concurring in the judgment); *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) ("Governments have long used monuments to speak to the public."); *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021) ("governments of all kinds have from time immemorial used parades to communicate" specific messages). Library books are not public monuments or military parades. Public libraries are forums for the exchange of ideas, not vehicles for a particular message.

which the Supreme Court held are subject to First Amendment limits in *Rosenberger*, 515 U.S. at 834–35; public school decisions about what content is worthy of publication in a student newspaper, which the Supreme Court held is subject to First Amendment limits in *Hazelwood*, 484 U.S. at 271–73; public broadcasters' decisions about which candidates to platform in a public debate, which the Supreme Court held is subject to First Amendment limits in *Arkansas Education Television Commission v. Forbes*, 523 U.S. at 672–73; regulators' decisions about what content is worthy of being broadcast, which the Supreme Court held is subject to First Amendment limits in *FCC v. League of Women Voters of California*, 468 U.S. 364, 375–76, 395 (1984); or jail officials' decisions about which volunteer ministry programs are worthy of permitting to operate in their facilities, which this Court held is subject to First Amendment limits in, *Jarrard*, 115 F.4th at 1319. Accepting the Board's arguments about government speech here would enable viewpoint discrimination in those contexts as well—irrationally, dangerously, and contrary to binding law.

The Supreme Court has called for the "exercise of great caution" against expansive interpretations of the government speech doctrine because of the risk it could "silence or muffle the expression of disfavored viewpoints" by "simply affixing a government seal of approval" to speech not directly or clearly communicating a

specific government message. *Matal*, 582 U.S. at 235. That is exactly what the application of government speech in this context would do. The Court should reject it.

### 2. The Board Did Not Meet Its Burden to Prove Its Government-Speech Defense

As the foregoing establishes, Defendant-Appellee's book selection and removal process is not the speech at issue; that process is regulation, not speech. The speech at issue here is *Tango*, and the District's library books more generally. That conclusion compels summary judgment for Plaintiffs-Appellants. Defendant-Appellee never disputed that library books are private speech, *see* ECF 216 at 10 ("Simply because a library shelf contains a collection of seemingly disparate ideas and viewpoints, does not mean it is a forum for private speech."); ECF 228 at 5, and Defendant-Appellee bore the burden of establishing they were government speech. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 n.9 (2003).

In any case, the record forecloses any finding that *Tango*—or any other book—becomes government speech when it is given a forum in a public school library. To assess whether expression constitutes government speech—"a holistic inquiry"—the Court evaluates three factors including "the history of the expression at issue; the public's likely perception as to who [] is speaking; and the extent to which

the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252; *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1288–89 (11th Cir. 2024), *cert. denied*, 2025 WL 3198583 (Mem.). All three factors establish that government speech is not present here.

The history factor asks whether the speech activity has "tradition[ally] . . . [and] usually convey[ed] the [government's] messages." *Shurtleff*, 596 U.S. at 254. Library books—individually or collectively—do not communicate any specific government viewpoint; on the contrary, the history and tradition of District libraries has been to provide access to a wide range of diverse ideas and opposing viewpoints. "District libraries have historically fostered the free exchange of ideas and served to fulfill students' intellectual curiosity about a diversity of subjects." ECF 227 at 12 (expert testimony and undisputed historical evidence that public school libraries do not have any tradition of communicating government messages). The District's Media Policy governing book selection and removals reflects this tradition, stating its goal of "provid[ing] students with access to wide variety of quality materials that reflect the diverse views and experiences of not only the school district's community but also the wider world," ECF 227 at 12; ECF 220-1 ¶ 12, as well as "provid[ing] education media that reflect differing and/or opposing viewpoints," ECF 220-1 at ¶ 23(d) (internal quotation marks omitted).

This is consistent with the longstanding tradition of public-school libraries in America. The American Library Association (the "ALA"), a professional and educational organization founded in 1876 with the purpose of preserving public libraries, including public school libraries, has published guidance that supports public school libraries' history of providing diverse information unfettered by partisan beliefs. ECF 220-1 at ¶¶ 17–19. For instance, the ALA adopted the *Library Bill of Rights* in 1939, setting out foundational principles that are to govern all types of libraries, including the principle that libraries should "support equal access to diverse information." *Id.* at ¶ 19(a). These core ALA principles govern the libraries of over 5,000 member organizations—including the District's libraries, *id.* at 5 n.2—and 44,000 individual members, *id.* at ¶ 17. Against this panoply of evidence about the tradition of public school libraries, Defendant-Appellees offered none.

