# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

PETER PARNELL, et al.,

Plaintiffs-Appellants,

v.

SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Florida
Hon. Allen Winsor
Case No. 4:23-cv-00414-AW-MAF

## BRIEF OF *AMICI CURIAE* FREEDOM TO READ FOUNDATION and AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS IN SUPPORT OF APPELLANTS AND REVERSAL

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 218-3389
Fax: (917) 344-1394
owolfe@seyfarth.com

*Attorneys for Amici Curiae Freedom to Read Foundation and American Association of School Librarians*

Dated: December 23, 2025

## DISCLOSURE STATEMENT
## AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* disclose as follows:

1. Freedom to Read Foundation is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

2. American Association of School Librarians is a not-for-profit organization and a division of the American Library Association, which is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

Pursuant to Local Rule 26.1-1, *amici curiae* disclose the following interested parties:

1. American Civil Liberties Union – *Amicus Curiae*

2. Bean, Joshua W. – Counsel for Plaintiffs/Appellants

3. B.G., by and through her parent, Raymond Guillory – Plaintiff/Appellant

4. Blechman, William J. – Counsel for Plaintiffs in District Court

5. Boehm, Korey – Counsel for Plaintiffs in District Court

6. Cockream, Joshua M. – Counsel for Plaintiffs/Appellants

7. Duke, Samantha Crawford – Counsel for Defendant/Appellee

8. Fitzpatrick, The Honorable Martin A. – United States District Court Magistrate Judge

9. Gay, Faith E. – Counsel for Plaintiffs/Appellants

10. Grosholz, Jeffrey J. – Counsel for Defendant/Appellee

11. Marsey, John David – Counsel for Defendant/Appellee

12. Neill, Anna T. – Counsel for Plaintiffs/Appellants

13. Parnell, Peter – Plaintiff/Appellant

14. Posdal, Bradley – Counsel for Plaintiffs in District Court

15. Richardson, Justin – Plaintiff/Appellant

16. Rumberger, Kirk & Caldwell, P.A. – Law Firm of Defendant/Appellee

17. School Board of Escambia County, Florida – Defendant/Appellee

18. Selendy Gay, PLLC – Counsel for Plaintiffs/Appellants

19. Seyfarth Shaw LLP – Counsel for *Amici Curiae* Freedom to Read Foundation and American Association of School Librarians

20. Smith, Nicole Sieb – Counsel for Defendant/Appellee

21. Sperling Kenny Nachwatler, P.A. – Counsel for Plaintiffs/Appellants

22. Stoughton, Corey – Counsel for Plaintiffs/Appellants

23. Sykes, Emerson – Counsel for *Amicus Curiae* American Civil Liberties Union

24. Ulrich, Ashley – Counsel for Plaintiffs in District Court

25. Winsor, The Honorable Allen C. – United States District Court Chief Judge; Trial Judge

26. Wolfe, Owen R. – Counsel for *Amici Curiae* Freedom to Read Foundation and American Association of School Librarians

27. Zimmerman, Lauren J. – Counsel for Plaintiffs/Appellants

# **TABLE OF CONTENTS**

Page

DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED
PERSONS .................................................................................................... i

TABLE OF CONTENTS.................................................................... iv

TABLE OF AUTHORITIES…………………………………………vi

I. STATEMENT OF INTEREST ................................................1

II. STATEMENT OF CONTRIBUTIONS ...................................2

III. SUMMARY OF THE ARGUMENT .......................................3

IV. ARGUMENT............................................................................4

    A. Libraries are crucial to American democracy .......................4

    B. School libraries are critical to our democracy......................5

    C. Robust school libraries result in better student outcome. ....6

    D. Librarians rely upon set standards to curate school libraries ...............7

    E. The Board ignored library curation standards and engaged in viewpoint discrimination by banning *Tango*......................10

    F. The District Court failed to properly analyze the First Amendment right to receive information ..........................14

        1. The Supreme Court has repeatedly reaffirmed the right to receive information .................................................14

        2. The District Court misunderstood this Court's prior decision in *ACLU*.................................................16

        3. The District Court relied upon inapposite authorities...............18

    G. The purported availability of *Tango* from other sources does not prevent a constitutional violation ......................20

    H. The Board's actions were not government speech.............21

**1.** School libraries are extracurricular ............................................22

**2.** The government does not speak through the contents of library shelves ...........................................................24

**3.** The most persuasive authorities hold that library collections are not government speech .....................................27

**V.** CONCLUSION.............................................................................28

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ........................................................16, 17, 18, 19

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ........................................................22, 24

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982)................................................12, 14, 17, 18, 23

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011)........................................................11, 14

*Case v. Unified Sch. Dist. No. 233*,
908 F. Supp. 864 (D. Kan. 1995)........................................................23

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ........................................................24

*Counts v. Cedarville Sch. Dist.*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ........................................................20

*Epperson v. State of Ark.*,
393 U.S. 97 (1968)........................................................11

*Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*,
684 F. Supp. 3d 879 (W.D. Ark. 2023) ........................................5, 7, 11, 15, 28

