**No. 25-13485**

In The

# United States Court of Appeals
# for the Eleventh Circuit

———————————

PETER PARNELL, *et al.*,
*Plaintiffs-Appellants*,

v.

SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA, *et al.*,
*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of Florida, Case No. 4:23-cv-00414-AW-MAF

———————————

**BRIEF OF *AMICI CURIAE* THE AMERICAN CIVIL LIBERTIES UNION
AND THE AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

———————————

Daniel B. Tilley
Florida Bar No. 102882
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler Street, Suite 400
Miami, FL 33134
T. (786) 363-2714
dtilley@aclufl.org

Emerson J. Sykes
Shana Knizhnik
AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T. (212) 549-2500
esykes@aclu.org
sknizhnik@aclu.org

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

*Amici Curiae* American Civil Liberties Union and American Civil Liberties Union of Florida file this Certificate of Interested Persons and Corporate Disclosure Statement, as required by Eleventh Circuit Rules 26.1, and 29-2.

1. American Association of School Librarians (*Amicus Curiae*)

2. American Civil Liberties Union (*Amicus Curiae*)

3. American Civil Liberties Union of Florida (*Amicus Curiae*)

4. B.G., by and through her parent, Raymond Guillory (Plaintiff-Appellant)

5. Bean, Joshua W. (Counsel for Plaintiffs-Appellants)

6. Blechman, William J. (Counsel for Plaintiffs in district court)

7. Boehm, Korey (Counsel for Plaintiffs in district court)

8. Cockream, Joshua M. (Counsel for Plaintiffs-Appellants)

9. Duke, Samantha Crawford (Counsel for Defendant-Appellee)

10. EveryLibrary (fiscal sponsor of *Amicus Curiae* Read Freely Alabama)

11. Fitzpatrick, The Honorable Martin A. (United States District Court Magistrate Judge)

12. Freedom to Read Foundation (*Amicus Curiae)*

13. Gay, Faith E. (Counsel for Plaintiffs-Appellants)

14. Grosholz, Jeffrey J. (Counsel for Defendant-Appellee)

15. Joslin, Kalli (counsel for *Amicus Curiae* Read Freely Alabama)

16. Knizhnik, Shana (Counsel for *Amicus Curiae* American Civil Liberties Union)

17. Marsey, John David (Counsel for Defendant-Appellee)

18. Neill, Anna T. (Counsel for Plaintiffs-Appellants)

19. Wolfe, Owen R. (Counsel for *Amici Curiae* Freedom to Read Foundation and American Association of School Libraries)

20. Parnell, Peter (Plaintiff-Appellant)

21. Posdal, Bradley (Counsel for Plaintiffs in district court)

22. Read Freely Alabama (*Amicus Curiae*)

23. Richardson, Justin (Plaintiff-Appellant)

24. Rumberger, Kirk & Caldwell, P.A. (Law Firm of Defendant-Appellee)

25. School Board of Escambia County, Florida (Defendant-Appellee)

26. Selendy Gay, PLLC (Counsel for Plaintiffs-Appellants)

27. Smith, Nicole Sieb (Counsel for Defendant-Appellee)

28. Sperling Kenny Nachwatler, P.A. (Counsel for Plaintiffs-Appellants)

29. Stoughton, Corey (Counsel for Plaintiffs-Appellants)

30. Sykes, Emerson (Counsel for *Amicus Curiae* American Civil Liberties Union)

31. Tilley, Daniel (Counsel for *Amicus Curiae* American Civil Liberties Union of Florida)

32. Thurston, Robin (counsel for *Amicus Curiae* Read Freely Alabama)

33. Ulrich, Ashley (Counsel for Plaintiffs in District Court)

34. Winsor, The Honorable Allen C. (United States District Court Chief Judge; Trial Judge)

35. Zimmerman, Lauren J. (Counsel for Plaintiffs-Appellants)

36. Axelman, David (Counsel for *Amicus Curiae* the Florida Legislature)

The following Defendants were dismissed in the District Court and are not parties to this appeal. Dismissed Defendants' counsel are also listed below.

37. Bardos, Andy V. (Counsel for Dismissed Defendants)

38. Bell, Daniel (Counsel for Dismissed Defendants)

39. Bowen & Schroth, P.A. (Counsel for Dismissed Defendants)

40. Broome, Zachary T. (Counsel for Dismissed Defendants)

41. Brown, Monesia (Dismissed Defendant)

42. Byrd, Esther (Dismissed Defendant)

43. Christie, Grazie P. (Dismissed Defendants)

44. Costello, David (Counsel for Dismissed Defendants)

Pursuant to Eleventh Circuit Rule 26.1-1(a), this Certificate includes only persons and entities omitted from the Certificate contained in Appellants' Opening Brief.

# CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* American Civil Liberties Union and American Civil Liberties Union of Florida are non-profit entities that do not have parent corporations. No publicly held corporation owns 10% or more of any stake or stock in *Amici Curiae*.

