**CASE NO. 25-13485**

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

Peter Parnell, et al. v. School Board of Escambia County, Florida

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
CASE NO. 4:23-cv-00414-AW-MAF

# ANSWER BRIEF OF DEFENDANT-APPELLEE, SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA

J. DAVID MARSEY
Florida Bar No.: 0010212
E-mail: dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.: 0017056
E-mail: nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.: 1018568
E-mail: jgrosholz@rumberger.com
Rumberger, Kirk & Caldwell, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel: 850.222.6550
Fax: 850.222.8783

and

SAMANTHA DUKE
Florida Bar No. 0091403

Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel: 407.872.7300
Fax: 407.841.2133

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully submits that oral argument would aid the Court in resolving the First Amendment issues in this appeal, including the question of whether the selection and curation of library books in public school libraries is government speech, which is, to Appellee's knowledge, an issue of first impression in this Court.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT .............................................. i
TABLE OF CITATIONS ............................................................................ iii
STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES ........................................................................................ xi
STATEMENT OF THE ISSUES.......................................................................1
STATEMENT OF THE CASE..........................................................................2
I. Nature of the Case ..........................................................................2
II. Course of Proceedings ......................................................................3
III. Statement of the Facts.......................................................................6
IV. Standard of Review...........................................................................9
SUMMARY OF THE ARGUMENT ...............................................................11
ARGUMENT .............................................................................................13
I. The District Court Correctly Entered Judgment in the Board's Favor .........13
  A. The Author Plaintiffs Have No First Amendment Rights to Force the Board to Carry Their Book in Its Libraries...................................13
  B. B.G. Has No First Amendment Right to Receive Her Desired Materials in the Board's Libraries.....................................................22
  C. *Pico* Provides No Aid to Plaintiffs.....................................................26
II. The Selection and Curation of Books for Public Schools Libraries Is Government Speech...............................................................................28
  A. History ..............................................................................................30
  B. Endorsement.......................................................................................32
  C. Control...............................................................................................35
  D. The Court Should Adopt the *Little* Plurality's View on Government Speech ..........................................................................36
III. Plaintiffs Are Not Entitled to Summary Judgment .......................................38
IV. The Court Can Affirm Because Plaintiffs Did Not Show Viewpoint Discrimination Caused *Tango*'s Removal..................................................47
V. The Board Members Are Protected by the Legislative Privilege..................47
CONCLUSION...........................................................................................54
CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ..........................................................................55

## TABLE OF CITATIONS

**CASES**

*Am. Civ. Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) .................................................... 26, 27, 28

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)............................................................... 17, 20, 29, 37

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025)...........................17

*Augusta Iron & Steel Works, Inc. v. Emps. Ins. of Wausau*,
835 F.2d 855 (11th Cir. 1988) ......................................................................44

*Bannon v. Sch. Dist. of Palm Beach Cnty.*,
387 F.3d 1208 (11th Cir. 2004) ....................................................................18

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) ....................................................................17

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)...................................................................... 23, 24, 27

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998)........................................................................... 49, 51

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ....................................................................50

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008)......................................................................37

*Bryant v. Jones*,
575 F.3d 1281 (11th Cir. 2009) ....................................................................51

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*,
115 F.4th 1266 (11th Cir. 2024) ..................................................... 9, 29, 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1985)....................................................................47

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005)........................................................38

*Church v. City of Huntsville*,
30 F.3d 1332 (11th Cir. 1994).......................................................40

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984).................................................................13, 14

*Clark v. Union Mut. Life Ins.*,
692 F.2d 1370 (11th Cir. 1982).....................................................44

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)..................................................14, 15, 17, 21

*Crymes v. DeKalb Cnty.*,
923 F.2d 1482 (11th Cir. 1991).....................................................50

*DeSisto Coll., Inc. v. Line*,
888 F.2d 755 (11th Cir. 1989).......................................................52

*Doe ex rel. Doe v. Governor of N.J.*,
783 F.3d 150 (3d Cir. 2015)..........................................................25

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012).....................................................21

*E.E.O.C. v. Wash. Suburban Sanitary Comm'n*,
631 F.3d 174 (4th Cir. 2011)........................................................49

*Ellis v. Coffee Cnty. Bd. of Registrars*,
981 F.2d 1185 (11th Cir. 1993).....................................................50

*Espanola Way Corp. v. Meyerson*,
690 F.2d 827 (11th Cir. 1982).......................................................52

*Finch v. City of Vernon*,
877 F.2d 1497 (11th Cir. 1989) ....................................................................50

*Florida v. Byrd*,
674 F. Supp. 3d 1097 (N.D. Fla. 2023) ........................................................49

*Fund for Cmty. Progress, Inc. v. Kane*,
943 F.2d 137 (1st Cir. 1991)..........................................................................18

*GLBT Youth in Ia. Schs. Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ........................................................................33

*Greer v. Spock*,
424 U.S. 828 (1976)........................................................................................19

*Gregg v. Barrett*,
771 F.2d 539 (D.C. Cir. 1985)........................................................................25

*Gundy v. City of Jacksonville*,
50 F.4th 60 (11th Cir. 2022) ............................................................ 33, 34, 35

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)....................................................................................4, 44

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981)........................................................................................16

*Hernandez v. City of Lafayette*,
643 F.2d 1188 (5th Cir. Unit A May 1981)....................................................49

*Hudgins v. City of Ashburn*,
890 F.2d 396 (11th Cir. 1989) ........................................................................52

*In re Hubbard*,
803 F.3d 1298 (11th Cir. 2015) ............................................................. 48, 49

*Int'l Ass'n of Machinists & Aerospace Workers, Seminole Lodge 971 v. United Techs. Corp.*,
778 F.2d 1562 (11th Cir. 1986) ......................................................................17

*Ismael v. Roundtree*,
161 F.4th 752 (11th Cir. 2025)....................................................................44

*Ivy v. Ford Motor Co.*,
646 F.3d 769 (11th Cir. 2011)........................................................ 16, 36, 48

*Khoury v. Miami-Dade Cnty. Sch. Bd.*,
4 F.4th 1118 (11th Cir. 2021)........................................................................10

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)........................................................................................25

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992)..........................................................................21

*Leake v. Drinkard*,
14 F.4th 1242 (11th Cir. 2021)........................................................ 30, 32, 35

*Lee v. City of L.A.*,
908 F.3d 1175 (9th Cir. 2018)........................................................................49

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025).... 13, 16, 18, 21, 22, 23, 24, 26, 27, 28, 29, 31, 33, 34, 36, 37, 38, 45, 46

*M.N.C. of Hinesville, Inc. v. U.S. Dep't of Def.*,
791 F.2d 1466 (11th Cir. 1986)......................................................................14

*Marks v. United States*,
430 U.S. 188 (1977)........................................................................................27

*Mason v. Vill. of El Portal*,
240 F.3d 1337 (11th Cir. 2001)......................................................................40

*Matal v. Tam*,
582 U.S. 218 (2017)........................................................................................37

*Matthews v. Columbia Cnty.*,
294 F.3d 1294 (11th Cir. 2002)......................................................................40

*McDonough v. Garcia*,
116 F.4th 1319 (11th Cir. 2024) ....................16

*McGriff v. City of Miami Beach*,
84 F.4th 1330 (11th Cir. 2023).................... 29, 32, 35, 36

*Mech v. Sch. Bd. of Palm Beach Cnty.*,
806 F.3d 1070 (11th Cir. 2015).................... 29, 32, 33

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).................... 29, 34, 37

*Muir v. Ala. Educ. Television Comm'n*,
688 F.2d 1033 (Former 5th Cir. 1982) .................... 26, 27

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*,
522 F.3d 1211 (11th Cir. 2008).................... 16, 36, 48

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)....................21

*Neinast v. Bd. of Trs. of Columbus Metro. Libr.*,
346 F.3d 585 (6th Cir. 2003)....................21

*Oravec v. Sunny Isles Luxury Ventures, L.C.*,
527 F.3d 1218 (11th Cir. 2008)....................47

*Parnell v. Sch. Bd. of Escambia Cnty.*,
802 F. Supp. 3d 1361 (N.D. Fla. 2025)... 6, 13, 14, 16, 20, 22, 24, 25, 27, 28, 36, 44

*Parnell v. Sch. Bd. of Lake Cnty.*,
No. 4:23-cv-414-AW-MAF, 2024 WL 5508347 (N.D. Fla. Sept. 24, 2024)..... .5, 48, 51, 52

*Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Dist.*,
No. 24-13896, 2025 WL 1937264 (11th Cir. July 15, 2025)....................48

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005)....................36

*Perez v. Hoblock*,
368 F.3d 166 (2d Cir. 2004) ....................................................................19

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)....................................................................................39

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)....................................................................... 20, 34, 38

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................................................................................39

*Rudolph v. United States*,
92 F.4th 1038 (11th Cir. 2024) ..................................................................17

*Ryan v. Burlington Cnty.*,
889 F.2d 1286 (3d Cir. 1989) ....................................................................52

*Schneider v. Indian River Cmty. Coll. Found., Inc.*,
875 F.2d 1537 (11th Cir. 1989) ..................................................................27

*Sconiers v. Lockhart*,
946 F.3d 1256 (11th Cir. 2020) ..................................................................44

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)............................................................................ 30, 36

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*,
641 F.3d 197 (6th Cir. 2011) ....................................................................52

*Stein v. Reynolds Sec., Inc.*,
667 F.2d 33 (11th Cir. 1982) ....................................................................26

*Sutton v. Wal-Mart Stores E., LP*,
64 F.4th 1166 (11th Cir. 2023) ....................................................................9

