# In the United States Court of Appeals for the Eleventh Circuit

───────────────

Peter Parnell, et al.,

*Plaintiffs-Appellants*,

v.

School Board of Escambia County, Florida,

*Defendant-Appellee*.

───────────────

On Appeal from the United States District Court
for the North District of Florida
No. 4:23-cv-00414-AW-MAF

───────────────

## Brief Of Amicus Curiae America First Legal Foundation In Support Of The Defendant-Appellee

───────────────

Gene P. Hamilton
President and General Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721 (phone)
gene.hamilton@aflegal.org

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel of record certifies that the following persons and entities, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case:

| Amicus Curiae | Counsel for Amicus Curiae |
| --- | --- |
| • America First Legal Foundation | Jonathan F. Mitchell<br>Gene P. Hamilton |

America First Legal Foundation is a not-for-profit corporation exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). It does not have a parent corporation, and no publicly held company has a 10 percent or greater ownership interest.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

Certificate of interested persons and corporate disclosure statement ........................i

Table of contents ....................................................................................................ii

Table of authorities ................................................................................................iii

Interest of amicus curiae .......................................................................................1

Statement of compliance with Rule 29 .................................................................1

Summary of argument............................................................................................1

Argument .................................................................................................................2

    I.    A school library's curation decisions are government speech..............2

    II.    A school district does not "abridge" the freedom of speech by excluding books from its libraries.......................................................10

    III.    It is absurd to prohibit school libraries from engaging in "viewpoint" discrimination, and nothing in *Pico* requires this court to impose a no-viewpoint-discrimination rule .........................14

    IV.    The Court should explicitly reject the reasoning of the *Pico* plurality ...............................................................................................21

        A.    The *Pico* plurality's attempt to distinguish a library's removal decisions from its initial-acquisition decisions is nonsensical .................................................................................21

        B.    The *Pico* plurality's test for library-book removals is unclear, contradictory, and incapable of principled application .................................................................................23

Conclusion ............................................................................................................26

Certificate of compliance ....................................................................................27

Certificate of service ...........................................................................................28

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
557 F.3d 1177 (11th Cir. 2009) .................................................................... 21

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982) ........................................ 16, 17, 18, 19, 20, 21, 23, 24, 25

*C.K.-W. by & through T.K. v. Wentzville R-IV School District*,
619 F. Supp. 3d 906 (E.D. Mo. 2022) ....................................................16, 18

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ........................................ 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................11

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).......................11

*Gideon v. Wainwright*, 372 U.S. 335 (1963) .............................................. 13

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024)..................................................................8

*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc) .............. 4, 5, 9, 13, 14

*Marks v. United States*, 430 U.S. 188 (1977) ............................................. 17

*Matal v. Tam*, 582 U.S. 218 (2017)........................................................8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................11

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).......................................6, 7, 8

*Muir v. Alabama Educational Television Comm'n*,
688 F.2d 1033 (Former 5th Cir. 1982)....................................................... 18

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) .....................................2

*PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005)...................................... 6, 10

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)............................... 2, 3

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) .......................................................................... 13

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995) .......................................................................... 3, 4

*Rust v. Sullivan*, 500 U.S. 173 (1991) ......................................................... 2, 3, 10, 13

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ..................................................... 3, 4

*Stanley v. Georgia*, 394 U.S. 557 (1969) ................................................................. 14

*Tuffendsam v. Dearborn County Board of Health*,
 385 F.3d 1124 (7th Cir. 2004) ............................................................................. 13

*United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) ......... 4, 5, 7, 15, 16

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
 576 U.S. 200 (2015) .......................................................................................... 2, 3

*Walls v. Sanders*, 760 F. Supp. 3d 766 (E.D. Ark. 2024) ......................................... 18

*Webster v. Reproductive Health Services*, 492 U.S. 490 (1989) ................................11

*Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353 (2009) ...................... 10, 11, 12, 13

**Other Authorities**

David P. Currie, *Positive and Negative Constitutional Rights*,
 53 U. Chi. L. Rev. 864 (1986) ............................................................................. 13

Daryl J. Levinson, *Framing Transactions in Constitutional Law*,
 111 Yale L.J. 1313 (2002) ................................................................................... 12

Frederick F. Schauer, *Principles, Institutions, and the First Amendment*,
 112 Harv. L. Rev. 84 (1998) ................................................................................. 5

Kenneth A. Shepsle, *Congress Is a "They," Not An "It": Legislative
 Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992) ..................................... 25

## Interest Of Amicus Curiae

Amicus curiae America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law and defending individual rights guaranteed under the Constitution. America First Legal has a substantial interest in this case because it believes that a proper understanding of constitutional rights must be informed by reference to their text, and that rights not expressly mentioned in the Constitution must be deeply rooted in this nation's history and tradition.