The endorsement and control prongs ask "whether the public would tend to view the speech at issue as the government's" and to what extent the government entity controls the speech. *Shurtleff*, 596 U.S. at 255–56. No reasonable person would believe that the District's library books espouse any particular government message. The District's Media Policy specifically states that the District does not "advocate[] or endorse[] the contents" of its educational media. ECF 220-3 at 10; 227 at 14–15. The Board also does not maintain the type of control that is characteristic of government speech. The only type of control that the Board engages in is

regulatory control, which the Supreme Court has found does not establish government speech. *Matal*, 582 U.S. at 235. Regulatory control does not transform a forum for speech into government speech, including in the context of public schools. *See, e.g.*, *Hazelwood*, 484 U.S. at 271, 274–76; *see also* Part I.C.1, *supra*.

In sum, public school library book selection is regulation of a government forum for private speech, not government speech. Defendant-Appellee's arguments for applying the doctrine should, therefore, be rejected. Regardless, Defendant-Appellee failed to meet its burden to show that the three *Shurtleff* factors, when applied to the facts in the record, establish government speech. The government speech doctrine thus cannot support summary judgment for Defendant-Appellee.

### D.    Allowing Viewpoint-Based Book Removals Would Sanction Dangerous and Unconstitutional Censorship

Declining to enforce the First Amendment's protection against viewpoint discrimination here would invite dangerous censorship antithetical to American law and tradition. Neither the district court's ruling nor Defendant-Appellee's government speech argument places *any* First Amendment constraint on library book decisions. If the Court adopts either rationale, then government officials may broadly remove books because they dislike the ideas expressed or wish to suppress certain political, social, or religious perspectives. Allowing officials to strip public school libraries of books because of ideological disagreement would weaponize the machinery of education to entrench political power and threaten important but

vulnerable ideas. A school board, for instance, could purge books that present moral or family topics from a religious perspective while leaving comparable secular titles untouched. As the Supreme Court explained in *Rosenberger*, the Constitution does not permit a school to allow discussion of a topic yet "select[] for disfavored treatment [] student journalistic efforts with religious editorial viewpoints" on that very topic. 515 U.S. at 831; *see also*, *Honeyfund.com*, 94 F.4th at 1279 (favoring certain viewpoints "violates the First Amendment, which demands an equality of status in the field of ideas." (internal quotation marks omitted)).

A school board could also systematically skew the book selection and removal process to promote specific political views and suppress others. The First Amendment protects not whichever political majority happens to control a school board, but the process of open debate on which self-government depends. As the Supreme Court explained in *Barnette*, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." 319 U.S. at 642. That is particularly so in schools, as the Supreme Court has long warned that "[i]n our system, state-operated schools may not be enclaves of totalitarianism," and "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker*, 393 U.S. at 511.

Equally, emboldening censorship risks transforming the election cycle into a chaotic cycle of library purges: a newly-elected school board could remove books with disfavored viewpoints, but the next administration could restore those books and target the opposite views. In swing districts, public school libraries could thus become partisan spoils of victory, their shelves rewritten with every shift in local politics. That is not republican democracy—it is the antithesis of it. And as the Supreme Court has underscored repeatedly, "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

The district court suggested that distinguishing viewpoint discrimination from permissible content regulation is "impossible." Final Order at 14. Not so. This kind of line-drawing is not novel and courts have successfully done it for decades in claims involving viewpoint discrimination. *See, e.g.*, *Rosenberger*, 515 U.S. at 832 (distinguishing permissible regulation of student groups from viewpoint discrimination); *Lamb's Chapel*, 508 U.S. at 394 (distinguishing permissible regulation of public access from viewpoint discrimination); *Cornelius*, 473 U.S. at 812–13 (distinguishing permissible content-based decisions about federal sponsorship for charity solicitation from viewpoint discrimination). Courts have also done such line-drawing successfully in cases involving government programs that necessarily pick and

choose among private speech. *See, e.g.*, *Finley*, 524 U.S. at 583 (recognizing discretion in awarding National Endowment for the Arts grants); *Forbes*, 523 U.S. at 683 (upholding public broadcaster's exclusion of candidate from televised debate as viewpoint neutral).

In any case, difficult line-drawing is no license to abdicate constitutional duty. *See, e.g.*, *Rosenberger*, 515 U.S. at 829–31, 835; *see also Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019) (noting that viewpoint discrimination must be separated from content-based restrictions to ensure the "censor [does not] deprive the citizen of the opportunity to persuade"). As this Court made clear, "when a particular decision implicating the First Amendment 'has no valid educational purpose . . . the First Amendment is so directly and sharply implicated as to require judicial intervention.'" *Searcey*, 888 F.2d at 1319–20 (quoting *Hazelwood*, 484 U.S. at 273). This Court's rejection of the notion "that federal courts may substitute their own findings and opinions about educational suitability for those of a school board whenever the board's motive for an action is questioned," *ACLU*, 557 F.3d at 1227, is not a reason to avoid scrutinizing school board decisions, as the district court wrongly suggested, *see* Final Order at 15; it is a guardrail to ensure that such necessary scrutiny is exercised responsibly. Courts' ability to do so also reveals the "parade of horribles" often invoked by proponents of library censorship—the prospect of age-inappropriate or factually inaccurate books being

unremovable from elementary school libraries, for example—to be a wildly exaggerated concern.