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ........................................................27

*González v. Douglas*,
269 F. Supp. 3d 948 (D. Az. 2017)........................................................22

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)........................................................11

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ........................................................19, 28

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021)....................................................................15

*Mahmoud v. Taylor*,
145 S.Ct. 2332 (2025).............................................................16, 22

*Martin v. City of Struthers*,
319 U.S. 141 (1943)....................................................................11

*Matal v. Tam*,
582 U.S. 218 (2017)...........................................................21, 25, 27

*Minarcini v. Strongville City Sch. Dist.*,
541 F.2d 577 (6th Cir. 1976) ......................................................10

*Packingham v. North Carolina*,
582 U.S. 98 (2017).......................................................................15

*PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*,
711 F. Supp. 3d 1325 (N.D. Fl. 2024) .........................................27

*Penguin Random House LLC v. Gibson*,
2025 U.S. Dist. LEXIS 163022 (M.D. Fl. Aug. 13, 2025),
*appeal pending*, Case No. 25-13181.............................................27

*Perry Educ. Assn. v. Perry Local Educators' Assn.*,
460 U.S. 37 (1983)................................................................12, 19

*Right to Read Def. Comm. v. Sch. Comm.*,
454 F. Supp. 703 (D. Mass. 1978) ........................................... 23-24

*Roberts v. Madigan*,
702 F. Supp. 1505 (D. Colo. 1989)........................................... 11-12

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)..........................................................13, 19, 24

*Sheck v. Baileyville School Committee*,
530 F. Supp. 679 (D. Me. 1982) ...............................................15, 23

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)................................................................21, 25

vii

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)...............................................................................11, 15, 16

*U.S. v. Am. Library Ass'n*,
539 U.S. 194 (2003)...........................................................................................18

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) .....................................................................15, 23

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)...........................................................................................12

## Other Authorities

*AASL Standards Framework for Learners*, AM. ASS'N OF SCH.
LIBRARIANS (2017), available at https://standards.aasl.org/wp-
content/uploads/2017/11/AASL-Standards-Framework-for-
Learners-pamphlet.pdf.........................................................................................9

*Access to Resources and Services in the School Library: An
Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N
(2025), available at
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations
/accessresources.................................................................................................8

*And Tango Makes Three*, SIMON & SCHUSTER,
https://www.simonandschuster.com/books/And-Tango-Makes-
Three-(School-and-Library-Edition)/Eliot-
Schrefer/9781665960281 (last visited Dec. 22, 2025) ......................................10

BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION
SCIENCES, SCHOOL LIBRARIES (4th ed. 2017)................................................6, 20

Briana Hovendick Francis, et al., *School Librarians Continue to Help
Students Achieve Standards: The Third Colorado Study*, LIBRARY
RESEARCH SERVICE (2010), available at
https://files.eric.ed.gov/fulltext/ED514556.pdf...................................................6

*Code of Ethics*, AM. LIBR. ASS'N (2021), available at
https://www.ala.org/tools/ethics ............................................................... 7-8, 10

*Diverse and Inclusive Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2025), available at https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/diversecollections ................................................9

Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008), available at https://digital.library.unt.edu/ark:/67531/metadc9800/ ......................................6

*IFLA Guidelines for Library Services to Children aged 0-18*, INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018), available at https://www.ifla.org/wp-content/uploads/2019/05/assets/libraries-for-children-and-ya/publications/ifla-guidelines-for-library-services-to-children_aged-0-18.pdf ................................................9

*Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017), available at https://www.ala.org/advocacy/intfreedom/librarybill/interpretations ................................................8

James Madison, *Letter from James Madison to W.T. Barry*, LIBRARY OF CONGRESS (Aug. 4, 1822), available at https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text .........3, 14, 14

Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381 (2012) ................................................4

Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001), available at https://files.eric.ed.gov/fulltext/ED456861.pdf ................................................7

Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012), available at https://files.eric.ed.gov/fulltext/ED543418.pdf ................................................6

Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018), available at http://kappanonline.org/lance-kachel-school-librarians-matter-years-research/ ................................................................7

Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993) ............................................6

Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012), available at https://files.eric.ed.gov/fulltext/ED572250.pdf ...................................6

*Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), available at https://www.ala.org/advocacy/intfreedom/librarybill .......................7, 8, 9, 10

Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, INFO. & CULTURE A J. OF HIST. 1,1 (2012), available at https://www.researchgate.net/profile/Michael-Kevane/publication/265724905_The_Development_of_Public_Libraries_in_the_United_States_1870-1930_A_Quantitative_Assessment/links/549f133a0cf257a635fe7233/The-Development-of-Public-Libraries-in-the-United-States-1870-1930-A-Quantitative-Assessment.pdf?_sg%5B0%5D=started_experiment_milestone&origin=journalDetail&_rtd=e30%3D ....................................5

Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU EDUC. & L.J. 103 (2005) ..........................4, 5

Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89 (1997) ............................................................................20

U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005), available at https://nces.ed.gov/pubs2005/2005324.pdf .......................................6

# I.  STATEMENT OF INTEREST

The Freedom to Read Foundation ("FTRF") was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The American Association of School Librarians ("AASL") is the preeminent national professional association for school librarians.  All aspects of the association's work reflect its core values: innovation, learning, collaboration, intellectual freedom, and equity, diversity, and inclusion.  AASL is committed to ensuring that all learners have a school library collection that is physically and intellectually accessible and where access is best met at the time of need.