Dated: December 29, 2025

/s/ Emerson J. Sykes
Emerson J. Sykes
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T. (212) 549-2500
esykes@aclu.org

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...............................................................C-1

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................1

SUMMARY OF THE ARGUMENT ........................................................2

INTRODUCTION ...............................................................................3

ARGUMENT ......................................................................................5

I.   The First Amendment Applies in Public School Libraries ..................................5

   a.   The *Pico* Court Held that the First Amendment Applies to School Library Book Removals ..............................................6

   b.   This and Other Courts Have Applied *Pico* for Decades ...........................8

      i.   *ALA* and *ACLU-FL* are not to the contrary ...................................13

   c.   Identifying Impermissible Viewpoint Discrimination is a Familiar Feature of First Amendment Law ............................................17

II.  Public School Library Curation Is Not "Government Speech."........................20

   a.   No Court Has Extended Government Speech Doctrine to Public School Libraries..........................................................20

   b.   The *Shurtleff* Factors Favor Plaintiffs .....................................23

CONCLUSION ....................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Florida v. Miami-Dade County School Board*,
557 F.3d 1177 (11th Cir. 2009) .................................................. 1, 8, 9, 15, 16, 19

*Arkansas Education Television Commission v. Forbes*,
523 U.S. 666 (1998).................................................................................. 18, 23

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982)............................................................ 1, 2, 6, 7, 13, 15, 19

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995) .................................................................................12

*Case v. Unified School District No. 233*,
908 F. Supp. 864 (D. Kan. 1995)........................................................................11

*Case v. Unified School District No. 233, Johnson County*,
895 F. Supp. 1463 (D. Kan. 1995).......................................................................11

*Cornelius v. NAACP Legal Defense & Education Fund, Inc.*,
473 U.S. 788 (1985)..............................................................................................18

*Counts v. Cedarville School District*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ..............................................................10

*Crookshanks ex rel. C.C. v. Elizabeth School District*,
775 F. Supp. 3d 1160 (D. Colo. 2025).......................................................... 10, 21

*E.K. by & through Keeley v. Department of Defense Education Activity*,
No. 1:25-CV-637, 2025 WL 2969560 (E.D. Va. Oct. 20, 2025) ............. 8, 9, 10

*Epperson v. Arkansas*,
393 U.S. 97 (1968)..................................................................................................7

*Fayetteville Public Library v. Crawford County*,
760 F. Supp. 3d 811 (W.D. Ark. 2024) ..............................................................21

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ....................................................... 21, 23, 24, 25

*Hazelwood School District v. Kulhmeier*,
484 U.S. 260 (1988) ............................................................8

*Jacobellis v. Ohio*,
378 U.S. 184 (1964) ..........................................................20

*Keyishian v. Board of Regents*,
385 U.S. 589 (1967) ..........................................................19

*Legal Services Corporation v. Velazquez*,
531 U.S. 533 (2001) ..........................................................17

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) .............................. 12, 21, 25

*Maryland v. Baltimore Radio Show, Inc.*,
338 U.S. 912 (1950) ..........................................................13

*Matal v. Tam*,
582 U.S. 218 (2017) ....................................... 20, 23, 24

*Miller v. California*,
413 U.S. 15 (1973) ........................................ 14, 19, 20

*Minarcini v. Strongsville City School District*,
541 F.2d 577 (6th Cir. 1976) ............................................11

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ............................................................12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..................................... 21, 22

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ................................... 17, 18

*National Rifle Association of America v. Vullo*,
602 U.S. 175 (2024) ..........................................................5

*PEN America Center, Inc. v. Escambia County School Board*,
711 F. Supp. 3d 1325 (N.D. Fla. 2024) ...................... 9, 18, 21, 22, 23

*Penguin Random House LLC v. Gibson*,
  796 F. Supp. 3d 1052 (M.D. Fla. 2025)........................................ 18, 22, 24, 25

*Penguin Random House LLC v. Robbins*,
  774 F. Supp. 3d 1001 (S.D. Iowa 2025) .................................................8

*Perry Education Association v. Perry Local Educators' Association*,
  460 U.S. 37 (1983).................................................................18

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)............................................................ 23, 24

*Right To Read Defense Committee of Chelsea v. School Committee of Chelsea*,
  454 F. Supp. 703 (D. Mass. 1978) ..................................................11

*Salvail v. Nashua Board of Education*,
  469 F. Supp. 1269 (D.N.H. 1979) ..................................................11

*Sheck v. Baileyville School Committee*,
  530 F. Supp. 679 (D. Me. 1982) ...................................................11

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022)....................................... 3, 21, 22, 23, 25

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..............................................................22

*Tinker v. Des Moines Independant Community School District*,
  393 U.S. 503 (1969)...............................................................5, 8

*United States v. American Library Association, Inc.*,
  539 U.S. 194 (2003)............................................. 1, 13, 14, 15, 23, 24

*Virden v. Crawford County*,
  23-cv-2071, 2024 WL 4360495 (W.D. Ark. Sep. 30, 2025)............................21

*Virden v. Crawford County*,
  No. 23-CV-2071, 2023 WL 5944154 (W.D. Ark. Sept. 12, 2023) .....................8

*Virgil v. School Board of Columbia County*,
862 F.2d 1517 (11th Cir. 1989) .........................................................................19

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943)................................................................................... 5, 6, 7