*Tenney v. Brandhove*,
341 U.S. 367 (1951)....................................................................................49

*Thornburgh v. Abbott*,
490 U.S. 401 (1989).........................................................................19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969).........................................................................21

*United States v. Am. Libr. Ass'n*,
539 U.S. 194 (2003)................................................................ 20, 24, 32, 34

*United States v. Brewster*,
408 U.S. 501 (1972).........................................................................48

*Universal Amusement Co. v. Hofheinz*,
616 F.2d 202 (5th Cir. 1980).............................................................50

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976).........................................................................25

*Waldman v. Conway*,
871 F.3d 1283 (11th Cir. 2017)................................................... 28, 47

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)................................................................... 29, 35

*Wells v. City & Cnty. of Denver*,
257 F.3d 1132 (10th Cir. 2001).........................................................17

*Whiteland Woods, L.P. v. Twp. of W. Whiteland*,
193 F.3d 177 (3d Cir. 1999)..............................................................17

*Wideman v. Shallowford Cmty. Hosp., Inc.*,
826 F.2d 1030 (11th Cir. 1987).........................................................23

*Woods v. Gamel*,
132 F.3d 1417 (11th Cir. 1998).................................................... 52, 53

*Yeldell v. Cooper Green Hosp., Inc.*,
956 F.2d 1056 (11th Cir. 1992).................................................... 51, 52

**STATUTES**

Fla. Stat. § 1001.32 ....................6, 50

Fla. Stat. § 1001.42 .................... 4, 6, 34, 40

Fla. Stat. § 1006.28 .................... 6, 7, 20, 33, 36

Tex. Loc. Gov't Code § 323.005 ....................33

Tex. Loc. Gov't Code § 323.006 ....................33

**OTHER AUTHORITIES**

2002 Fla. Laws ch. 2002-387....................31

2023 Fla. Laws ch. 2023-105....................4

Fla. Const. art. IX, § 4....................6, 50

Fla. Const. art. XII, § 11 (1885)....................30

**RULES**

Fed. R. Civ. P. 56(a)....................39

**BOOKS & TREATISES**

Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* (1920)....................31

Tom J. Cole, *The Origin and Development of School Libraries*, 37 Peabody J. of Educ. 87 (Sept. 1959) ....................31

U.S. Dep't of Interior, *Public Libraries in the United States of America: Their History, Condition, and Management* (1876)....................31

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

Appellee adopts by reference Appellants' Statement of Jurisdiction and is satisfied with Appellants' statement.

## STATEMENT OF THE ISSUES

1. Whether the district court properly granted summary judgment to Appellee on the basis that Appellee did not violate the First Amendment by removing a book from its library shelves.

2. Whether the selection and curation of library books in public schools constitutes government speech.

3. Whether the district court erred in denying Appellants' motion for summary judgment.

4. Whether Appellants failed to prove viewpoint discrimination was the reason behind Appellee's removal of the book at issue.

5. Whether the district court properly found school board members voting to remove a public school library book is an act covered by the legislative privilege.

## STATEMENT OF THE CASE[1]

### I. Nature of the Case

This appeal arises from a First Amendment challenge to a vote by the members of Appellee-Defendant, the School Board of Escambia County, Florida (collectively, "the Board"; individually, "the Board members"), to remove the book *And Tango Makes Three* ("*Tango*") from its public school libraries. Appellants-Plaintiffs consist of a minor student who attends school in the Escambia County School District ("District"), B.G., and the authors of *Tango* ("the Author Plaintiffs") (collectively, "Plaintiffs"). Plaintiffs sued the Board alleging First Amendment violations, bringing one count of viewpoint discrimination on behalf of the Author Plaintiffs, and one count of violation of the purported right to receive information in the context of school libraries on behalf of B.G.

As part of discovery, Plaintiffs sought to depose the Board members. The Board sought—and was granted—a protective order on behalf of the Board members, on the grounds that the act of voting to remove *Tango* is one covered by the legislative privilege, barring these depositions.

[1] Citations to the record below designate the original docket entry ("D.E."); citations to documents in this appeal are designated as ("Doc."); Plaintiffs' Initial Brief is designated as ("IB"). Where applicable, the document's page number and/or paragraph are referenced.

After discovery, both parties moved for summary judgment. The district court granted the Board's motion and denied Plaintiffs'. The district court determined the Board's library shelves did not constitute a forum for their speech, and therefore found Plaintiffs lacked First Amendment rights to challenge the Board's decision to remove *Tango*. The district court also considered, but did not decide, whether the Board's action constituted government speech. The district court entered final judgment in the Board's favor. This appeal followed.

## II. Course of Proceedings

Plaintiffs first initiated suit in June 2023 in the United States District Court for the Middle District of Florida. (D.E. 1). The Board was not named in this pleading. *See id.* After Plaintiffs' motion for preliminary injunction was denied, (D.E. 51), Plaintiffs filed an amended complaint on August 25, 2023, which named the Board and its Superintendent—in his official and individual capacities—as defendants, among others. (D.E. 61 ("Complaint")). The Board moved to transfer the matter to the United States District Court for the Northern District of Florida. (D.E. 71). This motion was granted. (D.E. 79). Plaintiffs do not challenge this decision on appeal. *See generally* IB.

The Board (and other defendants) then moved to dismiss the Complaint. (D.E. 108-110). The district court entered an order in April 2024, partially granting the motions to dismiss. (D.E. 151). The district court dismissed individual defendants

named on behalf of the State of Florida, defendants representing the School Board of Lake County, Florida, and the Board's Superintendent. *See id.* at pp. 26-27. The district court also dismissed two counts of Plaintiffs' Complaint which challenged section 1001.42, Florida Statutes, under the First and Fourteenth Amendments. *Id.* at p. 27. Plaintiffs also do not challenge this decision on appeal. *See generally* IB.

This left two counts remaining against the Board: (1) a First Amendment claim for content[2] and viewpoint discrimination under section 1001.42(8)(c)3., Florida Statutes (2022),[3] by the Author Plaintiffs; and (2) a First Amendment claim for a violation of the right to receive under section 1001.42(8)(c)3., Florida Statutes, by B.G. *Id.*; *see also* (D.E. 61 at pp. 48-53).

The parties engaged in discovery and, as part of this process, Plaintiffs sought to depose the Board members. (D.E. 157-1). After the Board's first motion for protective order was denied without prejudice, (D.E. 163), the Board again sought a

---

[2] Plaintiffs abandoned their theory of content-based discrimination since they did not argue it on summary judgment or in this appeal. *See generally* (D.E. 221); IB. Regardless, the law is unequivocal that schools can restrict speech based on its content if it is reasonably related to legitimate pedagogical concerns. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

[3] Unless otherwise indicated, all references to Florida Statutes are to the 2022 versions, given the conduct for which Plaintiff sued occurred in February 2023. *See* (D.E. 61 at ¶¶ 9, 40, 101). Additional changes to section 1001.42(8)(c)3., Florida Statutes, did not take effect until July 1, 2023, after the Board voted to remove *Tango*. *See id.* at ¶ 42; *see also* 2023 Fla. Laws ch. 2023-105, §§ 3, 9.

protective order on behalf of the Board members, arguing the act of voting to remove *Tango* is one protected by the legislative privilege. (D.E. 164). The Board's motion included declarations from each Board member averring their intent to assert the legislative privilege and their consent for the Board to raise it on their behalf. (D.E. 164-1–164-5). Plaintiffs responded in opposition. (D.E. 168). The district court held a hearing, (D.E. 180), and—at the district court's request—the parties submitted supplemental briefing. (D.E. 182, 183). On September 24, 2024, the district court granted the Board's motion for protective order, determining: (1) the Board could sufficiently invoke the privilege on behalf of the Board members; (2) the legislative privilege covered the Board members' votes to remove *Tango*; and (3) that the Board members had not waived any privilege. (D.E. 191, reported at *Parnell v. School Board of Lake County*, No. 4:23-cv-414-AW-MAF, 2024 WL 5508347 (N.D. Fla. Sept. 24, 2024)).

After discovery closed, the parties both moved for summary judgment, submitting exhibits in support. (D.E. 215, 216, 220, 221). Each side responded to the other's motion, (D.E. 225, 227), and also filed replies in support of their respective motions. (D.E. 228, 229). A pretrial stipulation was submitted by the parties, (D.E. 245), and a pretrial conference was held on February 10, 2025, at which both parties presented arguments concerning their motions for summary judgment. (D.E. 251).

On September 30, 2025, the district court entered its final order, granting the Board's motion for summary judgment and denying Plaintiffs'. (D.E. 261, reported at *Parnell v. School Board of Escambia County*, 802 F. Supp. 3d 1361 (N.D. Fla. 2025)). Final judgment was entered that day. (D.E. 262). Plaintiffs filed their notice of appeal on October 3, 2025. (D.E. 263).

## III. Statement of the Facts

Contrary to Plaintiffs' statement, the core facts underlying the appeal are not all undisputed. IB at 6. Indeed, the Board objected to much of Plaintiffs' statement of facts from Plaintiffs' motion for summary judgment. *See* (D.E. 225 at pp. 2-4).

The Board is the entity constitutionally vested with the authority and duty to "operate, control and supervise all free public schools within the [District]." Fla. Const. art. IX, § 4(b); Fla. Stat. § 1001.32(2). As of February 2023, the Board members were: Kevin Adams, Paul Fetsko, Patricia Hightower, William Slayton, and David Williams. *See* (D.E. 215-1 at ¶ 5).