## Statement Of Compliance With Rule 29

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the amicus curiae, its members, or its counsel financed the preparation or submission of this brief.

## Summary Of Argument

The Court should hold that the Speech Clause is inapplicable to a school library's curation decisions. This is so for three separate and independent reasons. First, a school library's curation decisions are government speech. Second, even apart from the government-speech doctrine, a school library does not and cannot "abridge" anyone's freedom of speech by removing or failing to include a particular book in its collection. Third, it is absurd to prohibit libraries from engaging in "viewpoint discrimination." Libraries are supposed to exercise quality control and exclude materials with disreputable

viewpoints and ideas, especially school libraries whose books will be read by impressionable children. The plaintiffs' proposed no-viewpoint-discrimination rule would leave school libraries powerless to exclude books that espouse racism or antisemitism, encourage drug use or other harmful behaviors, or glorify deviant sexual practices such as pederasty and pedophilia. The First Amendment does not require this result.

## ARGUMENT

### I.  A SCHOOL LIBRARY'S CURATION DECISIONS ARE GOVERNMENT SPEECH

When the government joins or assists others in propagating a message, it is engaged in government speech. In these situations, the government may choose the speech that it will subsidize or support without encountering rules against content or viewpoint discrimination. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda." (citation omitted)); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view" (citation omitted)); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 590–600 (1998) (Scalia, J., concurring in the judgment); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to

fund a program to encourage competing lines of political philosophy such as communism and fascism." (citation omitted)).

That remains the case even when the government-supported speech is created by private citizens[1] or delivered by private citizens.[2] The government may choose the artwork that hangs in government buildings, the quotations that appear on national monuments, the license-plate designs proposed by members of the public, and the books housed in a government-owned library. All of these are creations of private citizens—the artwork, the quotations, the license-plate designs, and the books. But the use of government resources to promote and convey these ideas and messages is government speech, and it remains government speech even when it is boosting or propagating another person's handiwork.

The only exception to this principle arises when the government's assistance or subsidies create a "forum" for private speech. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995). In these situations, the courts will not allow the government to characterize its facilitation or funding of private speakers as its own speech, because the benefits are so broadly conferred that the selective withholding of these perks from a disfavored speaker seems

---

1. *See Walker*, 576 U.S. at 217 (license-plate designs created and proposed by private citizens); *Summum*, 555 U.S. at 470–72 (privately donated permanent monuments in a public park).
2. *See Rust*, 500 U.S. at 179–81 (private clinics' medical counseling when receiving government subsidies).

more akin to a penalty that "abridges" the freedom of speech, rather than the government acting as a participant in the marketplace of ideas. *See Shurtleff*, 596 U.S. at 248 ("The city did not deny a single request to raise a flag until, in 2017, Harold Shurtleff, the director of a group called Camp Constitution, asked to fly a Christian flag."); *Rosenberger*, 515 U.S. at 830 ("It discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." (alteration in original) (citation omitted)).

But a public-school library does not and cannot serve as a "forum" for private speech. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) (plurality opinion) ("[F]orum analysis and heightened judicial scrutiny are … incompatible with the discretion that public libraries must have to fulfill their traditional missions."); *Little v. Llano County*, 138 F.4th 834, 859 (5th Cir. 2025) (en banc) (plurality opinion) ("[I]t makes no sense to apply forum analysis to a library's collection. . . . Forum analysis has no place on a library's bookshelves."). A library does not seek to accumulate as many publications as possible, and it does not serve as a dumping ground for authors or publishers who want to propagate their intellectual property. Quite the opposite: A library is *supposed* to curate its collection and retain only the materials that are useful, relevant, and appropriate for the students that it serves. Doc. 261 at 12–13 ("Libraries do not exist primarily to encourage diverse views of private speakers or to 'provide a public forum for the authors

of books.' Instead, libraries collect books that the government deems to be of 'requisite and appropriate quality.'" (citation omitted) (quoting *American Library*, 539 U.S. at 206 (plurality opinion)).