Thus, to ensure that the First Amendment is not a mere "parchment barrier," The Federalist No. 48, at 333 (J. Madison), but a meaningful protection against the imposition of government orthodoxy, the Court should reverse the district court's erroneous failure to apply the First Amendment to the censorship of library books.

## II. The Undisputed Factual Record Warrants Summary Judgment in Plaintiffs-Appellants' Favor on Their Viewpoint Discrimination Claim

The district court erred as a matter of law by refusing to apply the First Amendment's prohibition on viewpoint discrimination to the Board's removal of *Tango*. That error alone requires vacatur of the judgment below. But this Court can, and should, go further and direct entry of summary judgment for Plaintiffs-Appellants because the undisputed facts demonstrate unconstitutional viewpoint discrimination. Defendant-Appellee has never disputed that if the reason for *Tango*'s removal was the book's inclusive and responsible message about same-sex, adoptive parenting, that would constitute viewpoint discrimination. The record shows that *is* the reason *Tango* was removed.

*First*, the statements of the Board members regarding their reasons for removing *Tango* establish this was the reason. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (recognizing in an equal protection case that officials' statements can evidence unconstitutional motive). The statements of

all three members focus on the fact that the two penguin parents are male and that the book conveys that they are in love and are a family; no other rationale is offered. ECF 220-24 at 87:19–88:6; *id.* at 88:8–12; *id.* at 88:13–89:14. One member publicly pointed to his concern about the author's "aggressive" promotion of the book's message, *id.* at 88:4–6, and privately affirmed his agreement that the message he was responding to was to "promote . . . homosexual ideas," ECF 220-21, and committed to remove the book for that very reason. The Board members were well aware that the petition challenging *Tango* was expressly and solely based on what the petitioner described as the book's "political gay agenda" and "LGBTQ agenda using penguins." ECF 220-2 at 137, 158. These words and this context leave room for no other plausible interpretation of the vote.

*Second*, the only purportedly lawful content-based rationale Defendant-Appellee offered in litigation—*Tango*'s purported concern with "reproductive themes" including the concept of "where babies come from"—is obviously false and pretextual. The book itself is the proof: *Tango* contains no sexual conduct or innuendo and has no "reproductive themes" other than a reference to the fact that penguins hatch from eggs. *See* ECF 61-1 (copy of *Tango*). All *Tango* depicts is a true story with adorable animals in a zoo and a positive view of same-sex, adoptive parents. *Id*.

The Board's continued inclusion of books with indistinguishable content, but featuring opposite-sex pairs, further confirms the false and pretextual nature of Defendant-Appellee's purported content-based rationale. *See, e.g.*, *Cornelius*, 473 U.S. at 812 (recognizing that selective exclusion of speech while permitting others with similar characteristics may undermine the "genuineness" of the government's asserted justification and indicate viewpoint discrimination). At least two other picture books maintained by the District contain "similar information and imagery about the mating, nesting, and chick-rearing practices" shown in *Tango*, except that *Tango* depicts two male penguins. *See* ECF 220-1 at ¶ 30(a)–(b). For instance, *Tango* shows the parent penguins side-by-side as one keeps the egg warm in the nest. ECF 61-1 at 25. *The Emperor Lays an Egg* includes substantially similar imagery, with opposite-sex parents next to each other as one "cuddles" the egg beneath his body. *See* ECF 220-1 at ¶ 30(a). The District also retains numerous books, such as *The Lion King* and *Beauty and the Beast*, depicting characters who are innocently affectionate in a manner indistinguishable from the characters in *Tango*. *Id.* at ¶ 40(c). The record thus shows the Board removed *Tango* while retaining materially similar books with opposite-sex penguin parents.

None of these facts are in dispute. There is no evidence in the record to suggest any legitimate, content-based reason for removing *Tango* from Escambia County's public school libraries, only evidence pointing to a rationale that Defendant-

Appellee has never contested is viewpoint discrimination. Accordingly, this Court should reverse and direct entry of summary judgment for Plaintiffs-Appellants.

## III. Legislative Privilege Does Not Shield School Board Members from Discovery About Their Decisions to Remove Individual Books

The record is clear enough in this case to direct the district court to enter summary judgment for Plaintiffs-Appellants. *See* Part II, *supra.* Should the Court decline to direct entry of summary judgment, however, it should reverse the district court's erroneous ruling on legislative privilege. The Board's decision to remove *Tango* was an administrative, not a legislative, act and Plaintiffs-Appellants are entitled to an opportunity to more fully develop the record supporting their viewpoint discrimination claim by inquiring into the reasons and motivations of individual Board members.