*Amici curiae* believe that viewpoint censorship violates the core value of preserving intellectual freedom and that students have an important First Amendment right to receive information free of viewpoint discrimination.  *Amici* thus have a strong interest in the outcome of this case.

Appellants and Appellee consent to the filing of this *amici curiae* brief.

## II. <u>STATEMENT OF CONTRIBUTIONS</u>

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici curiae* state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the *amici curiae*, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

## III.  SUMMARY OF THE ARGUMENT

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." James Madison, *Letter from James Madison to W.T. Barry*, LIBRARY OF CONGRESS (Aug. 4, 1822).

Defendant-Appellee School Board of Escambia County, Florida (the "Board") undermined the purpose of the school library, and violated the First Amendment, by banning *And Tango Makes Three* ("*Tango*") from school libraries.  The Board's action was contrary to the history and purpose of libraries; well-established curation standards employed by trained librarians; and the First Amendment.  The prohibition was improper viewpoint discrimination, and also violated students' right to receive information.

In nonetheless ruling for the Board, the District Court erred.  The District Court essentially held libraries are free to remove books whenever they disagree with the viewpoints therein, and that doing so does not violate the First Amendment.  Moreover, although it ultimately declined to decide the issue, the District Court suggested that the Board's viewpoint discrimination might be immune from First Amendment scrutiny because it is "government speech."

The District Court cannot be correct.  It is not hyperbole to say that under the District Court's holding, or the alternative "government speech" argument advanced

by the Board, school libraries in Vermont could decide that children visiting those librarians can only see books that criticize President Trump; school libraries in Massachusetts could decide to carry only books that promote Democratic policies; school libraries in Texas could decide to carry only books that praise President Trump; and school libraries in Oklahoma could include only books that promote Republican policies.

As those hypotheticals show, the District Court's view that governments have free rein in libraries to discriminate based upon viewpoint is anathema to the First Amendment and the purpose of libraries. If the District Court is right, and that is the law, then the "Farce" and "Tragedy" James Madison feared is upon us. The District Court should be reversed.

## IV.   <u>ARGUMENT</u>

### A. Libraries are crucial to American democracy.

Public libraries predate our country's establishment, with Benjamin Franklin often credited with founding the first American subscription library in 1731. Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381, 394 (2012). Colonial libraries developed as early as 1770. Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU Educ. & L.J. 103, 112 (2005).

"After the British burned Washington's congressional library during the War of 1812, Thomas Jefferson sold his personal collection…to start what is now the Library of Congress." *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 889 (W.D. Ark. 2023). "He famously said, 'I have often thought that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county….'" *Id.*

**B. School libraries are critical to our democracy.**

The emergence of public libraries coincided with the rise of public education and, with it, school libraries. "[P]ublic libraries…were originally conceived as part of the nation's broader educational movement, and it was their educational function that provided the principal justification for public support." Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, INFO. & CULTURE A J. OF HIST. 1, 1 (2012). Melvil Dewey, inventor of the library cataloging system, asserted that:

> [a] collection of books in every schoolroom for everyday use is coming to be considered an essential part of a school building's furniture. These books introduce children to the best literature of the world; they interest them in other phases of any subject they may be studying than those set forth in their text-books…. [T]hey familiarize the children with books and their use; and, in any subject, they permit the beginning of that laboratory method which is now considered so essential in all educational work.

Peltz, *supra*, at 114.

Professional school libraries began to emerge in the 1900s. BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION SCIENCES, SCHOOL LIBRARIES 4000 (4th ed. 2017). Since the early 1950s, more than 30,000 school libraries have been established. U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005).

### C. Robust school libraries result in better student outcomes.

School libraries' positive impact on students is well-documented. "Research studies" show "student success when schools had libraries, librarians, and resources." WOOLLS, *supra*, at 4004. The quality of, and access to, books at a school library is a powerful predictor of academic achievement. *See, e.g.*, Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012); Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012); Briana Hovendick Francis, et al., *School Librarians Continue to Help Students Achieve Standards: The Third Colorado Study*, LIBRARY RESEARCH SERVICE (2010); Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008); Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993).

Research consistently confirms that strong library programs increase student achievement. Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018); *see also, e.g.*, Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001).

### D. Librarians rely upon set standards to curate school libraries.

The American Library Association ("ALA") is the sole accrediting body for U.S. library and information science schools. *Fayetteville*, 684 F. Supp. 3d at 890. "Professional librarians hold advanced degrees from ALA-accredited institutions, and…are taught to adhere to the ALA's Code of Ethics and Library Bill of Rights in their professional lives." *Id.*

The ALA's Code of Ethics "guide[s] the work of librarians," focusing on "the values of intellectual freedom that define the profession of librarianship." *Code of Ethics*, AM. LIBR. ASS'N (2021). Chief among librarians' obligations is the duty ***not*** to limit access to information based on viewpoint:

> 1. We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.