**Statutes**

20 U.S.C. § 9134(f)(7)(B).........................................................................14

**Other Authorities**

Am. Libr. Ass'n, *Standard Library Organization and Equipment for
Secondary Schools of Different Sizes* (1920).......................................................26

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization with approximately two million members and supporters. The ACLU of Florida ("ACLU of Florida") is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, and have long advocated for First Amendment protections for accessing library books. The ACLU was counsel in both *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) and *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003). The ACLU of Florida was both plaintiff and counsel in *ACLU of Florida v. Miami-Dade County School Board*, 557 F.3d 1177 (11th Cir. 2009). As organizations committed to protecting the rights to freedom of speech and freedom from government censorship, the ACLU and ACLU of Florida have a strong interest in the proper resolution of this case.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

The district court's holding that "the First Amendment offers Plaintiffs no protection" whatsoever in the context of public school library book removals, Op. 12, ignores decades of well-established First Amendment principles. The Supreme Court's analysis in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) provides the prevailing standard for examining challenges to library removal decisions, which courts across the country, including this Court, have applied since it was decided. Public officials may not, consistent with the First Amendment, remove books from public school libraries merely because they disapprove of the political or social messages in those materials. In this case, the local school board removed *And Tango Makes Three*, an age-appropriate children's book based on the true story of two male penguins who partnered and raised a penguin hatchling together, solely because it allegedly promotes the "LGBTQ agenda using penguins." In so doing, the school board ran afoul the Constitution. Contrary to the district court's pronouncement that that *Pico's* standard would be "impossible" to apply, Op. 14, the distinction between permissible content-based decisions and impermissible invidious viewpoint discrimination is a familiar feature of First Amendment law, which applies to every government activity, including in public primary schools. This court should reject the district court's

infirm reasoning and reaffirm that the First Amendment does indeed apply to public school libraries.

The district court found Defendants' argument that public school library curation constitutes "government speech" to be "persuasive" without explicitly holding as much. Op. 10. But no court has held that library removal decisions qualify for First Amendment exemption under the government-speech doctrine. That is the case because, under the factors set forth by the Supreme Court in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), (1) there is no history of the government using school library collections to convey a government message, (2) the public does not associate library collections with state expression, and (3) the government has not traditionally had an active role in controlling the content of library collections. Rather, the purpose of a school library, including in Florida, is to provide information on a broad range of subjects, which students have the freedom to explore individually and voluntarily. As a result, the government speech doctrine does not apply, and the First Amendment does.

## INTRODUCTION

Tattered books that are out of print. Factually inaccurate nonfiction books. Books with explicit sex or violence. Public school libraries can remove these types of books from circulation without offending the First Amendment because libraries have the authority to curate their collections based on viewpoint-neutral criteria like

physical condition, educational value, and age-appropriateness. But removing an award-winning children's book about the *real-life* story of two male penguins in a zoo does not fit into any of these legitimate categories. Instead, Escambia County School Board removed *And Tango Makes Three* from its public school library catalog because of some members' moral objection to the penguins' actions— namely, forming a lifelong same-sex partnership and caring for a parentless penguin hatchling—and the authors' portrayal thereof.

Removing *And Tango Makes Three* from circulation was a First Amendment violation because it was done for viewpoint discriminatory reasons—here, an opposition to the "LGBTQ agenda." The district court's holding to the contrary ignored binding precedent and was a legal error this Court is obligated to correct. Perhaps even more troubling than the initial removal, or the district court's flawed analysis, is Defendants' persistent assertion that government officials, no matter their role, have complete discretion to curate public school libraries according to their personal beliefs and whims. They argue there is literally nothing students, families, courts, or the Constitution can do if a library scrubs all LGBTQ perspectives from its collection. If library curation were "government speech" as Defendants claim, Escambia County School Board could likewise tomorrow replace the entire library catalog with copies of the governing political party's publications. Or an official could decide to replace the catalog with works only featuring

individuals of a particular race, to the exclusion of all others. Defendants' theory provides no guardrail. While Defendants claim the mantle of protectors of children and education, their theory of unbridled governmental discretion has exactly the opposite effect—by permitting a limitless restriction on the ideas that students can explore.

Thankfully, no court has ever accepted Defendants' "government speech" argument despite repeated attempts by governments in similar litigation across the country. This Court should not become the first.

## ARGUMENT

### I. The First Amendment Applies in Public School Libraries.

The First Amendment "prohibits government officials from wielding their power selectively to punish or suppress speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). That is true even in the context of public primary schools, because it is a "fixed star in our constitutional constellation" that government actors—including school board officials—may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Indeed, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969). The district court disregarded these fundamental principles by holding that "the First

Amendment offers Plaintiffs no protection" whatsoever from even the most illegitimately motivated library book removals. Op. 12. This Court should reject that proposition and reaffirm, as courts have done for decades, that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Pico*, 457 U.S. at 872 (1982) (plurality opinion).