Pursuant to section 1001.42(9), Florida Statutes, the Board is to "[p]rovide adequate instructional materials for all students in accordance with the requirements of chapter 1006." Section 1006.28(2)(a)1., Florida Statutes, in turn, states each district school board is responsible for the content of all materials made available in a school library, whether otherwise purchased or made available. Books made available in the Board's libraries are selected by District employees and purchased

by the Board. *Id.* § 1006.28(2)(d). Each book in a school library bears a bar code or other ownership tag indicating it is the Board's property. (D.E. 215-2 at pp. 8-11 (Interrog. Resp. No. 3)).

In 2022, section 1006.28(2)(a)2.b., Florida Statutes, stated:

> Each district school board must adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material, which clearly describes a process to handle all objections and provides for resolution. The process must provide the parent or resident the opportunity to proffer evidence to the district school board that:
>
> . . .
>
> b. Any material used in a classroom, made available in a school library, or included on a reading list contains content that is pornographic or prohibited under s. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used.
>
> If the district school board finds that an instructional material does not meet the criteria under sub-subparagraph a. or that any other material contains prohibited content under sub-subparagraph b., the school district shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable.

At the time the Board voted to remove *Tango*, Board Policy 4.06 governed the proper procedure and process for the selection, review, restriction, and removal of book titles, as well as procedures for objecting to particular titles. *See* (D.E. 215-3). *Tango* was, at that time, available in five elementary schools. (D.E. 215-4 at ¶ 5).

On or around August 24, 2022, an individual named Vicki Baggett submitted a challenge to *Tango*. (D.E. 61 at ¶ 90). On February 20, 2023, the Board held a special meeting to consider this challenge to *Tango* per section 1006.28(2)(a)2. (D.E. 61 at ¶ 101); (D.E. 61-4). A motion to leave *Tango* in the school libraries failed 2-3. (D.E. 61 at ¶ 101).

Board members Kevin Adams, Paul Fetsko, and David Williams voted "no" on the motion, and made public comments about their decision. *See* (D.E. 93); *see also* (D.E. 93-1, 10:02-13:08); (D.E. 220-24, 87:14-88:21).[4] For example, in discussing his vote, Mr. Fetsko referenced his concern that—although "it [was] neat that the two male penguins had the compassion and the love to nurture this egg and watch it hatch to feed the chick and raise it"—the book nonetheless "sexualiz[ed] what was going on with the penguins" via innuendo. *See* (D.E. 93-1, 11:13-12:04). This "verbiage" gave him "pause to say do we just give it to a child to read without an adult there to interpret, to give support, to give understanding." *Id*. at 12:05-12:15.

On the same date Ms. Baggett challenged *Tango*, she also challenged the title *Drama*, by Raina Telgemeier. *See* (D.E. 215-6). Ms. Baggett's objection was

---

[4] The Board and Plaintiffs filed a transcript from the Board's public meeting at which *Tango* was removed at various times throughout the lawsuit. *See* (D.E. 93-1; 220-24). The video of this meeting is also publicly available at: https://www.youtube.com/watch?v=7khKXKqvf0Q&list=PLkuTAI1Za_y4DWZFLI57Kuze0qetQ0031&index=44.

"Indoctrination of LGBTQ; age inappropriate + content not relevant." *Id.* On March 20, 2023, the Board held a special meeting to consider a citizen's challenge to *Drama* per section 1006.28(2). (D.E. 215-7). The Board voted on a motion to keep *Drama* as middle and high school material. (D.E. 215-8). The motion carried, with four of five Board members voting in favor of it. *Id.*

The record shows that, as of November 2024, the Board had never voted to keep a challenged book in elementary school libraries. (D.E. 215-4 at ¶ 7).

## IV. Standard of Review

This Court "review[s] a district court's decision on summary judgment *de novo* and appl[ies] the same legal standard used by the district court, drawing all inferences in the light most favorable to the non-moving party and recognizing that summary judgment is appropriate only where there are no genuine issues of material fact." *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023) (citation omitted).

Likewise, "[w]hen the parties have filed cross-motions for summary judgment, [this Court] review[s] *de novo* the district court's grant of summary judgment and view[s] the facts in the light most favorable to the non-moving party on each motion." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1287 (11th Cir. 2024).

The standard of review for the district court's ruling on discovery matters is for abuse of discretion. *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1125 (11th Cir. 2021). This decision will not be disturbed "unless the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.* (citation omitted).

## SUMMARY OF THE ARGUMENT

The district court properly granted the Board summary judgment because Plaintiffs' First Amendment rights do not apply to a school board's decision to remove a book from public school libraries. The district court's determination that the shelves of the Board's library shelves do not constitute a forum for Plaintiffs' First Amendment rights was correct.

Alternatively, this Court should affirm because the Board's selection and curation of books for its libraries constitute government speech, and therefore Plaintiffs have no First Amendment rights to compel the Board include or make available certain texts in its libraries.

Because the district court properly granted summary judgment in the Board's favor, it appropriately denied Plaintiffs' motion for summary judgment. This ruling should not be disturbed. But even if the Court reverses the district court's grant of summary judgment, this Court should not remand with instructions to grant Plaintiffs' motion for summary judgment. In that event, the Board would contend Plaintiffs have not met their burden—itself grounds for affirmance—or, at a minimum, disputes of material fact remain precluding judgment in Plaintiffs' favor.

Finally, this Court need not reach the question of legislative privilege because Plaintiffs' lack of First Amendment rights is dispositive. If the Court does reach this issue, it should affirm the district court's order granting the Board's motion for

protective order shielding the Board members from compelled testimony. A school board member's act of voting to remove a library book is one that is protected by the legislative privilege.

## ARGUMENT

### I. The District Court Correctly Entered Judgment in the Board's Favor

#### A. The Author Plaintiffs Have No First Amendment Rights to Force the Board to Carry Their Book in Its Libraries

This Court should affirm the district court's decision that parties cannot challenge the decision to remove library books based on the First Amendment. *Parnell*, 802 F. Supp. 3d at 1367-68. This finding was consistent with the Fifth Circuit's recent en banc decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025).[5] Simply put, "[t]he Author Plaintiffs have no First Amendment right to speak through the library." *Parnell*, 802 F. Supp. 3d at 1368.

In urging this Court to reverse, Plaintiffs argue that the district court created a "public library exception." IB at 14. But this is an incorrect framing of the issue, and of Plaintiffs' own position. The district court observed—and Plaintiffs effectively agreed—it is Plaintiffs' burden to prove that the Board's library shelves are a forum for their speech. (D.E. 251, 7:20-7:23). This aligns with the Supreme Court's holding that "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

[5] A majority of judges joined *Little*'s holding that removal of books does not violate the Free Speech Clause, and a plurality joined the finding that the selection and curation of library books constitutes government speech. 138 F.4th at 835 n.†.

"To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Id.* "In the absence of a showing that such a rule is necessary to protect vital First Amendment interests, *we decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it*." *Id.* (emphasis added); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) (noting that to resolve plaintiffs' First Amendment challenge, "we must first decide whether [their conduct] is speech protected by the First Amendment, for, if it is not, we need go no further").

Here, though, the Author Plaintiffs failed to meet their burden to establish that the Board's library shelves are a forum for their speech. *See Parnell*, 802 F. Supp. 3d at 1367-68; *see also M.N.C. of Hinesville, Inc. v. U.S. Dep't of Def.*, 791 F.2d 1466, 1472 (11th Cir. 1986) ("The location where a speaker conveys or wishes to convey its message is relevant to deciding whether government regulation of that speech is permissible."). In fact, Plaintiffs generally overlook their burden and state the Court "need not resolve whether public school libraries are limited or non-public forums." IB at 21. But this argument presupposes that the Board's library shelves are a forum for speech to begin with and thus skips the crucial step of determining whether the First Amendment even applies.[6] *See Clark*, 468 U.S. at 293 n.5. To the

[6] As discussed below, the caselaw cited by Plaintiffs is distinguishable. Relying primarily upon broad statements of what the First Amendment does and does not

extent Plaintiffs have not satisfied their burden of showing the First Amendment even applies here, their claims fail. *Cf. Cornelius*, 473 U.S. at 797 ("Assuming that [the expression] is protected speech, we must identify the nature of the forum[.]").

Additional examination of Plaintiffs' challenge reveals further flaws. Under questioning from the district court, Plaintiffs' counsel admitted they "have never contended that" the Author Plaintiffs have an "affirmative right . . . to force their books into public school libraries." (D.E. 251, 40:15-41:05); *see also id.* at 44:09-44:11 ("It's not our position that the authors have an affirmative right for their materials to be selected for school libraries."). Indeed, Plaintiffs' counsel agreed that when it came to the "selection" of books, they "[did not] even really know in what context somebody would try to frame the First Amendment right in the first place." *Id.* at 41:10-41:13. Nevertheless, Plaintiffs continue to argue that the Board's removal of *Tango* somehow constituted interference with their free speech rights. *Id.* at 41:05-41:09.

But as the district court recognized, Plaintiffs failed to offer—and continue to fail to offer—any principled reason why the Board's decision to *select* a book is any

---

permit, *see generally* IB at 15-19, Plaintiffs have not offered any persuasive reasons specific to the question of why the Board's library shelves—as opposed to other fora or parts of libraries—are a forum for speech.

different from the Board's decision to *remove* a book.[7] *See Parnell*, 802 F. Supp. 3d at 1369; (D.E. 251, 42:02-42:17 (admitting "there would not be a principled reason to treat it differently" responding to a hypothetical concerning authors trying to compel library to accept book)); *see also Little*, 138 F.4th at 845 ("[I]f people can challenge which books libraries remove, they can challenge which books libraries buy."). That is, if the Author Plaintiffs have no right to force the Board to purchase their book—as Plaintiffs concede—what right do they have to challenge the Board's decision to remove that book? The answer is they have no such a right, which the district court correctly recognized. *Parnell*, 802 F. Supp. 3d at 1367-69.