Librarians are trained to remove and exclude books with poor content, mediocre writing style, inaccurate information, or biased, racist, or sexist terminology or views. *See American Library*, 539 U.S. at 204 (plurality opinion) ("The librarian's responsibility … is to separate out the gold from the garbage, not to preserve everything" (alteration in original) (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)); *Little*, 138 F.4th at 863 (plurality opinion) (quoting from library weeding manuals that instruct librarians to remove books with "[b]iased, racist, or sexist terminology or views" and "[o]utdated philosophies on ethics and moral values"). This compels librarians to discriminate against viewpoints and ideas that are inaccurate, biased, racist, or sexist. *See Little*, 138 F.4th at 859 (plurality opinion) ("Libraries choose certain viewpoints (or range of viewpoints) on a given topic. But they may exclude others. A library can have books on Jewish history without including the Nazi perspective."); Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 106 (1998) ("[One] would hardly disagree … with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence."). Libraries and librarians must separate "the gold from the garbage," and the "garbage" will include materials with disreputable viewpoints and ideas, such as discredited scientific theories, as well

as viewpoints and ideas that may not have been considered racist or offensive when originally published but are no longer compatible with modern sensibilities. *See PETA v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005) ("The government … may run museums, libraries, television and radio stations, primary and secondary schools, and universities. In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech.").

More importantly, a public-school library's selection and weeding decisions are government speech *by definition*. A library's curation decisions are no less "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the Supreme Court explained in *NetChoice*:

> An entity "exercis[ing] editorial discretion in the selection and presentation" of content is "engage[d] in speech activity." *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666 (1998). And that is as true when the content comes from third parties as when it does not. (Again, think of a newspaper opinion page or, if you prefer, a parade.) Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product.

*Id.* at 731. And "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 732; *see also id.* at 738 ("That those plat-

forms happily convey the lion's share of posts submitted to them makes no significant First Amendment difference."). Most libraries are willing to carry the vast majority of available books, but that does not mean that they are no longer engaged in "speech" when they exclude certain materials from their collections. *See American Library*, 539 U.S. at 204 (plurality opinion) ("[L]ibraries collect only those materials deemed to have 'requisite and appropriate quality.'" (citation omitted)).

And a library's acquisition and weeding decisions remain its own "speech" even though a library is conveying the speech of others when deciding whether to include materials in its collection. Like a social-media platform, a library is "in the business … of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice*, 603 U.S. at 738 (quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995)). As *NetChoice* explains:

> The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* So too with a library. The "individual messages" originate with the authors, but "the larger offering" is the library's speech. *See id.* And a library's acquisition and weeding decisions "rest on a set of beliefs about which [mate-

rials] are appropriate" to include in the library's collection and "which [materials] are not." *Id.* Finally, the aggregate of the library's curation decisions gives the collection "a particular expressive quality" unique to that library. *Id.* A library is "engage[d] in speech activity"[3] when it curates its collection, and that means that a government-owned library's acquisition and weeding decisions qualify as government speech.[4]

The Eighth Circuit's opinion in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), erred by claiming that the state's government-speech argument would make the content of the library books into government speech. *See id.* at 668 ("[I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017))). That is untrue, as the act of curation is speech distinct from the speech within the curated materials. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). No one is claiming that the content of school-library books is government speech. But whenever a library selects or removes books from its collection, those curation decisions are the speech of

---

3. *NetChoice*, 603 U.S. at 731 (quoting *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

4. A government-speech holding will not immunize public-library weeding decisions from *all* forms of constitutional attack, and it may still be possible to challenge book-removal decisions on Establishment Clause or Equal Protection grounds.

the library—and that speech remains distinct from the speech of the authors that appears inside the library books. *See id*. As the plurality in *Little* cogently explained:

> [T]he Eighth Circuit misunderstood the government "speech" at issue. It is not the words of the library books themselves. . . . Rather, the government speaks through its *selection* of which books to put on the shelves and which books to exclude.
>
> The Eighth Circuit also misapplied *Summum*. . . . The city's message was its *selection and display* of the monuments, not the monuments themselves. That maps precisely onto a library collection: the library conveys its *own* message (which books are worth reading) by collecting third-party speech (books). But the Eighth Circuit's reasoning makes *Summum* impossible: the only "speech" the court saw was by the books' *authors*, not the library's *choosing* some books over others. By that reasoning, when the City of Pleasant Grove displayed the Ten Commandments, it was speaking as God.