Legislative immunity—from which legislative privilege is derived—shields government officials from suit "when they take actions that are 'an integral part of the deliberative and communicative processes by which [legislators] participate in . . . proceedings with respect to the consideration and passage or rejection of proposed legislation.'" *Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) (quoting *Gravel v. United States*, 408 U.S. 606, 625 (1972)). A particular act is legislative if it "is characterized by having a policymaking function and general application," *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1011 (11th Cir. 1992), which results in

"prospective, legislative-type rules," *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009) (internal quotation marks omitted).

This Court has stressed "that a legislator's vote constitutes the act of 'legislating,' and thus cloaks the legislator with immunity, *if* the vote is cast for or against the enactment of a law." *Smith*, 45 F.3d at 405 (emphasis in original) (internal citations omitted). Such protection, however, does not exist for administrative (or "ministerial") acts. *See id.* at 406; *see also Crymes v. DeKalb Cnty., Ga.*, 923 F.2d 1482, 1485 (11th Cir. 1991). Conduct is administrative or ministerial if it is specific and responds to a particular occurrence. *E.g.*, *Crymes*, 923 F.2d at 1485. Examples of administrative acts include a decision to terminate an individual's employment, *Bryant*, 575 F.3d at 1306, as well as acts of zoning enforcement, *Crymes*, 923 F.2d at 1485. As it conceded in its briefing below, the Board's book removal procedure is "ministerial in nature." ECF 111 at 4–5.

The district court held that the Board's decision to remove *Tango* was "a quintessential [legislative] policy decision." ECF 191 at 4. Not so. Decisions related to specific people or specific facts—like the Board's decision to remove a specific book, *Tango*—are administrative under the framework established by this Court in *Crymes*. 923 F.2d at 1485. The Board did not pass a bill or promulgate any policy or generally applicable rule. Its decision involved only the highly specific review and examination of *Tango* under existing policies and procedures in response to a

particular District resident's book challenge appeal, a decision lacking any direct legal implications for any other book challenge. That *Tango* was made "unavailable in all Escambia school libraries and thus to all Escambia students" is of no matter. ECF 191 at 4. This Court has made clear that as long as the decision is tied to specific facts—whether it impacts one individual or several—it is likely administrative. *Crymes*, 923 F.2d at 1485 ("Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature"). Moreover, this Court has repeatedly held that applications of existing policy, as opposed to deliberative processes connected to proposed legislation, are administrative not legislative. *See, e.g.*, *Smith*, 45 F.3d at 405–06; *Crymes*, 923 F.2d at 1485.

As one district court in this Circuit recently concluded, a decision to remove or restrict a particular book "is functionally an administrative act." *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 787 F. Supp. 3d 1292, 1297 (N.D. Fla. 2024), *appeal docketed*, No. 25-13298 (11th Cir. Sept. 23, 2025)*.* In *PEN*, the court explained that "just like there is a functional difference between the adoption of a zoning ordinance (legislative act) and the application of the ordinance to a specific permit application (administrative act), there is a functional difference between the school board's adoption of a policy detailing what content is generally prohibited in school library books and the board's determination that a specific book must be removed from school libraries because it contains such content." *Id.* at 1297–98.

For these straightforward reasons, the Court should hold that the decision to remove *Tango* was an administrative act and, if the Court does not direct summary judgment for Plaintiffs-Appellants on the existing record, reverse the district court's protective order precluding the Board members from being deposed.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand to the district court with instructions to enter summary judgment in Plaintiffs-Appellants' favor. In the alternative, the Court should vacate the district court's summary judgment decision, reverse the district court's ruling that legislative privilege bars discovery into the Board members' reasons for removing *Tango*, and remand for further proceedings consistent with those rulings.

Dated: December 17, 2025

Respectfully submitted,

SELENDY GAY PLLC

By: /s/ *Corey Stoughton*

Faith E. Gay
Corey Stoughton
Lauren J. Zimmerman
Joshua W. Bean
Joshua M. Cockream
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
cstoughton@selendygay.com
lzimmerman@selendygay.com
jbean@selendygay.com
jcockream@selendygay.com

Anna T. Neill
SPERLING KENNY NACHWALTER,
P.A. 1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
aneill@sperlingkenny.com

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(A) and Eleventh Circuit Rule 32-4 because it contains 9,823 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

The undersigned further certifies that this Brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface of Times New Roman 14-point font.

*/s/ Corey Stoughton*
Corey Stoughton

# CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2025, I electronically filed the foregoing Plaintiffs-Appellants' Brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Corey Stoughton*
Corey Stoughton