> 2. We uphold the principles of intellectual freedom ***and resist all efforts to censor library resources***.

***

6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.

7. We distinguish between our personal convictions and professional duties **and do not allow our personal beliefs to interfere** with…the provision of access to their information resources.

*Id.* (emphasis added).

As referenced in Plaintiffs-Appellant's Brief (Doc. No. 26 at 33), the ALA's Library Bill of Rights sets forth the "basic policies [that] should guide [library] services," *Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), and is unequivocal in its condemnation of censorship and attempts to limit information based on viewpoint:

> Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.
>
> Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

*Id.* §§ II, III. "'[A]ll people' and 'all points of view' should be included in library materials and information," with "no limiting qualifiers for viewpoint, origin, or politics." *Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017).

These policies apply to school libraries. *Access to Resources and Services in the School Library: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2025). The school library serves to, *inter alia*, "foster intellectual growth and personal development" and "meet learners' recreational reading needs." *Id.* School librarians should make curation decisions "without letting personal beliefs or biases

get in the way" so that students and educators "can access a wide range of ideas." *Id.*

The National School Library Standards emphasize the importance of the school library as an essential part of the learning community, preparing students for college, careers, and life. *See generally AASL Standards Framework for Learners,* AM. ASS'N OF SCH. LIBRARIANS (2017). School librarians are trained to curate collections in an inclusive, not exclusive, process. *See generally Diverse and Inclusive Collections: An Interpretation of the Library Bill of Rights,* AM. LIBR. ASS'N (2025). School librarians do not exclude materials because they are controversial or represent viewpoints with which they disagree, but include books that reflect a diversity of thought. *See id.* School librarians curate the library collection, and provide resources and learning tools for an entire school.

When following these principles, librarians are guided by the understanding that there is no "one size fits all" approach to what books are appropriate for a particular school and community:

> Children's libraries should provide a variety of developmentally appropriate materials…to meet the needs of all age groups. There are no universal standards for the size and content of children's library collections…. A wide range of opinions, values and views should be reflected in the library stock and online accessible materials.

*IFLA Guidelines for Library Services to Children aged 0-18,* INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018).

In short, trained librarians curate library collections not to promote or restrict particular viewpoints, but to ensure that those collections serve as "a mighty resource in the free marketplace of ideas." *Minarcini v. Strongville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). A librarian engaging in viewpoint discrimination when making curation decisions acts contrary to their training; the Library Bill of Rights and Code of Ethics; and the First Amendment.

**E. The Board ignored library curation standards and engaged in viewpoint discrimination by banning *Tango*.**

*Tango* is a bestselling children's book with significant literary and educational merit. The book won or was nominated for numerous awards and received glowing reviews, including starred reviews from Booklist, Publisher's Weekly, and Kirkus Reviews. *And Tango Makes Three*, Simon & Schuster (last visited Dec. 22, 2025). It is the type of book that a trained librarian would be expected to select for the school library collection. There is a simple reason why the Board banned *Tango*: the Board did not like the pro-LGBTQ+ viewpoint allegedly reflected in the book, and so it sought to suppress that viewpoint. *See* Final Order at 14-17. By essentially holding that the First Amendment does not apply to library curation decisions, the District Court erred.

"Our founding fathers understood that 'novel and unconventional ideas might disturb the complacent'; yet in authoring the First Amendment, they sought "to encourage a freedom which they believed essential if vigorous enlightenment was

ever to triumph over slothful ignorance." *Fayetteville*, 684 F. Supp. 3d at 891-92

(quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).  With respect to

schools, "[o]ur Nation is deeply committed to safeguarding academic freedom,

which is of transcendent value to all of us….  That freedom is therefore a special

concern of the First Amendment, which does not tolerate laws that cast a pall of

orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603

(1967).  As Justice Antonin Scalia explained, although there is "[n]o doubt a State

possesses legitimate power to protect children from harm…that does not include a

free-floating power to restrict the ideas to which children may be exposed." *Brown

v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794-95 (2011).

There "can be no doubt that the First Amendment does not permit the State to

require that teaching and learning must be tailored to the principles or prohibitions

of any…sect or dogma." *Epperson v. State of Ark.*, 393 U.S. 97, 106 (1968).  "[T]o

justify prohibition of a particular expression of opinion, [the State] must…show that

its action was caused by something more than a mere desire to avoid the discomfort

and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des

Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969).  Otherwise, actions like

the Board's here could be used to restrict viewpoints from any part of the political,

religious, or social spectrum. *See, e.g., Roberts v. Madigan*, 702 F. Supp. 1505,

1512-13 (D. Colo. 1989) (rejecting attempts to remove the Bible from a school

library and holding that "[t]he school library is a mirror of the human race, a repository of the works of scientists, leaders, and philosophers. It is the locus where the past meets tomorrow, embellished by the present").