### a. The *Pico* Court Held that the First Amendment Applies to School Library Book Removals.

While the Supreme Court in *Pico* did not reach a majority holding, it is nonetheless binding in certain respects and instructive in others. *Pico* remains the Supreme Court's only case addressing library book removals. There, eight of nine justices concluded that there were certain circumstances in which school officials could violate the First Amendment by removing books from their library shelves. The four-justice plurality held that although schools "possess significant discretion to determine the content of their school libraries," school officials "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 870 (quoting *Barnette*, 319 U.S. at 642). Justice Blackmun joined the plurality but concurred to "present the obverse of the plurality's analysis" as to "the failure to provide information" by the government, instead highlighting the First Amendment's

prohibition of "the State's decision to single out" particular "political ideas or social perspectives" "for disapproval and then deny access to" them. *Id.* at 875–79, 879 n.2 (Blackman, J., concurring). Justice White, in his concurrence, preferred to sidestep the "difficult First Amendment issue[]" at hand but agreed the case should be remanded to the district court for further fact-finding regarding "the reason or reasons underlying the school board's removal of the books," indicating that certain reasons or motivations *could* indeed be unconstitutional. *Id.* at 883–84 (White, J., concurring). And even three dissenting justices "cheerfully concede[d]" that it would violate the First Amendment rights of students if officials removed books in a "narrowly partisan or political manner," such as removals based on "party affiliation" or "racial animus." *Id.* at 907 (Rehnquist, J., dissenting) (quoting plurality opinion at 870–71).

Each of these opinions in *Pico* considered the unique considerations attendant to the public school setting, affirming that despite the "important, delicate, and highly discretionary functions" of school board officials, *id.* at 865 (plurality opinion) (quoting *Barnette*, 319 U.S. at 637), "students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *id.* (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)), and courts must "apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry." *Id.* (quoting

*Tinker*, 393 U.S. at 506). In other words, the Justices' disagreement in *Pico* "was not over whether the right to access information existed at all, but rather over how it should be balanced against the unique pedagogical and disciplinary concerns that are present in a public-school environment." *Virden v. Crawford Cnty.*, No. 23-CV-2071, 2023 WL 5944154, at *5 (W.D. Ark. Sept. 12, 2023).

**b. This and Other Courts Have Applied *Pico* for Decades.**

Binding precedent in this Court recognizes *Pico* as the default starting point for assessing book removals on First Amendment grounds.[2] In *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) [hereinafter "*ACLU-FL*"], despite describing *Pico* as a "non-decision" because of its fractured nature, this Court nonetheless acknowledged its fundamental conclusion that there is *some*

---

[2] The other relevant Supreme Court precedent the district court ignored when pronouncing that Plaintiffs' "First Amendment rights" are in no way "implicat[ed]" by book removals in a public school library, Op. 12, is *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), which governs public school restrictions on curricular speech. Under *Hazelwood*, restrictions on "student speech in school-sponsored expressive activities" that "bear the imprimatur of the school" must be "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 271–73. To avoid making any definitive pronouncements about *Pico's* precedential value, some lower courts have "applied both" *Pico* and *Hazelwood* in the alternative. *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, No. 1:25-CV-637, 2025 WL 2969560, at *15 (E.D. Va. Oct. 20, 2025), *appeal docketed*, No. 25-2497 (4th Cir. Dec. 22, 2025) (collecting cases); *but see Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001 (S.D. Iowa 2025) (applying *Pico*, and explicitly rejecting *Hazelwood*, as the proper standard for evaluating the constitutionality of a state statute regarding school library book removal).

"extent to which the First Amendment limits the discretion of a school board to remove books from a school library" and applied *Pico*'s plurality standard to the facts of the case to find that the "decisive factor" in the board's removal decision was not "an unconstitutional motive," i.e. "a desire to promote political orthodoxy and . . . opposition to the viewpoint of the book." *Id.* at 1200, 1206–7, 1227.

Federal district courts within this circuit, and indeed within Florida, have done the same analysis. *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (explaining the lack of clarity regarding "[t]he applicable legal standard for evaluating alleged First Amendment violations in the school library context," but noting the "common theme" that "content-based removal decisions based on legitimate pedagogical concerns" were constitutionally permissible, while "remov[ing] books solely because they disagree with the views expressed in the books" was not).

In cases *amicus* American Civil Liberties Union and its affiliates are litigating all over the country, federal district courts have vindicated students' First Amendment rights under *Pico*. In *E.K. by & through Keeley v. Department of Defense Education Activity*, No. 1:25-CV-637, 2025 WL 2969560 (E.D. Va. Oct. 20, 2025), *appeal docketed*, No. 25-2497 (4th Cir. Dec. 22, 2025), student plaintiffs won a preliminary injunction requiring public schools run by the Department of Defense on military bases to immediately return 596 books to school library shelves.

In so doing, the court noted that even though there is in some sense an "unresolved" question "of what standard applies to school library book removal decisions," "courts have long relied on [*Pico*] for guidance in public school book removal cases." The court held that the book removals in question were motivated by "impermissible partisan or political motivation[s]". *Id*. at *14–15.

Likewise, in a remarkably similar case brought by the ACLU of Colorado, *Crookshanks ex rel. C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1178–79 (D. Colo. 2025), the district court noted that although "the precedential value of *Pico* has perplexed courts for years," it "remains a useful starting point in determining the constitutionality of [a school district's] book-removal decision." The court concluded that school district officials' anti-LGBTQ motivations for book removals in that case were "blatantly unconstitutional under *Pico* and other precedents." *Id.* at 1182, *appeal docketed*, No. 25-1105 (10 Cir. Mar. 21, 2025).