The shelves of the Board's libraries are not a forum for the Author Plaintiffs' speech. *Little*, 138 F.4th at 859 (plurality op.) ("[I]t makes no sense to apply forum analysis to a library's collection"). The fact that the Board's libraries are government property does not automatically transform all aspects of the library into a forum for speech. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."); *see also McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (en banc) ("The First

---

[7] Plaintiffs' failure to challenge this aspect of the district court's ruling should be considered a waiver or abandonment of this issue. *Ivy v. Ford Motor Co.*, 646 F.3d 769, 773 (11th Cir. 2011); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 n.4 (11th Cir. 2008).

Amendment, after all, does not guarantee access to property simply because it is owned or controlled by the government." (citation modified)). As the Supreme Court has observed, "[w]here the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum *or not a forum at all*." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998) (emphasis added); *see also id.* at 677 ("Other government properties are either nonpublic fora or not fora at all.").[8]

This is because "forum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum, [courts] have focused on the access sought by the speaker." *Cornelius*, 473 U.S. at 801. Here, because the Author Plaintiffs do not have "access" to the Board's library shelves—that is, they

---

[8] While this Court has commented that nonpublic fora and what the Supreme Court in *Forbes* described as "not fora at all" are the same, this comment was dicta because the nature of the fora in that case was not disputed, and the Court "agree[d] with the parties that the [fora in question] [were] limited public fora." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224-25 (11th Cir. 2017). *Barrett*'s digression was therefore "a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case," and is "not binding on anyone for any purpose." *Rudolph v. United States*, 92 F.4th 1038, 1045 (11th Cir. 2024) (citations omitted); *see also Int'l Ass'n of Machinists & Aerospace Workers, Seminole Lodge 971 v. United Techs. Corp.*, 778 F.2d 1562, 1564 n.1 (11th Cir. 1986). The Supreme Court has not disavowed its statement in *Forbes*, *see* 523 U.S. at 677-78, and other courts have reiterated it. *See, e.g.*, *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1145 (10th Cir. 2001); *Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 182 n.2 (3d Cir. 1999); *see also Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *5 (D.C. Cir. June 6, 2025) ("Some government properties, however, are 'not fora at all.'" (citation omitted)).

do not possess some freestanding right to compel the Board to carry their book—it is clear the Board's libraries are "not a forum at all, public or nonpublic, and there is no First Amendment question." *Fund for Cmty. Progress, Inc. v. Kane*, 943 F.2d 137, 138 (1st Cir. 1991).

To find otherwise—that is, to say the Author Plaintiffs have a standing right to access and contest the decisions concerning the books on the Board's library shelves—would result in untenable circumstances. For example, if the Board decided to remove a poster from the wall of the library, could its designer sue for viewpoint discrimination? If the Board decided to paint the library walls a neutral color rather than pink, could someone advocating on behalf of breast cancer awareness challenge this decision? *Cf. Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1216 (11th Cir. 2004) (disagreeing with plaintiff that a school is required to allow students to proselytize via painted murals in school hallways).

The answer to these questions must be no. *See Little*, 138 F.4th at 859 (plurality op.) ("Library shelves are not a community bulletin board: they are not 'places' set aside for 'public expression of particular kinds or by particular groups.'" (citation omitted)). Not all decisions by the Board are subject to First Amendment scrutiny because not all of the Board's decisions implicate others' First Amendment rights. Plaintiffs effectively conceded as much, admitting certain types of actions by the Board are simply "just decisions that are made by the [B]oard." (D.E. 251, 20:13-

20:21 (stating Board's decision to paint schools a certain color would not be speech subject to scrutiny)).

Plaintiffs contend that the Board's libraries—writ large—are the forum for the Author Plaintiffs' speech, likening it to other areas where the First Amendment exists but is at its nadir. *See* IB at 16, 24; *cf. Perez v. Hoblock*, 368 F.3d 166, 173 (2d Cir. 2004) ("In a nonpublic forum, an individual's freedom of speech is at its nadir." (citation modified)). But this misses the mark: it is the shelves themselves that are the forum at issue. Hence, the Board's libraries are not akin to the military base in *Greer v. Spock*, 424 U.S. 828 (1976), because the base there had occasionally invited civilian speakers to address military personnel. *Id.* at 831. Here, there is no record evidence the Board has ever solicited authors to submit their books for selection in the Board's libraries. *See* (D.E. 215-3 at pp. 8-17 (Board's policy on media materials, discussing process of book selection)). Likewise, the prison regulation in *Thornburgh v. Abbott*, 490 U.S. 401 (1989), implicated the publishers' "First Amendment interest in access to prisoners," since those prisoners, "who, through subscription, willingly [sought] [the publishers'] point of view." *Id.* at 408.[9] But that is not the case here.

---

[9] Taken at face value, though, these hypotheticals fail given Plaintiffs' admission that even in nonpublic fora like "military bases, jails," they cannot simply "go to a jail right now or to a military base and start affirmatively sharing [their] viewpoint,"

Again, the Board does not solicit, request, or otherwise advertise that authors can submit materials for inclusion on its library shelves. *See* (D.E. 251, 42:18-42:22 (Plaintiffs' admission that the Board's policy "doesn't include authors making pitches to the library")). Rather, "[e]ach book made available to students through a school district library media center must be selected *by a school district employee* regardless" of its origin. Fla. Stat. § 1006.28(2)(d)1. (emphasis added) (citation modified); *see also* (D.E. 215-3 at p. 11). Thus, the district court was correct in finding that "when the government decides which books to choose, it is not creating a forum for others to speak, and it is not otherwise implicating Plaintiffs' First Amendment rights." *Parnell*, 802 F. Supp. 3d at 1367.

"[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." *Pleasant Grove City v. Summum*, 555 U.S. 460, 480 (2009). Just so here, as "curating a library inherently requires an 'exercise of judgment in selecting the material' in the library, so 'forum analysis and heightened judicial scrutiny are incompatible.'" *Parnell*, 802 F. Supp. 3d at 1368 (quoting *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 205 (2003) (hereafter "*ALA*") (plurality op.)); *see also Forbes*, 523 U.S. at 673 ("As a general rule, the nature of editorial discretion counsels against subjecting

---

agreeing this is "not viewpoint discrimination," and "wouldn't give [them] a First Amendment claim." (D.E. 251, 52:02-52:18).

[government] broadcasters to claims of viewpoint discrimination."); *cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view[.]").

Accordingly, that schools (or libraries) may be fora for speech in other contexts is of no matter; it is the nature of the specific fora that matters because that dictates the level of access. *See Cornelius*, 473 U.S. at 800. So while the Board may not be able to prohibit students from engaging in peaceful First Amendment expression that does not create a material disruption, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969), it does not automatically follow that this transforms the Board's library shelves into a forum for speech.

Plaintiffs' cited cases, *see* IB at 21, are of no aid in this respect, given these considered instances where individuals were barred access to the library writ large on the basis of being: (1) a sex offender, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1115 (10th Cir. 2012); (2) barefoot, *Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 588-89 (6th Cir. 2003); and (3) homeless/menacing. *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1246-47 (3d Cir. 1992). "[T]hose cases addressed whether a library could evict someone from its *premises*, not whether someone could demand the library put certain books on its *shelves*." *Little*, 138 F.4th at 845. They do not support Plaintiffs' contention that individuals "can make a library carry the books they want," because "[b]y definition, libraries

must have discretion to keep certain ideas—certain viewpoints—off the shelves." *Id.* at 845, 848; *see also id.* at 859 (plurality op.) ("It is one thing to say that a public library's *premises* may constitute some kind of public forum. A library might open one of its rooms to poetry readings by the public and thereby create a limited public forum. It is entirely another thing, though, to extend this concept to a library's *bookshelves*. Plaintiffs' cases lend no support for that." (citation modified)).

This Court should affirm the district court's entry of judgment in favor of the Board as to Count I.

B. B.G. Has No First Amendment Right to Receive Her Desired Materials in the Board's Libraries

This Court should also affirm the district court's entry of judgment in the Board's favor as to B.G.'s claim under the alleged right to receive information in the public school library setting. This is because, while the right to receive information exists in some contexts, the public school library is not one of them. Like the plaintiffs in *Little*, Plaintiffs would "stretch the right far beyond its roots." 138 F.4th at 845.

Here, Plaintiffs admit the district court's "underlying observation" that "there is a difference between asserting the right to receive information and demanding that the government provide that information," was correct. IB at 26 (quoting *Parnell*, 802 F. Supp. 3d at 1368). Yet they resist the district court's decision not to apply the

right to receive in the context of the Board's libraries on the grounds that, by virtue of creating libraries, the Board is now subject to First Amendment scrutiny for its curation decisions in those libraries. *See id.*

This strained logic shows why the right to receive information does not exist in the context of a public school library. B.G.'s right is to "receive information from others without government interference." *Little*, 138 F.4th at 845. That is, her right is to be free from government interference "with the exchange of information by private citizens." *Id.* at 843 (citation omitted). This aligns with the principle that "the Constitution is a charter of negative rather than positive liberties." *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1033 (11th Cir. 1987) (citation modified); *accord Little*, 138 F.4th at 843; *see also Little*, 138 F.4th at 866 (Ho, J., concurring) ("Our founders enacted a charter of negative liberties.").