*Little*, 138 F.4th at 864–65 (plurality opinion) (footnote omitted) (citations and some internal quotation marks omitted) (footnotes omitted).

Finally, *GLBT Youth* makes no attempt to reconcile its stance with *NetChoice*, which holds that curation decisions are speech of the curator—even when the curator is compiling the speech of others. The Court should disavow *GLBT Youth* and hold that school-library curation decisions are gov-

ernment speech, in accordance with the D.C. Circuit[5] and the Fifth Circuit plurality in *Little*.

## II. A School District Does Not "Abridge" The Freedom Of Speech By Excluding Books From Its Libraries

Regardless of how this Court rules on the government-speech argument, it should still affirm the district court because a school district does not and cannot "abridge"[6] a constitutional right by withholding assistance from those seeking to exercise a constitutional prerogative. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 359–60, 360 n.2 (state law that "removes politically related deductions from an existing system" is not an "abridgment of the unions' speech," even though it revokes assistance that the state had previously been providing to the unions' speech activities); *Rust*, 500 U.S. at 200 ("[T]he Government may choose not to subsidize speech"); *id.* at 201 ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected").

Suppose that Florida decided to open and operate a state-owned gun store that allows its residents to borrow weapons in the same way that they borrow library books—by checking them out for a few weeks and promising to return them. The government-speech doctrine would not apply to the

---

5. *See PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").

6. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech").

state's decisions to stock and shelve weaponry in this store, as assembling a collection of firearms is conduct rather than the propagation of a government-sponsored message. Yet if the state decided to remove handguns from this government-owned store, that would not "infringe" the right to keep and bear arms—even though the Second Amendment protects the right to "receive" handguns as much as the First Amendment protects the right to "receive" information and ideas.[7] The removal of handguns from this government-owned store is constitutionally permissible not because the state is engaged in "government speech," but because a state does not "infringe" the right to keep and bear arms (or any other right) by removing handguns from a government-owned store that it had no obligation to open or operate in the first place. *See Ysursa*, 555 U.S. at 359.

Or suppose that Florida had operated a public hospital before *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), that offered abortions and other medical procedures to its residents. None of these services qualify as "government speech," yet the state could still remove abortion services from the menu without "abridging" or violating the erstwhile right to abortion. *See Webster v. Reproductive Health Services*, 492 U.S. 490, 510 (1989) ("Nothing in the Constitution requires States to enter or remain in the business of performing abortions."). This prerogative comes not from the government-speech doctrine, but from the fact that the Constitution does

---

7.  *See District of Columbia v. Heller*, 554 U.S. 570, 628–32 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

not require the government to assist or facilitate efforts to exercise a constitutional right.[8] *See Ysursa*, 555 U.S. at 359–60, 360 n.2.

The analysis is no different when a school district removes books from its libraries. A public school does not (and cannot) "abridge" the right to receive information and ideas by removing a book from its library collection. *See id.* at 359–60 & n.2; *see generally* Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1313 (2002). Students remain free to access the removed books from other sources (such as Amazon.com or private bookstores) without fear of punishment or penalty from the government. And although the school district is no longer *facilitating* efforts to obtain those books at its libraries, that does not violate or even implicate anyone's constitutional rights, any more than a decision to exclude handguns from a government-owned store or withdraw abortion services from government-owned hospitals. As the en banc Fifth Circuit explained in *Little*:

> [P]laintiffs cannot invoke the right to receive information to challenge the library's removal of the challenged books. . . . It is one thing to tell the *government* it cannot stop *you* from receiving a book. The First Amendment protects your right to do that. It is another thing for *you* to tell the *government* which books it must keep in the library. The First Amendment does not give you the right to demand that.

---

8. The right to counsel for criminal defendants is one notable exception to this rule. *See* note 9, *infra*.

*Little*, 138 F.4th at 845 (majority opinion) (citations omitted). The Court cannot reverse the district court's judgment without creating a split with the Fifth Circuit on this point.