This is true for school libraries: "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Bd. of Educ. v. Pico*, 457 U.S. 853, 866 (1982) (plurality). "Access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868. "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Because the First Amendment "does not permit the official suppression of *ideas*," a majority of the Supreme Court agreed that the removal of books from school library shelves "in a narrowly partisan or political manner" is unconstitutional. *Id.* at 870-71 (plurality); *id.* at 907 (Rehnquist, J., dissenting) ("cheerfully" conceding this point).

Thus, once the government opens a school library, patrons have rights that the government cannot take away without complying with the Constitution. *See, e.g., Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983)

("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum"); *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (cited in Final Order at 6, 11) ("Once it has opened a limited forum…the State must [not]…discriminate against speech on the basis of its viewpoint").

Viewpoint discrimination is improper in *any* forum. *See, e.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (in limited public forum, state cannot "discriminate against speech on the basis of viewpoint"); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-93 (1993) ("'[c]ontrol over access to a nonpublic forum'" is constitutional "so long as the distinctions drawn…are viewpoint neutral"); *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 436 (3d Cir. 2019) ("the type of forum sheds no light…. [V]iewpoint discrimination is impermissible in any forum").[1]

The Board's discrimination against a particular viewpoint relating to LGBTQ+ issues is, accordingly, unconstitutional. *See, e.g., Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 362 (8th Cir. 1988) (university engaged in viewpoint

---

[1] The Board's action is unconstitutional regardless of whether the school library is a nonpublic forum, limited public forum, or designated public forum. At a bare minimum, to pass constitutional muster, the Board's actions would need to be "reasonable" and "viewpoint neutral." *See Lamb's Chapel*, 508 U.S. at 392-93.

discrimination by funding student groups while denying funding to group advocating for gay and lesbian rights).

Library bookshelves have limited space and cannot include every book published. Certified, trained librarians make decisions about which books should or should not be included based upon the needs of the students and communities they serve. In permitting the Board to restrict a book because it contained a disfavored viewpoint, the District Court endorsed the "free-floating power to restrict the ideas to which children may be exposed" about which Justice Scalia warned. *Brown*, 564 U.S. at 794-95. The District Court should be reversed.

### F. The District Court failed to properly analyze the First Amendment right to receive information.

The District Court erred by failing to engage in a proper analysis of the First Amendment right to receive information. *See* Final Order at 12-17.

#### 1. The Supreme Court has repeatedly reaffirmed the right to receive information.

Consistent with James Madison's concerns, *supra*, the "right to receive information and ideas" is protected by the Constitution because it is an "inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Pico*, 457 U.S. at 867. The Supreme Court has recognized this right for decades, both before and after *Pico*, recently reaffirming that "[a] fundamental principle of the First Amendment is that all persons have access to places where they

can speak ***and listen***….” *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (emphasis added); *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (recognizing “the right to receive information and ideas”); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) (“It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences”). Accordingly, where “the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power.” *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975).

This right applies to minors in schools. *See, e.g., Fayetteville*, 684 F. Supp. 3d at 909-10 (“When it comes to children, it is well established that ‘minors are entitled to a significant measure of First Amendment protection’ and the government may restrict these rights ‘only in relatively narrow and well-defined circumstances’”); *see also Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187 (2021) (“Minors are entitled to a significant measure of First Amendment protection” (internal quotation and brackets omitted)); *Tinker*, 393 U.S. at 506 (minors do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate”); *Walls v. Sanders*, 144 F.4th 995, 1002 (8th Cir. 2025) (recognizing “reciprocal right to receive…information,” which “do[es] not disappear inside public schools”); *Sheck v. Baileyville School Committee*, 530 F.

Supp. 679, 689 (D. Me. 1982) ("the first amendment right of students to receive that information and those ideas is entitled to constitutional protection").

Earlier this year, the Supreme Court reaffirmed *Tinker* and reiterated that "[g]overnment schools…may not place unconstitutional burdens on" First Amendment rights. *Mahmoud v. Taylor*, 145 S.Ct. 2332, 2350 (2025). The Court held that schools cannot "exert upon children a psychological 'pressure to conform' to…specific viewpoints." *Id.* at 2355; *see also id.* at 2378 (Thomas, J., concurring) (school may not use curriculum to "pursue…ideological conformity").

The District Court essentially ignored the right to receive information, and it permitted the Board to pressure students to conform to a particular viewpoint. *See* Final Order at 12-17. That holding was erroneous and should be reversed.

## 2. The District Court misunderstood this Court's prior decision in *ACLU*.

The District Court's decision was also contrary to this Court's holding in *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009). *See* Final Order at 14. The District Court asserted that because the *ACLU* Court held that "plaintiffs would lose" under any applicable standard, the case did not "support[]" Plaintiffs' arguments in this case. *See id.* The District Court then went on to essentially hold, however, that the First Amendment does not apply to library curation decisions. *See id.* at 14-17. That holding cannot be reconciled with *ACLU*,

where the Court quite clearly held that the First Amendment ***does*** apply to curation

decisions, leaving only the specific standard of review unresolved.