Older cases litigated by *amici* have reached similar results. For example, in *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003), the district court applied *Pico*'s prohibition on "the official suppression of *ideas*" to reject school district policy requiring parental permission to access the *Harry Potter* book series. *Id.* at 1004–05. The court concluded that the book removals were improper because the school district's policy was based in part on officials' "personal distaste" for "witchcraft" rather than a legitimate justification. *Id.* at 1004.

Further back, in *Case v. Unified School District No. 233, Johnson County*, 895 F. Supp. 1463 (D. Kan. 1995), the district court, granting a motion for summary judgement, held that *Pico* "is the only Supreme Court decision dealing specifically with the removal of books from a public school library" and therefore "must be used as a starting point." *Id.* at 1469. The court then applied *Pico's* analysis in its injunction order, concluding that the First Amendment was violated because "school board members' personal disapproval of the ideas contained in the book" was the "decisive factor behind" its removal and granted an injunction restoring the book. *Case v. Unified School District No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995).

Even before *Pico* was decided, courts came to the same conclusion: that school officials who removed library books because they found them "objectionable," because they "occasioned their displeasure or disapproval," or "solely [due] to the[ir] social or political tastes" ran afoul of the First Amendment. *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 581–82 (6th Cir. 1976); *see also Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686–88 (D. Me. 1982); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of Chelsea*, 454 F. Supp. 703, 715 (D. Mass. 1978); *Salvail v. Nashua Bd. of Educ.*, 469 F. Supp. 1269, 1272, 1275 (D.N.H. 1979).

The sole authority cited by the district court in departing from the vast majority of lower courts was a recent decision from the Fifth Circuit, *Little v. Llano*

*Cnty.*, 138 F.4th 834 (5th Cir. 2025) (en banc). In *Little*, a majority of the en banc Fifth Circuit held that book removal decisions could not be challenged under "a right to receive information" theory, overruling its prior decision in *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995). *See Little*, 138 F.4th at 850–51. As the *Little* dissent pointed out in detail, the majority's decision "not only reaches a result directly contrary to *Pico*, but also casts aside the reasoning of a supermajority of the Court in the process," and "overturns decades of settled First Amendment law." *Id.* at 869, 873–79 (Higginson, J., dissenting). The *Little* court's analysis, which the district court adopted in this case, contains no limiting principle whatsoever and ultimately "sanctions government censorship" by "forsak[ing] core First Amendment principles." *Id.* at 869, 885. In concluding that abandoning the First Amendment in the context of libraries is necessary to prevent "the practical problems that a contrary decision would invite," Op. 14, the district court (following in the Fifth Circuit's lead) would allow school board officials to engage in the very conduct proscribed by a supermajority of the *Pico* court: the indiscriminate suppression of disfavored speech for narrow partisan reasons. This Court should not follow the same path.[3]

---

[3] The Supreme Court recently denied Plaintiffs' petition for certiorari in *Little v. Llano County*, but that should not overly concern this Court. Denial of certiorari has no precedential value and the Fifth Circuit's en banc split holding is still not binding on this court. *See Missouri v. Jenkins*, 515 U.S. 70, 86 (1995) (holding a denial of a

Just as a "Democratic school board, motivated by party affiliation" cannot constitutionally remove books "written by or in favor of Republicans," and "an all-white school board, motivated by racial animus" cannot constitutionally remove books "authored by blacks or advocating racial equality and integration," *Pico*, 457 U.S. at 871, 907 (acknowledged by both plurality and dissenting opinions), neither can a heterosexual school board motivated by anti-LGBTQ sentiment constitutionally remove books written by LGBTQ authors or containing LGBTQ themes.

### i. *ALA* and *ACLU-FL* are not to the contrary.

In its Summary Judgment Order, the district court misconstrued important Supreme Court and Eleventh Circuit precedent as undercutting *Pico*. Op. 12–17. The Supreme Court's decision in *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003) [hereinafter "*ALA*"], and this Court's decision in *ACLU-FL* do not support the district court's conclusion or Appellees' argument that a public school library is a First Amendment-free zone.

In *ALA*, the Supreme Court considered the legality of the Children's Internet Protection Act, a federal statute requiring that public libraries install internet filtering

---

writ of certiorari "imports no expression of opinion upon the merits of the case"); *Maryland v. Balt. Radio Show, Inc.*, 338 U.S. 912, 919 (1950) (outlining the many reasons certiorari might be denied that are unrelated to the merits of the case).