Here, however, B.G. "demand[s] to receive information from the government itself." *Little*, 138 F.4th at 845. But this is not what the right requires, as such an interpretation would so hamstring the Board that, once a book is acquired, it could effectively never be removed under pain of a constitutional challenge and transform federal courts into "'super censor[s]' of school board library decisions." *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 885 (1982) (Burger, C.J., dissenting) (plurality op.).

Conversely, the Board would also be liable for its failure to acquire certain books. *Little*, 138 F.4th at 846. As the district court and the *Little* majority understood, this creates logistical problems that cannot be reconciled with the role of Article III courts. *See Parnell*, 802 F. Supp. 3d at 1369; *see also Little*, 138 F.4th at 846-47. Moreover, the Board's action in removing *Tango* does not prevent B.G. from "receiving" its information: the Board "does not own every copy" of *Tango*, and B.G. "could buy the book online or from a bookstore," "borrow it from a friend," or "look for it at another library." *Little*, 138 F.4th at 848 (citing *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting)). Indeed, as the district court noted, "Plaintiffs attached a complete copy of [*Tango*] to their operative complaint." *Parnell*, 802 F. Supp. 3d at 1363 n.1.

This demonstrates the unworkable nature of Plaintiffs' position. As *ALA* teaches, libraries "must have broad discretion to decide what material to provide to their patrons." 539 U.S. at 204 (plurality op.). That discretion allows them "to separate out the gold from the garbage." *Little*, 138 F.4th at 854 (plurality op.) (quoting *ALA*, 539 U.S. at 204). In line with this broad discretion, "plaintiffs cannot challenge the [Board's] decision to remove [*Tango*] by invoking a right to receive information." *Id.* at 850-51.

Just as "[t]he Author Plaintiffs have no First Amendment right to speak through the library," B.G. likewise cannot invoke the "right to receive the Author

Plaintiffs' message through the library." *Parnell*, 802 F. Supp. 3d at 1368 (citation omitted). This is because B.G.'s right to receive exists as a corollary of the Author Plaintiffs' right to speak, i.e., the latter "necessarily protects" the former. *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972). Since the Author Plaintiffs have no right to speak, B.G. has no reciprocal right to receive. *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015) ("The listener's right to receive information is reciprocal to the speaker's right to speak." (citations omitted)); *cf. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both.").

The First Amendment does not require the government to provide access to information it possesses on demand, and it certainly does not require the government to gather information. *See Gregg v. Barrett*, 771 F.2d 539, 547 (D.C. Cir. 1985). The First Amendment right to receive information requires only that the government not engage in conduct that impermissibly silences a willing speaker. Accordingly, when a First Amendment claim fails to allege a willing speaker's speech has been chilled, the claim should be dismissed for failing to state a claim. *See id.* at 546-49.

This Court should affirm the district court's entry of judgment in favor of the Board as to Count II.

C. *Pico* Provides No Aid to Plaintiffs

Plaintiffs (and amici) rely heavily on the *Pico* plurality decision. *See, e.g.*, IB at 17-19; *see also* (Doc. 30, 34, 36). But as this Court has made abundantly clear, "*Pico* is a non-decision so far as precedent is concerned." *Am. Civ. Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009) (hereafter "*ACLU*"); *see also Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality op.) ("*Pico* is of no precedential value as to the application of the First Amendment to these issues.").

As this Court noted in *ACLU*, even though *Muir* was a plurality opinion, a majority of judges "explicitly recognized that the *Pico* decision has no precedential value." 557 F.3d at 1200 n.4. Thus, this finding from *Muir* is binding. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (recognizing that decisions "made by a non-unit panel of the Former Fifth" are considered binding precedent). And that ruling was that "*Pico* carries no precedential weight." *Little*, 138 F.4th at 843-44 (citing *Muir*, 688 F.2d at 1045 n.30, and quoting it for proposition that "we conclude that the Supreme Court decided neither the extent, nor, indeed, *the existence, vel non., of First Amendment implications in a school book removal case*" (emphasis added)).

This fatally undercuts Plaintiffs' view that *Pico* "produce[d] a controlling opinion that the First Amendment's prohibition on viewpoint discrimination *does*

apply." IB at 18-19. This Court was emphatic that *Pico* "establishes no standard." *ACLU*, 557 F.3d at 1200. This accords with the *Marks* rule,[10] which stands for the "principle that, absent a majority opinion, the narrowest concurring opinion is the holding of the case." *Schneider v. Indian River Cmty. Coll. Found., Inc.*, 875 F.2d 1537, 1541 (11th Cir. 1989). This means that Justice White's concurrence represents the holding, if any, of *Pico*. *See Little*, 138 F.4th at 844; *see also Muir*, 688 F.2d at 1045 n.30. But Justice White's opinion "said nothing about the First Amendment." *Little*, 138 F.4th at 844; *see also Pico*, 457 U.S. at 883 (White, J., concurring) ("The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. *I see no necessity for doing so at this point.*" (emphasis added)); *Muir*, 688 F.3d at 1051 n.18 (Rubin, J., concurring) (noting Justice White "concurred in the judgment of the Court but did not reach [the First Amendment] issue").

Plaintiffs are thus incorrect the district court's decision flaunted precedent. *See* IB at 19. Instead, the district court accurately concluded that "neither *Pico* nor *ACLU* supports Plaintiffs' position." *Parnell*, 802 F. Supp. 3d at 1368-69. This Court should "reaffirm what [the Former Fifth] held over forty years ago," *Little*, 138 F.4th

---

[10] *Marks v. United States*, 430 U.S. 188, 193 (1977).

at 844, and reject any attempts by Plaintiffs to import *Pico*'s "badly fractured decision" into this circuit's jurisprudence. *ACLU*, 557 F.3d at 1199.

## II. The Selection and Curation of Books for Public Schools Libraries Is Government Speech

An additional, and independent, reason to affirm the district court is that the Board's selection and curation of library books is government speech. Although this argument was considered by the district court—who admitted that it had "some force"—it ultimately declined to rule on it, instead concluding that "even if book curation is *not* government speech," the Board was still entitled to judgment in its favor. *Parnell*, 802 F. Supp. 3d at 1365, 1367. Should the Court not affirm for the previously-discussed reasons, it should nonetheless affirm by finding the Board's actions are government speech. *See Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) ("[This Court] may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below.").

The Board's position below was that in selecting and curating books for its libraries, it was engaged in government speech. *See* (D.E. 216 at pp. 9-10). Plaintiffs essentially agreed, stating the Board "appear[ed] to be arguing that it's sending a message through the selection of books for the [D]istrict's libraries." (D.E. 251, 9:19-9:21). Viewed through this lens, it becomes clear the Board's actions were government speech, and so Plaintiffs have no First Amendment right to challenge

said actions. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

This is because the Supreme Court has held that "expressive activity includes presenting a curated complication of speech originally created by others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024); *see also Little*, 138 F.4th at 852 (plurality op.) (collecting cases). So, that the Board did not originally write *Tango* is irrelevant: "[h]aving bought the [book], the [Board's] decision to" make it available or not available in its libraries, "was classic government speech." *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023). Plaintiffs' arguments that the Author Plaintiffs are the speaker, rather than the Board, *see* IB at 27, therefore fail. *See Little*, 138 F.4th at 852 (plurality op.) ("[T]he Supreme Court has held that the speaker is the one who selects, compiles, and presents." (citation omitted)); *see also Forbes*, 523 U.S. at 674 ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." (citation omitted)).

This Court has recognized that "[w]hether speech is government speech is inevitably a context specific inquiry," and "[t]here is no 'precise test' for determining whether speech is government or private speech." *Cambridge Christian*, 115 F.4th at 1288 (quoting *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074-75 (11th Cir. 2015)). That said, courts "generally consider three

factors: 'the history of the expression at issue; the public's perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression.'" *Id.* (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)). "These factors are neither individually nor jointly necessary for speech to constitute government speech." *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021). They "are not exhaustive and may not all be relevant in every case," *Cambridge Christian*, 115 F.4th at 1288, "[b]ut a finding that *all* evidence government speech will almost always result in a finding that the speech is that of the government" *Leake*, 14 F.4th at 1248. A review of these factors support the Board's position.

A. <u>History</u>

"The first factor—history—directs us to ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Leake*, 14 F.4th at 1248 (citation omitted). For nearly 140 years the State of Florida has enshrined the right to public free schools for its citizens, and at one point even explicitly provided for expenditure of funds "for the purchase of school libraries and textbooks." Fla. Const. art. XII, § 11 (1885).[11] Further, the Board's policy governing library selection and curation was adopted more than 30 years ago, (D.E. 215-3 at p.

[11] Publicly available at: http://library.law.fsu.edu/Digital-Collections/CRC/CRC-1998/conhist/1885con.html.

2), and the primary law upon which it was based was first created over 20 years ago. *See* 2002 Fla. Laws ch. 2002-387, § 303 (creating section 1006.28, Florida Statutes, requiring district school boards to "[e]stablish and maintain a program of school library media services"). Thus, the Board has a long history of curating and selecting materials for its libraries.

A broader historical overview supports the Board's position as well. *See Little*, 138 F.4th at 861-63 (plurality op.) (discussing history of public library expression). As public school libraries developed in the early twentieth century, "differences of opinion arose as to who should select, purchase, and regulate or supervise the use of the materials." Tom J. Cole, *The Origin and Development of School Libraries*, 37 Peabody J. of Educ. 87, 91 (Sept. 1959), https://www.jstor.org/stable/1490648; *see also* U.S. Dep't of Interior, *Public Libraries in the United States of America: Their History, Condition, and Management* 38-58 (1876), bit.ly/4dcouzw (providing a "historical sketch of common school libraries" in several states).