The Speech Clause prohibits only laws that "abridge" the freedom of speech. It does not require the government to subsidize or affirmatively assist anyone's efforts to access or propagate books. *See Rust*, 500 U.S. at 200 ("[T]he Government may choose not to subsidize speech"); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). The Speech Clause, like nearly every provision in the Bill of Rights, protects negative and not positive rights. *See Ysursa*, 555 U.S. at 358 ("[T]he government … is not required to assist others in funding the expression of particular ideas, including political ones."); *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties. It limits the powers of government but does not give people legally enforceable rights to demand public services and to obtain damages or other legal relief if the government fails to provide them." (citation omitted)); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986).[9] It protects citizens from government interference in their efforts to acquire reading materials, but it does not allow

---

9.  One notable exception is *Gideon v. Wainwright*, 372 U.S. 335 (1963), but *Gideon* has never been extended to the First Amendment.

private citizens to conscript the resources of government or demand that the government provide or maintain books for them at taxpayer expense. *See Little*, 138 F.4th at 868 (Ho, J., concurring) ("Plaintiffs have a First Amendment right to read books. They don't have a First Amendment right to force a public library to provide them.").

It is especially untenable to extend the "right to receive information and ideas" to a school library's curation decisions. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969). School districts are not even required to provide libraries or library books in the first place. And libraries *must* continually remove books from their shelves to make room for new materials. So students and book authors who disagree with a book-removal decision should be thanking their school districts for providing the library and offering the removed book during its shelf life, not suing them for rescinding a gratuity that they had no obligation to provide in the first place.

### III. It Is Absurd To Prohibit School Libraries From Engaging In "Viewpoint" Discrimination, And Nothing In *Pico* Requires This Court To Impose A No-Viewpoint-Discrimination Rule

The plaintiffs insist throughout their brief that the First Amendment prohibits public-school libraries from removing books because they disapprove of their "viewpoint." *See* Appellants' Br. at 2 ("The line between lawful discretion and constitutional violation is drawn by the First Amendment's prohibition on viewpoint discrimination."); *id*. at 3 (contrasting "permissible curation" with "impermissible viewpoint discrimination"); *id*. at 14 (falsely

asserting that "binding Supreme Court and Eleventh Circuit precedent …
consistently forbid[] viewpoint discrimination" in government-owned librar-
ies). The plaintiffs even go so far as to claim that *content* discrimination is
constitutionally forbidden except when "appropriate to the library's pur-
pose." *Id.* at 23; *see also id.* at 24 ("[T]he government may only exercise its
discretion to choose what ideas to include or exclude based on viewpoint-
neutral reasons appropriate to the library's purpose."). Each of these ideas is
nonsensical and unsupported by case law.

Content discrimination is not only permissible but inevitable when librar-
ies make collection decisions. *See American Library*, 539 U.S. at 205 (plurality
opinion) ("Public library staffs *necessarily consider content* in making collec-
tion decisions and enjoy broad discretion in making them." (emphasis add-
ed)). Libraries are supposed to establish standards for the materials in their
collection, and they must ensure that their limited shelf space is reserved for
quality publications. "Viewpoint discrimination" is equally unavoidable, and
there is nothing wrong with viewpoint-based removals of library books that
deny the Holocaust, promote crackpot conspiracy theories, or espouse obso-
lete and debunked scientific theories such as spontaneous generation or sci-
entific racism. Of course, the government could never ban or censor a publi-
cation on these grounds, nor could it discriminate against these views in a
traditional public forum. But libraries are not "forums" of any sort,[10] and

---

10. *See American Library*, 539 U.S. at 205 (plurality opinion) ("[F]orum
    analysis and heightened judicial scrutiny … are also incompatible with

15

they *must* impose content-based (and viewpoint-based) standards when deciding how to allocate their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality opinion); *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005). A public library cannot function if its librarians are prohibited from making content- or viewpoint-based weeding decisions, or if its librarians can be sued whenever someone suspects that a weeding decision was influenced by the content or viewpoints expressed in a book.

The plaintiffs claim that *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), prohibits "viewpoint" discrimination in library book-removal decisions. *See* Appellants' Br. at 3 (asserting that "eight Justices of the Supreme Court agreed [in *Pico*] that if a decision to remove a school library book was motivated by viewpoint discrimination it would violate the First Amendment"); *see also id*. at 17–19 (discussing *Pico*). *Pico* imposes no such rule. Justice Brennan's plurality opinion in *Pico*, which represents the most restrictive view of school-library curation prerogatives ever taken by a Supreme Court justice,[11] says only that school libraries may

---

the discretion that public libraries must have to fulfill their traditional missions.").