In fact, the *ACLU* court assumed, for purposes of the case before it, that the

*Pico* standard could apply, and it evaluated under the *Pico* standard the question of:

> whether the Board's decision to remove the book from school library
> shelves was motivated by its inaccuracies concerning life in Cuba or
> by a desire to promote political orthodoxy and by opposition to the
> viewpoint of the book. We find from the evidence in this record,
> including the School Board majority's consistent statements that it
> was removing Vamos a Cuba from the school library shelves because
> of factual inaccuracies and the undisputed fact that the book does
> contain inaccuracies, that those inaccuracies were what motivated the
> Board. If there had been no factual inaccuracies, the book would not
> have been removed…. The stated motive was not a pretext or a guise
> for viewpoint discrimination. The plaintiffs' First Amendment claim
> does not have a substantial likelihood of success on the merits. The
> district court should not have granted a preliminary injunction based
> on that claim.

*ACLU*, 557 F.3d at 1227. Far from holding that the First Amendment did not apply

or that school boards may engage in viewpoint discrimination in libraries, as the

District Court held here, the *ACLU* Court held that the First Amendment ***did*** apply,

but that the plaintiffs lost because, even under the *Pico* standard, there was no

viewpoint discrimination. *See id.*

That outcome makes sense. Removing an atlas published in 1980 because it

refers to countries that no longer exist, or a 1950 book of tax codes containing

statutes and regulations because the statutes and regulations therein were repealed

or amended decades ago, does not violate the First Amendment. But where, as here,

there is no real dispute that the government removed a book because of "opposition to the viewpoint of the book," *see id.*, that conduct violates the First Amendment.

The District Court's holding that the First Amendment does not apply to library curation, and that the government is free to remove books based upon the viewpoints therein, cannot be squared with the First Amendment or *ACLU*.

### 3. The District Court relied upon inapposite authorities.

The District Court also erred in relying (Final Order at 12) upon plurality and concurring opinions in *U.S. v. Am. Library Ass'n*, 539 U.S. 194 (2003) ("*ALA*"). The District Court's reliance on *ALA* was inconsistent because elsewhere, it refused to follow a different plurality opinion, *Pico*. *See* Final Order at 14. In any event, *ALA* is inapposite.

*ALA* involved filters on Internet-enabled computers in libraries meant to block three categories of unprotected speech: "'visual depictions' that constitute 'obscenity' or 'child pornography,' and [to] protect[] against access by minors to 'visual depictions' that are 'harmful to minors.'" *See, e.g., ALA*, 539 U.S. at 201, 208-09. *ALA* says nothing about whether library curation premised upon viewpoint discrimination passes muster under the First Amendment. Barring access to an acclaimed children's book because of disagreement with its viewpoint is a far cry from blocking *illegal* Internet content on library computers.

The District Court relied most heavily, and erroneously, on the Fifth Circuit's decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc). *See* Final Order at 13-17. *Llano* seems to have been driven largely by fear that applying the right to receive information to libraries would permit plaintiffs to sue libraries for refusing to purchase certain books. *See Llano*, 138 F.4th at 845-51. That fear is misplaced.

No one asserts that an individual can force a library to buy a particular book. Again, the point—which the District Court and the *Llano* court both misapprehended—is that once the government chooses to open a library, curation decisions are subject to the First Amendment and, as such, the government's conduct must be viewpoint-neutral. *See, e.g., Perry*, 460 U.S. at 46; *Rosenberger*, 515 U.S. at 829. As this Court recognized in *ACLU, supra*, librarians can consider ***content*** to the extent needed to, *e.g.*, remove factually-inaccurate books or provide materials of interest to their community, as long as they comply with the First Amendment when doing so, but they cannot discriminate based on viewpoint.

The District Court cannot be correct that the First Amendment has nothing to say about library curation decisions. If the District Court's holding stands, nothing is stopping libraries in "blue" states from offering only pro-Democratic books, or libraries in "red" states from offering only pro-Republican books. That approach is contrary to the First Amendment and to the purpose of libraries.

**G. The purported availability of *Tango* from other sources does not prevent a constitutional violation.**

The District Court stated that it was fine for the Board to engage in viewpoint discrimination because students can perhaps obtain *Tango* elsewhere. Final Order at 16-17. As a matter of law, that argument is incorrect: the fact that students "cannot simply go in the library, take the books off the shelf and thumb through them…is a restriction on [their] access" and an "impermissible infringement[] of First Amendment rights." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003).

The District Court also ignored the fact that some children cannot visit public libraries or purchase books. "[G]etting to the public library may be difficult for children and for those who live in homes without Internet access, the school library may be their only access to the digital world." WOOLLS, *supra*, at 4004. "Because many families cannot afford to purchase children's books, it becomes all the more important to make community resources…easily and readily available within disadvantaged communities." Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89, 527-37 (1997).