software "to block images that constitute obscenity or child pornography" or material similarly "harmful to minors"[4] as a condition for receiving federal subsidies. 539 U.S. at 199, 201 (plurality opinion). The court held that the statute was not facially unconstitutional under the First Amendment. *Id.* at 199; *see also id.* at 214–15 (Kennedy, J., concurring); *id.* at 215–19 (Breyer, J., concurring). The four-justice plurality emphasized library officials' discretion in making "*content*-based judgments in deciding what private speech to make available to the public," *id.* at 204 (plurality opinion) (emphasis added), but the decision had nothing to say about *viewpoint*-based restrictions driven by ideological or partisan motivations. Rather, the plurality emphasized the ways in which the restrictions at issue were consistent with public libraries' "traditional role of obtaining material of requisite and appropriate quality for educational and informational purposes," *id.* at 211, and underscored—endorsed in both Justice Kennedy's and Justice Breyer's concurrences—the quick and simple process by which a patron could unblock any improperly blocked website, suggesting that improperly obstructing access to websites for which the government had no "legitimate" interest in blocking *could*

---

[4] In the law at issue in *ALA*, "harmful to minors" was explicitly defined in accordance with the test for obscenity established in *Miller v. California*, 413 U.S. 15 (1973). *See* 20 U.S.C. § 9134(f)(7)(B).

raise First Amendment concerns if this feature did not exist. *Id.* at 208–09; *see also id.* at 214 (Kennedy, J., concurring); *id.* at 219 (Breyer, J., concurring).

Likewise, in *ACLU-FL* this Court did *not* hold that the First Amendment does not apply to school libraries. Rather, this Court found that officials' decision to remove a children's book about communist Cuba was properly motivated by the legitimate government interest in preventing the dissemination of factually inaccurate information in non-fiction books. *ACLU-FL*, 557 F.3d at 1202, 1206–27. The district court erred in its conclusion that *ACLU-FL* "merely concluded that 'even if the plaintiffs won the argument about the applicable standard and got the one of their dreams,' those plaintiffs would lose." Op. 14. While the *ACLU-FL* decision did rule against the plaintiffs in that case, it did so by methodically applying the *Pico* plurality standard, which this Court "assum[ed] applie[d]" for purposes of its constitutional analysis. *ACLU-FL*, 557 F.3d at 1204.

The *ACLU-FL* Court took pains to examine the factual record in detail to "determine 'the decisive factor' that motivated the Board" because if "inaccuracy was in fact the motivating concern behind the Board's action, the Board properly exercised its 'substantial legitimate role in the determination of school library content.'" *Id.* at 1206 (quoting *Pico*, 457 U.S. at 869, 871) (internal alterations omitted). Indeed, both the majority and dissent agreed that the school board's actual motive in removing the book was "a constitutional fact, 'a crucial fact' that

determine[d] the core issue of whether that removal violate[d] the First Amendment." *Id.* at 1205; *see also id.* at 1232 (Wilson, J., dissenting).

The Court concluded that the Board's explanation was not pretextual, based on the "consistency" of both the "inaccuracy complaints" raised "throughout the process" of the challenge to the book and of the "explanations of the Board members who voted to remove the book" who "explained that they were doing so because of inaccuracies in the book." *Id.* at 1209–11. The factual inaccuracies in the book went "to the heart of the dispute," and the Court concluded based on the evidence that if the book "had not distorted the facts about life in Cuba . . . there would not have been any opposition to the book." *Id.* at 1225. Because "everyone, including both sides' experts, agreed that the book contained factual inaccuracies," and "[f]actual accuracy in a non-fiction book is not a 'matter[] of opinion,'" the Court concluded that "the Board did not act based on an unconstitutional motive." *Id.* at 1207.

In contrast, Defendants claim no inaccuracies in *And Tango Makes Three*, let alone any obscenity or vulgarity, or even legitimate concerns around educational suitability, such that its removal could be based on a permissible motive under the First Amendment. Indeed, the book is based on an entirely true story and seemingly would not have been challenged but for its alleged promotion of the "LGBTQ agenda using penguins." Mot. for Summ. Judgement Ex. 2, at 158, ECF No. 220-2. Rather, Defendants maintain, and the district court accepted, the untenable position that

"even if the board removed a book based on its viewpoint, the removal would not be unlawful." Op. 6. That conclusion is unsupported by any binding precedent, and would create results proscribed by fundamental First Amendment principles.

### c. Identifying Impermissible Viewpoint Discrimination is a Familiar Feature of First Amendment Law.

Distinguishing between legitimate content-based restrictions on the one hand and invidious viewpoint discrimination on the other is far from an "impossible" task, as the district court concluded. Op. 14. Rather, it's a common feature of First Amendment analysis. For example, when the government facilitates or subsidizes private speech through a government program or subsidy or through a nonpublic forum, content-based distinctions consistent with the program's nature are permissible, whereas those based on "invidious viewpoint discrimination" that seek to "drive certain ideas or viewpoints from the marketplace" are not. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quotation marks and citation omitted).