However, by 1920, standard practice required "[b]ook selections" to "be made by the librarian with the approval of the principal." Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* 21

(1920).[12] So too has the Board long exercised control over the selection of its library materials, conveying the message the chosen materials are of the "requisite and appropriate quality" and will most benefit and interest the community. *ALA*, 539 U.S. at 204 (plurality op).

Accordingly, the first factor weighs in the Board's favor. Since school boards have long had the authority to maintain and curate the content within public school libraries in Florida, these libraries have traditionally communicated messages on the government's behalf. *McGriff*, 84 F.4th at 1335-36.

B. Endorsement

"The second factor—endorsement—asks whether 'observers reasonably believe the government has endorsed the message.'" *Leake*, 14 F.4th at 1248 (quoting *Mech*, 806 F.3d at 1076). The Eleventh Circuit has found activities "'observers would interpret [as] promoted, organized, and funded by the government as conveying some message on [its] behalf,' as '[government entities] typically do not organize and fund events that contain messages with which they do not wish to be associated.'" *McGriff*, 84 F.4th at 1336 (second alteration in original) (quoting *Leake*, 14 F.4th at 1250).

---

[12] Available at: https://ia800604.us.archive.org/2/items/libraryo00natistandardrich/libraryo00natistandardrich.pdf.

Clearly, observers would interpret libraries maintained, curated, and funded by the Board as conveying some message on its behalf. *See, e.g.*, *Mech*, 806 F.3d at 1076 (finding banners hung on school fences and government property often closely identified the public mind with the government unit that owns the land); *see also Gundy v. City of Jacksonville*, 50 F.4th 60, 78-79 (11th Cir. 2022) ("[T]he City Council's invocation can be closely identified in the public mind with the government because the City Council organizes that invocation, it provides the venue for the invocation, it selects the speaker for the invocation, and then it begins its business meeting."). That is, "[p]eople know that publicly employed librarians, not patrons, select library materials for a purpose." *Little*, 138 F.4th at 864 (plurality op.) (citation omitted). Similar to a Texas law cited in *Little*, Florida law mandates that each book made available in a public school library be selected by a school district employee who holds a valid educational media specialist certificate. *Compare id.* (citing Tex. Loc. Gov't Code §§ 323.005(c), 323.006), *with* Fla. Stat. § 1006.28(2)(d)1.

This act of selection satisfies the endorsement prong. This is also where, respectfully, the Eighth Circuit erred in coming to a different conclusion. *See GLBT Youth in Ia. Schs. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024). The Eighth Circuit inaccurately focused on the words of the books themselves. *See id.* But as *Moody* and other cases show, it is the curation and selection that is the

government's speech. *See* 603 U.S. at 728; *see also Little*, 138 F.4th at 864 (plurality op.) ("A library that includes *Mein Kampf* on its shelves is not proclaiming 'Heil Hitler!' Rather, 'the government speaks through its *selection* of which books to put on the shelves and which books to exclude.'" (citation omitted)).

This is supported by the fact the books in the Board's libraries bear its imprimatur through their location on the shelves; they also include either a barcode, property stamp, or both, indicating they are property of the school in which the book is kept. (D.E. 215-2 at pp. 8-10 (Interrog. Resp. No. 3)). This imprimatur indicates they are Board property. *Id.*; Fla. Stat. § 1001.42(2).

"That a private party takes part in the propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Gundy*, 50 F.4th at 79 (citation modified). When a school makes certain books available on its library shelves to be read by its students, it is conveying the message it has approved these books as age-appropriate and suitable for students who patronize the library. *ALA*, 539 U.S. at 208. This message stands independent of whatever message the Author Plaintiffs may wish to convey. *See Summum*, 555 U.S. at 476-77 ("By accepting a privately donated monument, a city engages in expressive conduct, but the intended and perceived significance of that conduct may not coincide with the thinking of the monument's donor or creator. Indeed, when a privately donated memorial is funded by many

small donations, the donors themselves may differ in their interpretation of the monument's significance. By accepting such a monument, a government entity does not necessarily endorse the specific meaning that any particular donor sees in the monument." (footnote omitted)) The endorsement factor is met here.

C. Control

"Finally, the control factor asks whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Leake*, 14 F.4th at 1248 (citation omitted); *see also Walker*, 576 U.S. at 213). This Court has commented "no case precedent says that the government must control every word or aspect of speech in order for the control factor to lean toward government speech." *Gundy*, 50 F.4th at 79 (citation modified); *see also id.* (finding city exerted control over message conveyed by speakers because inviting speakers to give invocations inherently exhibits government control from outset of selection process); *McGriff*, 84 F.4th at 1334 (city controlled art installation and painting because "it contracted to commission and fund the artists' work; to control its exhibition, including by subjecting the art to the City Manager's approval; and to provide the space in which the exhibition was housed").

The Board controls the materials within its libraries because it provides and controls the library space itself; it purchases and takes ownership of the books and materials within, and subjects those materials to Board approval. Fla. Stat. §

1006.28(2)(d); *see McGriff*, 84 F.4th at 1334; *cf. Shurtleff*, 596 U.S. at 257 (noting in contrast to city in *Summum*—which "always selected which monuments it would place in its park" and "typically took ownership over them"—and state board in *Walker*—which "maintained direct control over license plates by actively reviewing every proposal and rejecting at least a dozen"—the City of Boston "ha[d] no comparable record" of control (citation modified)). Simply put, once a book is acquired, it becomes the Board's prerogative to do with it—including whether to select or deselect it for availability—as it chooses.

All three factors weigh in favor of the Board's actions serving as government speech.

D. <u>The Court Should Adopt the *Little* Plurality's View on Government Speech</u>

Given the above, this Court should adopt the *Little* plurality's finding that a public library's collection decisions are government speech.[13] *See* 138 F.4th at 865. This comports with other courts which have observed similar. *See, e.g.*, *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of

[13] As the district court noted, "nothing in the summary-judgment record suggest[ed] [the Board's] libraries operate differently from other public libraries in any meaningful way." *Parnell*, 802 F. Supp. 3d at 1367. Plaintiffs do not challenge this on appeal, and therefore any challenge to this finding by the district court is waived or abandoned. *Ivy*, 646 F.3d at 773; *N. Am. Med. Corp.*, 522 F.3d at 1217 n.4.

which books to put on the shelves and which books to exclude."); *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries, broadcasters, newspapers, museums, schools, and the like.").

Plaintiffs ask the Court to resist this, arguing it would "invite dangerous censorship." IB at 34. Setting aside its hyperbolic nature, this rhetoric is an inaccurate characterization of government speech. *See Little*, 138 F.4th at 856 (plurality op.) (rebutting plaintiffs' claims of "censorship"). Plaintiffs are also incorrect that finding the Board's actions are government speech would "weaponize the machinery of education" and impermissibly broaden this doctrine. IB at 34-35.

*Matal v. Tam*, 582 U.S. 218 (2017), is instructive as a comparison. There, the government sought to claim that "the *content* of a registered mark is government speech." *Id.* at 236 (emphasis added). The Supreme Court rightly rejected this as "far-fetched." *Id.* Here, by contrast, it is the Board's exercise of discretion in selecting and curating the books—rather than the content themselves—that constitutes its speech. *Moody*, 603 U.S. at 728; *Forbes*, 523 U.S. at 673. "The two cases would be equivalent only if [the Board] claimed the library's speech lay in the words of the books themselves. No one argues that, though." *Little*, 138 F.4th at 857 (plurality op.).

Plaintiffs also raise the specter that a school board could use its libraries as a political football, turning each election cycle into a referendum on books and their purported viewpoints. IB at 35-36. But the political process—and requiring legislators be held accountable to the electorate—is the quintessential restraint on government speech identified by the Supreme Court. *See Summum*, 555 U.S. at 468-69. This is not a reason to decline a finding of government speech here.

Plaintiffs also try to advance a supposedly practical framework for their position premised on distinguishing viewpoint discrimination from content discrimination. IB at 36-38. But "[b]ecause the Board must necessarily exercise its editorial discretion in selecting which private entities will convey the message the state selects, forum analysis and the viewpoint neutrality requirement are inapposite in this case." *Chiras v. Miller*, 432 F.3d 606, 615 (5th Cir. 2005). So Plaintiffs' forum analysis arguments fall flat, as explained above and by the *Little* plurality. *See* 138 F.4th at 858-59.

The Board respectfully argues the *Little* plurality correctly found a library's selection and curation is government speech, and this Court should adopt that finding here.

## III. Plaintiffs Are Not Entitled to Summary Judgment

Even if this Court were to reverse the district court's final order, it should not direct entry of judgment in Plaintiffs' favor. That is, Plaintiffs have not shown there

is no genuine dispute of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Plaintiffs argue the Board members' statements purportedly establish the reason for removing *Tango* was based on unconstitutional viewpoint discrimination. IB at 38. But this is inaccurate, as a review of their statements show. *See* (D.E. 93-1). Critically, Plaintiffs stipulated that to prove viewpoint discrimination, they needed to prove that "[a]ll members of the majority [of the Board that voted to remove *Tango*] must share the unconstitutional motive." (D.E. 245 at p. 15); *see also* (D.E. 251, 33:10-33:13). Based on this record, Plaintiffs did not meet their burden in demonstrating *Tango* was removed from elementary school libraries based on viewpoint discrimination. At most, Plaintiffs can speculate—and in so doing ask this Court to share in that speculation—as to the true motives of the Board members. But they have not proven that such motives were discriminatory as opposed to a determination that *Tango* was not suitable or appropriate for elementary school students. Accordingly, remanding with orders to enter judgment in Plaintiffs' favor would be improper.