11. *See Pico*, 457 U.S. at 885 (1982) (Burger, C.J., dissenting) (describing the Brennan plurality opinion as "a lavish expansion going beyond any prior holding under the First Amendment"); *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 915 (E.D. Mo. 2022) (describing "Justice Brennan's approach" as "the most expansive view of the purported right at play").

not remove books "in a *narrowly* partisan or political manner"[12]—a far cry from the total prohibition on viewpoint discrimination that the plaintiffs are demanding. The *Pico* plurality opinion also acknowledges that libraries may remove books that are "pervasively vulgar" or that lack "educational suitability." *Pico*, 457 U.S. at 871 (plurality opinion); *see also id.* at 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment) (endorsing specific examples of content and viewpoint discrimination in library-book selection). So even Justice Brennan would allow "partisan" or "political" library-book removals so long as they do not cross the line into "narrowly" partisan or political decisions, and he would allow school officials to remove library books with viewpoints that are "pervasively vulgar" or that lack "educational suitability." *Id.* at 871 (plurality opinion).

More importantly, Justice Brennan's plurality opinion in *Pico* was joined by only three justices, so it has no status as law. In cases such as *Pico*, which fail to produce a rationale that garnered five or more votes, the lower courts must follow the opinion of the justice (or justices) who "concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977); *see also id.* ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who

---

12.  *See Pico*, 457 U.S. at 870 (plurality opinion) (emphasis added); *id.* at 872 ("[S]chool boards may not remove books from school library shelves *simply because* they dislike the ideas contained in those books." (emphasis added)).

concurred in the judgments on the narrowest grounds . . . .'" (alteration in original) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). In *Pico*, the controlling opinion under *Marks* belongs to Justice White, who concurred in the judgment and refused to join any portion of Justice Brennan's plurality opinion. *See Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment); *Muir v. Alabama Educational Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion) ("[T]he opinion of Justice White [is] the narrowest grounds for the judgment [in *Pico*]"); *C.K.-W.*, 619 F. Supp. 3d at 913 ("Justice White's opinion [in *Pico*] therefore controls."); *Walls v. Sanders*, 760 F. Supp. 3d 766, 779 n.49 (E.D. Ark. 2024) ("Justice White's decisive concurrence in the judgment … controls under *Marks v. United States*, 430 U.S. 188, 193 (1977)"). Yet Justice White's opinion refused to weigh in on the constitutional standards for determining whether a library-book removal violates the First Amendment:

> The District Court found that the books were removed from the school library because the school board believed them "to be, in essence, vulgar." 474 F. Supp. 387, 397 (E.D.N.Y. 1979). Both Court of Appeals judges in the majority concluded, however, that there was a material issue of fact that precluded summary judgment sought by petitioners. The unresolved factual issue, as I understand it, is the reason or reasons underlying the school board's removal of the books. I am not inclined to disagree with the Court of Appeals on such a fact-bound issue and hence concur in the judgment of affirmance. Presumably this will result in a trial and the making of a full record and findings on the critical issues.

> The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. I see no necessity for doing so at this point. . . . [I]f there is an appeal, if there is dissatisfaction with the subsequent Court of Appeals' judgment, and if certiorari is sought and granted, there will be time enough to address the First Amendment issues that may then be presented. . . .
>
> We should not decide constitutional questions until it is necessary to do so, or at least until there is better reason to address them than are evident here. I therefore concur in the judgment of affirmance.

*Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment) (cleaned up). The controlling opinion in *Pico* remains entirely agnostic on whether the First Amendment imposes *any* constraints on book-removal decisions made by public-school libraries, and it merely concurs in a judgment that affirms a federal court of appeals' decision vacating a ruling that granted summary judgment for the school district and remanding the case for trial. *See id.* at 856–61 (plurality opinion) (describing the lower-court proceedings). So there is *no* binding precedent from the Supreme Court that restricts a public school's authority to remove books from its libraries—and no precedent that precludes this Court from holding that public-school library curation decisions are government speech or otherwise immune from First Amendment scrutiny.[13]

---

13. The plaintiffs suggest that Justice White's vote to remand the case for factfinding proves that Justice White believed that the Speech Clause constrains a public school's ability to remove books from its libraries. *See* Appellants' Br. at 18 ("Justice White urged a remand for further factual