School libraries and librarians are a critical resource for children. For many students, the school library is their primary or only means of accessing books. The

fact that *Tango **might*** be available elsewhere is not a substitute for students' access in a school library.

### H. The Board's actions were not government speech.

The Board also attempted to justify its actions by arguing that library curation is "government speech," and not subject to First Amendment scrutiny. *See* Final Order at 6-12. Although the District Court ultimately declined to decide the issue, it discussed the issue at length and suggested that the Board's argument might be viable. *See id.* The Board's argument, and the District Court's comments, ignore the role of school libraries and significant limitations on the government speech doctrine. Thus, to the extent the Court considers the government speech issue, it should reject the Board's argument.

"[T]he real question in government-speech cases [is] whether the government is *speaking* instead of regulating private expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 262 (2022) (Alito, J., concurring). Justice Alito warned that "it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint'" and cautioned that "the government-speech doctrine becomes 'susceptible to dangerous misuse.'" *Id.* at 262-63; *see also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[i]f private speech could be passed off as government speech by simply affixing a government seal of

approval, government could silence or muffle the expression of disfavored viewpoints"). The Board's actions were not government speech.

### 1. School libraries are extracurricular.

In discussing government speech, the District Court appears to have improperly conflated the school library with the school curriculum. *See* Final Order at 11. Even the government's powers over the school curriculum are not unlimited, however. Again, the Supreme Court reiterated this year that even where the government is acting in connection with the curriculum, "[g]overnment schools…may not place unconstitutional burdens on" First Amendment rights in order to pressure students into ideologic conformity. *Mahmoud*, 145 S.Ct. at 2350, 2355.

The Supreme Court's decision is consistent with longstanding law. "Students have a First Amendment right to receive information and ideas," and that right "applies in the context of school curriculum design." *See González v. Douglas*, 269 F. Supp. 3d 948, 972-73 (D. Ariz. 2017). Removal of "materials otherwise available in a local classroom" is unconstitutional unless it is "reasonably related to legitimate pedagogical concerns." *Id.*; *see also Arce v. Douglas*, 793 F.3d 968, 982-83 (9th Cir. 2015) ("remov[al of] materials otherwise available in a local classroom" is not government speech).

The Board's power over school libraries is even more limited, however, because those libraries are **extracurricular**. Library books are not required reading, but are available for students to explore with the guidance of trained librarians. *See Pico*, 457 U.S. at 862 (Brennan, J.) ("the only books at issue…are *library* books that by their nature are optional rather than required reading"); *Walls*, 144 F.4th at 1004 ("distinguish[ing] the school library from the classroom"; although plaintiffs conceded that curriculum decisions at-issue were government speech, "books in a library" are different than "in-classroom instruction and materials"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875-76 (D. Kan. 1995) (school officials do not have "absolute discretion beyond the compulsory environment of the classroom into the school library," where "the regime of voluntary inquiry…hold[s] sway"); *Sheck*, 530 F. Supp. at 689 (discussing "the extracurricular environment of the school library"; "[t]he information and ideas in books placed in a school library by proper authority are protected speech and the first amendment right of students to receive that information and those ideas is entitled to constitutional protection").

As another court explained:

> The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment…. [A] library is a place to **test or expand upon ideas** presented to him, **in or out of the classroom**. The most effective antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control.

*Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978) (emphasis added).

Although school librarians support the entire school community and are instrumental beyond the library, school library collections are not part of the curriculum and their curation is not government speech. Selecting books for libraries is a situation where the government "expends funds to encourage a diversity of views from private speakers." *Rosenberger*, 515 U.S. at 833-34. That conduct is ***not*** government speech. *Id.* at 833-86.

Thus, the District Court's citation (Final Order at 11) to *Chiras v. Miller*, 432 F.3d 606, 615-16 (5th Cir. 2005) was misplaced, as *Chiras* involved the selection of textbooks for use ***in the classroom***. *See id.*; *cf. Arce*, 793 F.3d at 982 (*Chiras* does not apply to "a *student's* First Amendment rights"). In short, to the extent the District Court conflated the school library collection with the school curriculum, it erred.

## 2. The government does not speak through the contents of library shelves.

The Board's attempt to equate certified, trained librarians' decisions about library curation to other forms of government speech should be rejected. *See* Final Order at 6-12. The Supreme Court articulated three factors to determine whether an action is government speech: "[1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking;

and [3] the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 244.

In *Matal*, the Supreme Court held that the government's registration of trademarks is not government speech. 582 U.S. at 235-39. The Court reasoned that "[t]he Federal Government does not dream up these marks, and it does not edit marks submitted for registration." *Id.* at 235. If the marks were government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *Id.* at 236. The Court held that "[t]rademarks have not traditionally been used to convey a Government message…[a]nd there is no evidence that the public associates the contents of trademarks with the Federal Government." *Id.* at 238; *see also, e.g., Shurtleff*, 596 U.S. at 254-56 (city did not control messages on flags on government property and public would not believe city endorsed those messages).