These related contexts require courts to examine whether the restriction at issue "distort[s]" the "usual functioning" of the program or forum at issue. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Even where "content-based considerations . . . may be taken into account" because of "the nature" of the program, those considerations must be tied to the program's purpose and usual

functioning. *Finley*, 524 U.S. at 584–85 (explaining that the NEA could consider subjective content-based criteria such as "artistic excellence" but could not engage in invidious viewpoint discrimination); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (emphasizing the "nature" of public broadcasting in explaining what First Amendment restrictions apply to it). By the same token, when the government creates a nonpublic forum, it can make content-based decisions to ensure that speech is "compatible with the intended purpose of the property" and "reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983). But those restrictions must still be "viewpoint neutral," and cannot be imposed "solely to suppress the point of view [a speaker] espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

"The traditional purpose of a library is to provide information on a broad range of subjects and viewpoints." *Penguin Random House LLC v. Gibson*, 796 F. Supp. 3d 1052, 1074 (M.D. Fla. 2025) (quoting *Pen Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331) (quotation marks omitted) (internal alterations omitted). The State of Florida itself acknowledges the same, stating that "one of the goals of the school library media program is to 'provide intellectual and physical access to a broad range of literature and informational reading materials.'" *Id.* at 1075 (quoting Fla. Dep't. of Educ. Libr. Media Reading Guidelines). Unlike curricular materials, the "unique role

of the school library" is as a "repository for 'voluntary inquiry.'" *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1523 n.8 (11th Cir. 1989) (quoting *Pico*, 457 U.S. at 869). A school library is the "principal locus" of students' freedom "to inquire, to study and to evaluate, to gain new maturity and understanding," as it "afford[s] them an opportunity at self-education and individual enrichment that is wholly optional." *Pico*, 457 U.S. at 868–69 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 684 (1967)). Giving school board officials the unfettered ability to limit the scope of students' self-directed exploration and inquiry in order to "promote political orthodoxy and by opposition to [certain] viewpoint[s]," *ACLU-FL*, 557 F.3d at 1227, would distort these purposes, and is anathema to the First Amendment's proscription on government censorship.

The fact that in closer cases, it can be difficult for courts to draw lines between constitutionally permissible content-based decisions and constitutionally infirm invidious viewpoint discrimination does not mean the line does not, or should not, exist. "[N]o amount of 'fatigue' should lead [courts] to adopt a convenient 'institutional' rationale—an absolutist, 'anything goes' view of the First Amendment—because it will lighten [their] burdens." *Miller v. California*, 413 U.S. 15, 29 (1973) (footnote omitted). Unfortunately, that is what the district court in this case has done. It is the "duty" of this Court to right this wrong and "uphold the constitutional guarantees" of the First Amendment in the context of ideologically

and animus-motivated school library book removals. *Id.* (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 187–88 (1964))

## II.    Public School Library Curation Is Not "Government Speech."

Despite not squarely deciding the issue, the district court found "persuasive" Defendants' argument that a public school library's choice to remove a book for discriminatory reasons constitutes government speech. Op. 10. This Court should correct this error and clarify that library curation decisions do not qualify for exemption from First Amendment scrutiny under the "government speech" doctrine. Florida and many other states have sought to expand the bounds of "government speech," to the detriment of First Amendment rights, and it is incumbent upon federal courts to hold the line.

### a.    No Court Has Extended Government Speech Doctrine to Public School Libraries.

The Supreme Court has warned that judges "must exercise great caution before extending [the Court's] government-speech precedents" because "it is a doctrine that is susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Namely, overextending the government speech doctrine would allow the government to "silence or muffle the expression of disfavored viewpoints" by "pass[ing] off" various kinds of speech as government speech. *Id.*

Indeed, no court has *ever* held that the removal, relocation, or curation of library materials is government speech. Even *Little v. Llano* did not go that far, with only seven out of seventeen judges sitting en banc adopting the position that "a library's choice of the books on its shelves is government speech." *Little*, 138 F.4th at 860–65. *See also GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) (hereinafter "*GLBT Youth*") (rejecting the idea that "placement and removal of books in public school libraries" is government speech); *Crookshanks*, 775 F. Supp. 3d at 1175 (same); *PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 (same); *Virden v. Crawford Cnty.*, 23-cv-2071, 2024 WL 4360495, at \*5 (W.D. Ark. Sep. 30, 2025) (same); *Fayetteville Pub. Libr. v. Crawford Cnty.*, 760 F. Supp. 3d 811, 834 (W.D. Ark. 2024) (same).

The district court's (and the Fifth Circuit's plurality) citation to *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), analogizing private platforms' content moderation of online speech to public school library catalogue curation, is inapposite, because the Government is bound by the First Amendment, not protected by it. *See Shurtleff*, 596 U.S. at 268–69 (Alito, J., concurring) ("[T]he government-speech doctrine is not based on the view . . . that governmental entities have First Amendment rights."). The *Moody* decision itself recognized that the First Amendment serves to ensure the public "has access to a wide range of views . . . by preventing *the government* from 'tilt[ing] public debate in a preferred direction.'"

*Moody*, 603 U.S. at 741 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011)). The fact that expressive action would be protected if engaged in by a private actor does not make the same action "government speech" when done by the government. *Shurtleff*, 596 U.S. at 268–69 (Alito, J., concurring). Were that true, "[n]aked censorship of a speaker based on viewpoint," which "might well constitute 'expression' in the thin sense that it conveys the government's disapproval of the speaker's message," could be deemed government speech and thus immunized from First Amendment scrutiny. *Id.* "But plainly that kind of action cannot fall beyond the reach of the First Amendment." *Id.*

When the government removes a book because it dislikes the ideas contained in it, as opposed to evaluating "the holistic value of the book individually or as part of a larger collection," "the government is not engaging in expressive activity." *Penguin Random House LLC*, 796 F. Supp. 3d at 1069. "[T]he fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints" further weakens Defendants' government speech argument, because no "reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves." *PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331. In this way, "the speech embodied in a library collection is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and

monuments on public property." *Id.* As the Eighth Circuit recently held, "the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. Nor is it likely to do so because "it is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking." *Id.* at 668.