Viewpoint discrimination only occurs when the "specific motivating ideology or the opinion or perspective of the speaker *is the rationale for the restriction*." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S.

37, 46 (1983)). Under Florida law, the Board acts as one, so it is the speaker. Fla. Stat. § 1001.42. And as a unified entity, the Board can only be subject to liability if the Board "itself acted with an unconstitutional motive." *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002); *see also Mason v. Vill. of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001) (finding there could be no municipal liability unless three members of a five member counsel shared the purported illegal motive); *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994) ("The plaintiffs concede that, under Alabama law, final policymaking authority rests with the entire five-member City Council and the Mayor[.]").

In making their argument, Plaintiffs ask this Court to suppose that—at the time of their vote—the comments made by the Board members who voted to remove *Tango*, Messrs. Adams, Fetsko, and Williams, were made based on some animus towards same-sex parents. *See* IB at 38-39. But such animus is not evident from the record. None of these Board members expressly stated that they were voting to restrict *Tango* based on their disagreement with the views of the Author Plaintiffs.

Looking solely to Mr. Fetsko's public statement, for example, shows Plaintiffs have not proven he had an unconstitutional motive.[14] (D.E. 93-1, 11:13-12:25).

[14] The Board disputes that the record reflects any discriminatory animus on behalf of either Messrs. Adams or Williams either, such that would entitle Plaintiffs to summary judgment. *See generally* (D.E. 93-1).

Indeed, Mr. Fetsko discussed how he was concerned that *Tango*'s depiction of penguins was sexualized via innuendo. *Id.* at 11:19-12:04. For Mr. Fetsko, this gave him pause, as he was worried about children reading these kinds of themes "without an adult there to interpret, to give support, to give understanding." *Id.* at 12:12-12:15.

This alone precludes a finding of judgment in Plaintiffs' favor. Plaintiffs try to paint the three Board members with a broad brush, stating "all three members focus on the fact that the two penguin parents are male and that the book conveys that they are in love and are a family." IB at 38-39. But this is inaccurate. In fact, just the opposite, as in recounting his admiration for a teacher who had previously taught *Tango* to a class he observed, Mr. Fetsko commented "how wasn't it neat that the two male penguins had the compassion and the love to nurture this egg and watch it hatch to feed the chick and raise it." (D.E. 93-1, 11:23-12:01). At no point did he disparage or otherwise negatively speak about the fact that the penguins raising a chick were both male. *See id.* Rather, he found the "discussion about that they were a couple, they were in love, that they were embracing each other" too "sexual" in his opinion for elementary students. *Id.* at 12:02-12:04.

Plaintiffs further attempt to demonstrate animus by filing out-of-context emails and text communications and incorrectly characterizing those messages as

demonstrating this hostility.[15] But, again by focusing on a single member, it is clear that this evidence is insufficient to establish that *the Board's* vote was based on a discriminatory motive. For example, as to Mr. Fetsko, the only "evidence" offered in addition to his public statements during the February 2023 meeting is a single email in which he thanked Ms. Baggett for sharing an article about a book review issue in Alabama. (D.E. 220-2 at p. 142). This anodyne comment to a constituent and teacher is insufficient to demonstrate that Mr. Fetsko's vote on *Tango* was based on an animus to the LGBTQ+ community.

The record makes clear that it was the sexual nature of the relationship that concerned Mr. Fetsko—that the penguins were both male is irrelevant. Notably, there is no evidence that when presented with a similar book depicting opposite sex animals purportedly in love and demonstrating a sexual side, Mr. Fetsko voted to keep it on the library shelves, a fact Plaintiffs admitted. *See* (D.E. 245 at p. 48 (admitted fact that other books depicting opposite-sex penguin parents had not been the subject of a library challenge)); *see also id.* at p. 10 (admitted fact that the Board has not held a meeting or voted on every book selected for inclusion in the libraries). To the extent Plaintiffs argue the Board may have books with "indistinguishable content," IB at 40, this is a red herring. *Tango* was the book in front of the Board for

[15] The Board objected to such evidence sought to be introduced. (D.E. 225 at p. 5).

review; Plaintiffs cannot secure summary judgment by speculating how Mr. Fetsko (or any of the other Board members) would vote in a theoretical vote on these other books.

Further, the Board has submitted evidence showing that what Plaintiffs contend is a pattern of viewpoint discrimination, are in fact reasonable, content-based restrictions.[16] For example, when a citizen challenged the book *Drama*, the Board voted to remove it from elementary schools but keep it in middle and high schools. (D.E. 245 at p. 39). This, despite the reason indicated for challenging *Drama* was "Indoctrination of LGBTQ; age inappropriate + content not relevant." (D.E. 215-6). Yet despite this objection, and despite Plaintiffs' beliefs as to the Board members' animus to same-sex characters, the Board voted to keep *Drama* in some schools but remove it from others. This aligns with Plaintiffs' concession that there are categories of content that are not appropriate for children that are appropriate for older individuals. (D.E. 251, 31:04-31:07). If the Board's discriminatory intent was the decisive factor in voting to remove *Tango*, it is not clear why then the Board would vote to keep *Drama* in school libraries. It must be because there was no discriminatory intent and because *Tango* was not removed based on viewpoint discrimination.

---

[16] This assumes the Board's library shelves are a forum for speech, a position the Board rejects.

Plaintiffs ask this Court to infer from public comments that the Board members' true motivation was based on discriminatory animus. The Board contends the Board members' statements speak for themselves and do not evidence discriminatory animus. Regardless, at a minimum—and even accepting Plaintiffs' claim that the facts surrounding the Board members' vote are undisputed, *see* IB at 38—"[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works, Inc. v. Emps. Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (quoting *Clark v. Union Mut. Life Ins.*, 692 F.2d 1370, 1372 (11th Cir. 1982)); *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020); *cf. Ismael v. Roundtree*, 161 F.4th 752, 758 (11th Cir. 2025) (noting all reasonable inferences must be drawn in favor of the nonmoving party when considering summary judgment).

Finally, Plaintiffs recognize the Board may engage in permissible, content-based limitations. IB at 17; *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Yet, Plaintiffs have not explained why the decision to remove *Tango*, even if based on the fact that the book contained LGBTQ+ themes, would not be a permissible content-based restriction. As the district court rightly observed, "[d]istinguishing between 'pedagogical appropriateness,' which Plaintiffs argue is a permissible consideration, and 'viewpoint,' which Plaintiffs argue is not, [is] impossible." *Parnell*, 802 F. Supp. 3d at 1369. In this context, they are effectively

two sides of the same coin, with no meaningful difference. Or as the *Little* court aptly put it, "[r]acism is a viewpoint. So is sexism." 138 F.4th at 850; *see also* (D.E. 251, 28:07-30:25 (questioning whether a decision to not introduce concepts of same-sex parenting to extremely young children is just a form of content-based restriction)).

Plaintiffs' arguments show the instability of their position: while they admitted there are "categories of content that are not appropriate for children that are appropriate for older people," the Board's age-based decision to remove *Tango* from elementary schools was allegedly "using a concern about age inappropriateness to green light viewpoint discrimination." (D.E. 251, 31:01-31:07). This classification, however, relies on trying to delineate between permissible content-based restrictions versus some nebulous "larger class of content" that is, to Plaintiffs, impermissible. *Id.* at 31:09-31:17. Accepting Plaintiffs' perspective means that while the Board could remove books with excessive drug use based on content, the Board would apparently commit a First Amendment violation if it removed these books because, in its view, the books' opinion or perspective glorified the use of drugs. "The problem [with Plaintiffs' position] is [thus] obvious: deeming a book 'inaccurate' or 'unsuitable' is often *the same thing* as disliking its 'content' and 'viewpoint.' Judges might as well flip a coin." *Little*, 138 F.4th at 847.

The unfeasibility of Plaintiffs' position is perhaps best evidenced by their assertion that if the Board decided to remove *Mein Kampf* "based on the views expressed in that book," that decision would create a First Amendment violation. (D.E. 251, 40:08-40:14). This cannot be the law. *Cf. Little*, 138 F.4th at 848 ("The First Amendment does not force public libraries to have a Flat Earth Section." (citation omitted)). Just as the *Little* plaintiffs insisted that a book espousing racist or antisemitic beliefs could not be removed based on viewpoint, 138 F.4th at 847, so too did Plaintiffs argue that it would be "impermissible viewpoint discrimination" for the Board to remove a pro-segregation book that advocated for segregated schools. (D.E. 251, 39:17-40:09). Schools are allowed to make content-based decisions, such as whether a book is age appropriate and suitable. Simply because someone dislikes such a decision does not transform the decision into impermissible viewpoint discrimination.

As such, Plaintiffs have not met their burden in demonstrating that the Board voted to remove *Tango* based on disagreement with the book's viewpoint, and therefore should the Court reverse the district court, it should *not* remand with instructions to grant Plaintiffs summary judgment.

## IV. The Court Can Affirm Because Plaintiffs Did Not Show Viewpoint Discrimination Caused *Tango*'s Removal

In addition, should the Court find the First Amendment applies and that the Board's action was not government speech, it should nonetheless affirm because Plaintiffs did not show viewpoint discrimination was the reason behind *Tango*'s removal. *Waldman*, 871 F.3d at 1289. The Board moved for summary judgment on the grounds that there was no viewpoint discrimination underlying the Board's decision to remove *Tango*. *See* (D.E. 216 at pp. 23-33). As noted, Plaintiffs admitted they had to show all three Board members who voted to remove *Tango* did so for discriminatory reasons. But as the Board's motion for summary judgment and above arguments show, Plaintiffs have failed in this regard. This provides an independent basis for affirmance: that Plaintiffs "fail[ed] to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [Plaintiffs] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1985).