Finally, the plaintiffs claim that three of the *Pico* dissenters "cheerfully concede[d]" that the Speech Clause limits a library's authority to remove books. *See* Appellants' Br. at 18 (quoting *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting)). They did nothing of the sort. All four *Pico* dissenters joined Chief Justice Burger's dissent, which emphatically rejects any Speech Clause limits on a library's book-removal prerogatives. *See Pico*, 457 U.S. at 889 (Burger, C.J., dissenting) ("[T]here is not a hint in the First Amendment, or in any holding of this Court, of a 'right' to have the government provide continuing access to certain books."). Then-Justice Rehnquist's dissent assumed for the sake of argument that *some* constitutional provision (not necessarily the Speech Clause) would limit library-book removals in the extreme hypotheticals described in the plurality opinion, but he made clear that the Court *should not rule* on those hypotheticals until they were actually presented. *See id.* at 908 (Rehnquist, J., dissenting) ("I would save for another day—feeling quite confident that that day will not arrive—the extreme examples posed in Justice Brennan's opinion."). The dissenters in *Pico* did not join or approve any portion of Justice Brennan's plurality opinion.

---

development regarding the government's reasons for removing the book, and by that action acknowledged that the government's reasons are crucial to understanding whether the removal violates the First Amendment."). Not so. Justice White voted to remand the case so that the Supreme Court could determine whether it would be even be necessary to weigh in on the First Amendment questions in the first place.

## IV. The Court Should Explicitly Reject The Reasoning Of The *Pico* Plurality

This Court has already recognized that *Pico* has no status as binding precedent. *See ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1200 (11th Cir. 2009) ("*Pico* is of no precedential value as to the application of the First Amendment to these issues." (quoting *Muir*, 688 F.2d at 1045 n.30)). But the Court should go further than that. It should explicitly reject the *Pico* plurality opinion and instruct district courts in the Eleventh Circuit not to follow it.

### A. The *Pico* Plurality's Attempt To Distinguish A Library's Removal Decisions From Its Initial-Acquisition Decisions Is Nonsensical

The *Pico* plurality opinion imposes no constitutional constraints on a library's refusal to add new materials to its collection. *See Pico*, 457 U.S. at 871–72 (plurality opinion) ("[N]othing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools. . . . [O]ur holding today affects only the discretion to *remove* books."). This attempt to distinguish removals from additions is untenable and the Court should reject it.

A school district that refuses to add *Tango* to its libraries because it disapproves of the book's "viewpoint" imposes a greater injury on students who wish to read that book (and the authors who wish to propagate it) than a school district that removes *Tango* after adding it to its library's collection. The school district that initially allows a book into the library, but later

changes its mind and removes it, has at least provided *some* access to the disputed material. But the school district that refuses to purchase that book in the first instance has withheld *all* library access to the contested tome. If a school district's decision to remove *Tango* "abridges" the plaintiffs' First Amendment rights, then a school district that refuses to purchase that book in the first place has *a fortiori* "abridged" the First Amendment rights of its authors and the students who wish to access that book.

It is also easy to evade a rule that limits library-book removals while leaving school officials with a free hand to exclude materials at the acquisition stage. Suppose that this Court were to reverse the district court's judgment and adopt the *Pico* plurality opinion as the law of the Eleventh Circuit. In response, a student checks out *Tango* and then loses or damages the books (either by accident or at the direction of a parent who opposes its presence in the library). Then the school-board members refuse to purchase a replacement copy, for the same reasons that they voted to remove *Tango* from their libraries. None of that will violate (or even implicate) the *Pico* plurality opinion because the school district is refusing to add books to its libraries. So adopting the *Pico* plurality opinion will create a farcical regime in which a school district can refuse to buy replacement copies if the books that it wants to remove get damaged or lost, and then leave it to library vigilantes (who are not subject to the First Amendment) to deep-six the unwanted materials.

As Justice O'Connor observed in *Pico*:

> If the school board can … determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it.

*Pico*, 457 U.S. at 921 (O'Connor, J., dissenting). Justice O'Connor is correct, and Justice Brennan is wrong. If the school district has carte blanche to exclude *Tango* from its libraries at the initial-acquisition stage, then it can remove *Tango* if it regrets or wants to undo its previous decision.