The Board did not "dream up" or "edit" the books in the school library. *See Matal*, 582 U.S. at 235. If putting books on a shelf is government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *See id.* Florida libraries are not sending any cognizable message

by, *e.g.*, including on their shelves both *Mein Kampf* and books celebrating Jewish faith.[2]

The government has not traditionally conveyed messages to the public through library shelves. *See id.* at 238. Rather, as set forth above at pgs. 4-10, *supra*, the Board's actions are antithetical to school libraries' history and mission. Nor would the public reasonably perceive that the government speaks by placing particular books on library shelves. No one thinks that authors like Peter Parnell and Justin Richardson are conveying government messages, or that the government has endorsed every word of their works.

The Board argued below that the government is not speaking through books, but through placing certain books, but not others, on the shelves. *See* Final Order at 8-10. Unlike a private actor who curates newspaper articles, television programs, or social media posts expressing certain viewpoints or content, however, one of a library's major objectives is to make available a wide array of books of interest to their particular community, regardless of viewpoint. *See* pgs. 4-10, *supra*.

---

[2] *See Mein Kampf*, Jacksonville Public Library Catalog, https://jaxpl.na4.iiivega.com/search/card?id=5abd27f8-ac68-5435-8d38-bcde905dbacf&entityType=FormatGroup (last visited Dec. 22, 2025); *The Everything Judaism Book*, Jacksonville Public Library Catalog, https://jaxpl.na4.iiivega.com/search/card?id=6c8c1269-d221-5a63-b842-c66d180ffd13&entityType=FormatGroup (last visited Dec. 22, 2025).

Again, no coherent, discernible "message" is conveyed to someone who sees both *Mein Kampf* and books about Jewish faith on the shelves. It is hard to imagine, as the District Court appeared to suggest (*see* Final Order at 9-10 n.6), that the government is trying to convey that *Mein Kampf* is an "appropriate" book all students should read. A library collection is not "government speech."

### 3. The most persuasive authorities hold that library collections are not government speech.

As the District Court acknowledged (Final Order at 10), courts frequently hold that library collections are not government speech. In *GLBT Youth in Iowa Schools Task Force v. Reynolds*, the Eighth Circuit held that the government-speech doctrine does not extend to "the placement and removal of books in public school libraries." 114 F.4th 660, 667 (8th Cir. 2024). Unlike public monuments, a library collection does not have "the effect of conveying a government message." *Id.* at 668. If placing a variety of books on the shelves "constitutes government speech, the State 'is babbling prodigiously and incoherently.'" *Id.* (quoting *Matal*, 582 U.S. at 236).

*GLBT* is consistent with other decisions. *See Penguin Random House LLC v. Gibson*, 2025 U.S. Dist. LEXIS 163022, at *24-32 (M.D. Fl. Aug. 13, 2025) ("the argument that it is government speech has yet to obtain endorsement by a majority opinion…. Slapping the label of government speech on book removals only serves to stifle the disfavored viewpoints…. That way, the Supreme Court has warned, lies danger") *appeal pending*, Case No. 25-13181; *PEN Am. Ctr., Inc. v. Escambia Cty.*

*Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fl. 2024) ("The Court is not persuaded that decisions regarding the content of school libraries is 'government speech' that is not subject to any constitutional constraints"); *Fayetteville*, 684 F. Supp. 3d at 909 (discussing lack of "legal precedent to suggest that the state may censor non-obscene materials in a public library because such censorship is a form of government speech"). This Court should follow those holdings.[3]

## V. <u>CONCLUSION</u>

It is no mere rhetorical flourish to say that school libraries are citadels of American democracy. The Board's actions undermined those citadels, in violation of the First Amendment. The District Court should be reversed.

---

[3] A minority (7 of 17 judges) of the *en banc* Fifth Circuit argued otherwise in *Llano*. *See* Final Order at 7-10. That minority opinion is not binding anywhere, including the Fifth Circuit, and was *dicta* because the majority dismissed plaintiffs' claims on other grounds. *See Llano*, 138 F.4th at 850-51. In any event, the *Llano* minority's analysis was flawed for the same reasons as the Board's argument.

Respectfully submitted,

**FREEDOM TO READ FOUNDATION
AND AMERICAN ASSOCIATION OF
SCHOOL LIBRARIANS**

By their attorneys,

*/s/ Owen R. Wolfe*

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Tel:  (212) 218-3389
Fax:  (917) 344-1394

*Attorneys for Amici Curiae,
Freedom to Read Foundation and American
Association of School Librarians*

Dated:  December 23, 2025

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS AND VIRUS-FREE CERTIFICATION**

      1.    This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7) because the brief contains 6,285 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

      2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface; footnotes appear in 14-point Times New Roman typeface.

                            */s/ Owen R. Wolfe*
                            Owen R. Wolfe

Dated: December 23, 2025

## CERTIFICATE OF SERVICE

I certify that on December 23, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Owen R. Wolfe*
Owen R. Wolfe