**b. The *Shurtleff* Factors Favor Plaintiffs.**

To determine whether the government's editorial decisions constitute government speech, reviewing courts must conduct a "holistic inquiry" examining (1) "the history of the expression at issue"; (2) "the public's likely perception" of that expression; and (3) "the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252.

*First*, the history of public school libraries does not indicate that their collections are government speech. Unlike the park monuments in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), the government has not historically used school library collections to speak to the public. *GLBT Youth,* 114 F.4th at 668–69 (citing *Pleasant Grove City*, 555 U.S. 460 and *Matal*, 582 U.S. at 238). Rather, the government's role in establishing and maintaining libraries, including for public schools, is "deciding what private speech to make available to the public." *ALA*, 539 U.S. at 195 (citing *Ark. Educ. Television Comm'n*, 523 U.S. at 672–74). To the extent

libraries have historically been selective in the texts that they choose to accept and present, it is merely to choose materials "of requisite and appropriate quality." *ALA*, 539 U.S. at 195. In short, public school library collections are not "meant to convey" and do not "have the effect of conveying a government message." *GLBT Youth,* 114 F.4th at 668 (quoting *Matal*, 852 U.S. at 238, in turn quoting *Summum*, 555 U.S. at 472).

*Second*, no one considers the library catalogue to be an expression of the state's own views. *Id.* "[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking," *Penguin Random House LLC*, 796 F. Supp. 3d at 1071 (quoting *GLBT Youth*, 114 F.4th at 668), because school library collections have never been "closely identified in the public mind with the government." *GLBT Youth*, 114 F.4th at 668 (quoting *Matal*, 852 U.S. at 238). As the Eighth Circuit pointed out, well-appointed libraries contain texts that contradict one another. *Id*. Thus, if this is the government speaking, it is "babbling prodigiously and incoherently." *Matal*, 582 U.S. at 236. For example, just because an elementary school library catalog contains *Garfield* books, no one would understand the local or state government to be officially endorsing laziness, lasagna over-eating, or hatred of Mondays.

*Third*, there is no history of the government actively "assert[ing] extensive control over removing books from public school libraries." *GLBT Youth*, 114 F.4th

at 668 (citing to *Shurtleff*, 596 U.S. at 258). To the contrary, "[h]istorically, librarians curate their collections based on their sound discretion[,] not based on decrees from on high." *Penguin Random House LLC*, 796 F. Supp. 3d. at 1071. Indeed, the standard practice in public schools for over a century has been for librarians, not school board officials, to make "book selections . . . with the approval of the principal." *Id.* at 668 (citing Am. Libr. Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* 21 (1920)) (internal alterations omitted). Nothing in the record establishes a history of Florida, or Escambia County, officials acting otherwise.

In sum: school libraries "democratize access to a broad range of often-contradictory ideas and provide fertile ground for our minds to grow." *Little*, 138 F.4th at 888 (Higginson, J., dissenting). They "offer every one of us the tools to educate and entertain ourselves, to embrace or reject new ideas, and, above all, to engage and challenge our minds." *Id.* They are not institutions designed for the government to promote or "express its own message." *Shurtleff*, 596 U.S. at 271 (Alito, J., concurring). As a result, the First Amendment applies, and the government speech doctrine does not insulate the government's conduct when engaging in invidious viewpoint discrimination designed to erase LGBTQ voices and experiences.

## CONCLUSION

This Court should vacate the district court's summary judgement order and either order summary judgment in Plaintiffs' favor or remand the case to the district court for reconsideration in light of binding First Amendment precedent.

Dated: December 29, 2025

Daniel B. Tilley
Florida Bar No. 102882
 ACLU FOUNDATION OF FLORIDA
4343 W. Flagler Street, Suite 400
Miami, FL 33134
T. (786) 363-2714
dtilley@aclufl.org

*/s/* Emerson J. Sykes
Emerson J. Sykes
Shana Knizhnik
AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T. (212) 549-2500
esykes@aclu.org
sknizhnik@aclu.org

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief of Amicus Curiae complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief is printed in proportionally spaced 14-point Times New Roman font, using Microsoft® Word 365 and there are 6028 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).

Dated: December 29, 2025          /s/ Emerson J. Sykes
                                  Emerson J. Sykes
                                  AMERICAN CIVIL LIBERTIES
                                     UNION FOUNDATION
                                  125 Broad Street, 18th Floor
                                  New York, NY 10004
                                  T. (212) 549-2500
                                  esykes@aclu.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of December, 2025, the foregoing Brief of *Amicus Curiae* American Civil Liberties Union Foundation was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: December 29, 2025

/s/ Emerson J. Sykes
Emerson J. Sykes
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T. (212) 549-2500
esykes@aclu.org