## V. The Board Members Are Protected by the Legislative Privilege

Finally, this Court need not reach the question of legislative privilege given it should affirm on the dispositive grounds argued above. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 n.3 (11th Cir. 2008) ("Because we affirm the district court on the dispositive issues, we need not address [other decisions by the district court]."). Should the Court reverse and remand, however, it should affirm the district court's decision to find the Board members' actions were

protected by the legislative privilege. The district court's ruling in this regard was not an abuse of discretion because it was not an error of law or one that reflected a clear error. *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015).

On appeal, Plaintiffs do not challenge the district court's findings regarding the Board's invocation of the legislative privilege on behalf of its members or lack of waiver by the Board members, IB at 41-44, waiving/abandoning any challenge to these findings. *Ivy*, 646 F.3d at 773; *N. Am. Med. Corp.*, 522 F.3d at 1217 n.4. Instead, they merely quibble with the district court's decision that the acts under scrutiny—that is, the Board members' votes on *Tango*—were legislative rather than administrative. *See Parnell*, 2024 WL 5508347, at *2. This decision should be affirmed.[17]

"The legislative privilege 'protects against inquiry into acts that occur in the regular course of the legislative process and *into the motivation for those acts*.'" *In re Hubbard*, 803 F.3d at 1310 (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)). Here, the information Plaintiffs seek from the Board members via

[17] This is distinguishable from *Pen American Center, Inc. v. Escambia County School District*, No. 24-13896, 2025 WL 1937264 (11th Cir. July 15, 2025), because there, this Court dismissed the Board and Board members' interlocutory appeal of a district court's order *denying* a request for a protective order for lack of standing. *Id.* at *1. That is not the procedural posture here, where the Board is not seeking to challenge any findings by the district court, and therefore is under no obligation to prove its standing. *See id.* at *3.

deposition "and the scope of the legislative privilege [a]re one and the same." *Id.* at 1311. That is, "[a]ny material, documents, or information [including testimony] that d[o] not go to legislative motive [are] irrelevant," and "any that d[o] go to legislative motive [are] covered by the legislative privilege." *Id.* Even assuming *arguendo* that the Board members were motivated by an improper purpose, this does not change this analysis, as "[t]he claim of an unworthy purpose does not destroy the privilege." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). "Legislative immunity and privilege are parallel concepts, and the privilege exists to safeguard the immunity." *Florida v. Byrd*, 674 F. Supp. 3d 1097, 1103 n.2 (N.D. Fla. 2023) (citation modified); *see also E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180-81 (4th Cir. 2011); *Lee v. City of L.A.*, 908 F.3d 1175, 1187 (9th Cir. 2018) ("While *Tenney*'s holding rested upon a finding of immunity, its logic supports extending the corollary legislative privilege from compulsory testimony to state and local officials as well.").

To that end, "this [C]ourt [previously] held . . . that [local legislators] possessed absolute legislative immunity from liability under s 1983 for conduct in the furtherance of their legislative duties." *Hernandez v. City of Lafayette*, 643 F.2d

1188, 1192 (5th Cir. Unit A May 1981)[18] (citing *Universal Amusement Co. v. Hofheinz*, 616 F.2d 202, 205 (5th Cir. 1980)); *see also Finch v. City of Vernon*, 877 F.2d 1497, 1505 (11th Cir. 1989) (same). Thus, that the Board members were engaging in conduct in the furtherance of their legislative duties—i.e., voting pursuant to a state mandate regarding library book challenges—weighs in favor of their conduct being legislative.

Critically, though, even without the existence of a statutory duty, under Florida's Constitution, the Board has the duty to "operate, control and supervise all free public schools" within the District. Fla. Const. art. IX, § 4(b); *see also* Fla. Stat. § 1001.32(2). And even when engaging in actions that did not strictly result in policy, this Court has nonetheless found legislative privilege applied. *See, e.g.*, *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185. 1190-92 (11th Cir. 1993); *see also Crymes v. DeKalb Cnty.*, 923 F.2d 1482, 1485 (11th Cir. 1991) (commenting that the vote of county commissioners to remove a road from the list of truck routes "was probably legislative in nature").

Indeed, this Court has observed that a broad swath of acts including "voting, speech making on the floor of the legislative assembly, preparing committee reports,

---

[18] Decisions of the former Fifth Circuit handed down prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

and participating in committee investigations and proceedings are generally deemed legislative and, therefore, protected by the doctrine of legislative immunity." *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992) (citation modified). And taken as they were, these votes on *Tango* were prospective in that they eliminated access to the book, and thus "had a substantial nexus to the legislative process." *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009).

This is all consistent with what the district court determined, i.e., "that legislative acts are forward-looking policy decisions." *Parnell*, 2024 WL 5508347, at *2. Just as the decision to eliminate a public employment position "may have prospective implications that reach well beyond the particular occupant of the office," *Bogan*, 523 U.S. at 56, so too is the decision to vote to remove a book legislative in that it has prospective implications that reach the entirety of the District's libraries. *See Bryant*, 575 F.3d at 1306. And here, that was the impact of these votes: the removal of *Tango* across the entirety of the District, that regulated the access to *Tango* of every student within the District. *See Parnell*, 2024 WL 5508347, at *2 ("It made the book unavailable in all Escambia school libraries and thus to all Escambia students.").

These decisions embodied the Board members' legislative expressions by weighing various priorities before acting. *Bogan*, 523 U.S. at 55; *Bryant*, 575 F.3d at 1306; *see also Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 217

(6th Cir. 2011) (finding school board engaged in legislative activity when it made decision to eliminate alternative school as a result of weighing budgetary priorities). As this Court has explained, legislative acts have a "general scope or, to put it another way, legislation involves line-drawing." *Yeldell*, 956 F.2d at 1062 (quoting *Ryan v. Burlington Cnty.*, 889 F.2d 1286, 1290-91 (3d Cir. 1989)). Here, that is exactly what the Board members engaged in, making their actions legislative in nature. This is buttressed by the fact this Court has repeatedly reiterated that "voting, debate and reacting to public opinion are manifestly in furtherance of legislative duties." *DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 765 (11th Cir. 1989); *accord Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 829 (11th Cir. 1982); *Hudgins v. City of Ashburn*, 890 F.2d 396, 406 n.20 (11th Cir. 1989); *see also Woods v. Gamel*, 132 F.3d 1417, 1420 (11th Cir. 1998) (noting vote needed to pass county budget was legislative). And while voting is not dispositive, it cannot be overlooked as a factor to consider. *DeSisto Coll., Inc.*, 888 F.2d at 765; *Parnell*, 2024 WL 5508347, at *2 n.1 ("So voting is relevant but not dispositive.").

When viewing the Board members' actions in their totality, it becomes clear they are legislative: they were votes, taken in response to public opinion and input and following debate, done in furtherance of their duties and in service to their constituents, and were forward-looking and impacted the entirety of the District. Similar to the law in *Woods*, where the "statute under which the commissioners were

given the authority to pass this budget requires an annual budget for *all* county expenses," 132 F.3d at 1420, so too does Florida law make the Board responsible for *all* books in its libraries. And just as voting to pass a budget "sets spending priorities" and "affect[s] all county residents," so too was the vote to remove *Tango* an expression of the Board members' "priorities," that impacted every school and student in the District, making them acts that are "both policymaking and of general application," and thus legislative in nature. *Id.*

Accordingly, assuming this Court reaches the question of legislative privilege, it should affirm the district court's order.

## CONCLUSION

This Court should affirm the district court's order granting the Board summary judgment, either on the grounds that the Board's library shelves are not a forum for Plaintiffs' First Amendment rights, or because the Board's selection and curation of books for its library shelves constitute government speech. In the event this Court reverses, it should remand with instructions for further proceedings, rather than with instructions to grant Plaintiffs' motion for summary judgment, because Plaintiffs failed to meet their burden. Alternatively, it can affirm because Plaintiffs failed to prove an essential element of their case: that viewpoint discrimination was the reason for *Tango*'s removal. Should the Court reach the question of legislative privilege, it should affirm the district court's order finding the Board members are protected by the legislative privilege in this matter.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

The undersigned certify that this Brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because this Brief contains 12,483 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

The undersigned further certify that this Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

s/ Nicole Sieb Smith
J. DAVID MARSEY
Florida Bar No.: 0010212
E-mail: dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.: 0017056
E-mail: nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.: 1018568
E-mail: jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel: 850.222.6550
Fax: 850.222.8783
and
SAMANTHA DUKE
Florida Bar No. 0091403
Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel: 407.872.7300
Fax: 407.841.2133
Attorneys for Appellee

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 17, 2026, I electronically filed the foregoing by using the Eleventh Circuit Court ECF system which will send by e-mail a Notice of Docket Activity to the following: Faith E. Gay at fgay@selendygay.com; Corey Stoughton at cstoughton@selendygay.com; Lauren J. Zimmerman at lzimmerman@selendygay.com; Joshua W. Bean at

jbean@selendygay.com; Joshua M. Cockream at jcockream@selendygay.com; and Anna T. Neill at aneill@sperlingkenny.com (Counsel for Appellants) and Jonathan F. Mitchell at jonathan@mitchell.law (Counsel for Amicus).

s/ Nicole Sieb Smith
J. DAVID MARSEY
Florida Bar No.: 0010212
E-mail: dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.: 0017056
E-mail: nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.: 1018568
E-mail: jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel: 850.222.6550
Fax: 850.222.8783

and

SAMANTHA DUKE
Florida Bar No. 0091403
Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel: 407.872.7300
Fax: 407.841.2133

Attorneys for Appellee