### B. The *Pico* Plurality's Test For Library-Book Removals Is Unclear, Contradictory, And Incapable Of Principled Application

The *Pico* plurality opinion contains no fewer than three formulations of its test for distinguishing constitutionally permissible library-book removals from constitutionally impermissible ones.

The first formulation appears on page 870:

> Petitioners rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner.

*Pico*, 457 U.S. at 870 (plurality opinion). So "partisan" and "political" book removals are acceptable (according to Justice Brennan) as long as they do not enter the realm of "narrowly" partisan or political book removals. How a court is supposed to distinguish a "narrowly" partisan or political book removal from a merely "partisan" or "political" decision is anyone's guess.

The second formulation appears on page 871:

> [W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights de-

> pends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.

*Id.* at 871 (plurality opinion) (footnote omitted). In a footnote, Justice Brennan elaborated on the meaning of "decisive factor": "By 'decisive factor' we mean a 'substantial factor' in the absence of which the opposite decision would have been reached." *Id.* at 871 n.22 (plurality opinion).

The third formulation appears on page 872:

> [W]e hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."

*Id.* at 872 (plurality opinion) (citation omitted).

If this Court adopts the *Pico* plurality opinion as the law of the Eleventh Circuit, then it will need to decide which of these three formulations represents the proper test for determining when a library-book removal violates the Speech Clause. They are all different. Under the third test, a school district can defeat a Speech Clause claim by showing that it was motivated (even in part) by any reason other than mere "dislike" of the "ideas" contained in the book. A school district can also defeat a Speech Clause claim by refuting accusations that it was seeking to prescribe orthodoxy, even when its sole motivation for removing the book was dislike of its ideas. That is a far cry from the second test, which asks whether the school officials intended to

"deny" students "access" to the ideas in the removed books, and whether that intent was the but-for cause of the book-removal decision.

There are many other problems with the *Pico* plurality opinion. It acknowledges that the Speech Clause allows schools to remove library books that are "pervasively vulgar" or that lack "educational suitability." *Pico*, 457 U.S. at 871 (plurality opinion). But book removals based on vulgarity or lack of "educational suitability" will reflect a "dislike" or "disagreement" with the vulgar or educationally unsuitable "ideas" in those books. They will also reflect a desire to "prescribe" orthodoxy by excluding materials deemed vulgar or educationally unsuitable. Justice Brennan made no attempt to reconcile these caveats with the tests that appear elsewhere in his opinion.

Finally, the *Pico* plurality opinion requires judges to become mind readers and divine the subjective motivations and thought processes of school officials. But school boards comprise different members, each of whom has their own unique thoughts, and each of whom will have their own reasons for supporting removal of the disputed books. It is impossible to attribute a singular "intent" to a collective entity. *See* Kenneth A. Shepsle, *Congress Is a "They," Not An "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992). And in many situations it is impossible for a court to determine the intentions or motivations of librarians or school officials who remove library materials. A school board can simply vote to remove library books without discussion, and a librarian can remove books without documenting her rea-

sons. In these situations, a court can do nothing more than guess about what the relevant motivations might have been.

## Conclusion

The judgment of the district court should be affirmed.

Respectfully submitted.

Gene P. Hamilton
President and General Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721 (phone)
gene.hamilton@aflegal.org

Dated: February 22, 2026

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Amicus Curiae*

## Certificate Of Compliance

with type-volume limitation, typeface requirements,
and type-style requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

_/s/ Jonathan F. Mitchell_
Jonathan F. Mitchell
*Counsel for Amicus Curiae*

Dated: February 22, 2026

# Certificate Of Service

I certify that on February 22, 2026, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Eleventh Circuit and served through CM/ECF upon:

Faith E. Gay
Corey Stoughton
Lauren J. Zimmerman
Joshua W. Bean
Joshua M. Cockream
Selendy Gay PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000
fgay@selendygay.com
cstoughton@selendygay.com
lzimmerman@selendygay.com
jbean@selendygay.com
jcockream@selendygay.com

Anna T. Neill
Sperling Kenny Nachwalter LLC
4 Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, Florida 33131
(305) 373-1000
aneill@sperlingkenny.com

*Counsel for Plaintiffs-Appellants*

Jeffrey Grosholz
Rumberger Kirk
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
(850) 222-6550
jgrosholz@rumberger.com

*Counsel for Defendants-Appellees*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Amicus Curiae*