**No. 25-13485**

# United States Court of Appeals

*for the*

# Eleventh Circuit

PETER PARNELL, JUSTIN RICHARDSON, B G, By and through her parent Raymond Guillory,

*Plaintiffs-Appellants,*

E D B By and through her parent Whitney Morgan Donovan, et al.,

*Plaintiffs,*

– v. –

SCHOOL BOARD OF LAKE COUNTY, FLORIDA, et al.,

*Defendants,*

SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
IN NO. 4:23-CV-00414-AW-MAF, HONORABLE ALLEN C. WINSOR

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

ANNA T. NEILL
SPERLING KENNY NACHWALTER, LLC
4 Seasons Tower, 1441 Brickell Avenue,
Suite 1100
Miami, Florida 33131
(305) 373-1000

FAITH E. GAY
COREY STOUGHTON
JOSHUA W. BEAN
JOSHUA M. COCKREAM
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Plaintiffs-Appellants*

COUNSEL PRESS (800) 4-APPEAL • (391026)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................... 1

ARGUMENT ..................................................................................................... 3

I. DEFENDANT-APPELLEE'S ARGUMENTS DO NOT SUPPORT CREATING A PUBLIC LIBRARY EXCEPTION TO THE FIRST AMENDMENT ..................................................................................... 3

A. The Board Ignores Controlling Precedent and the Cases It Cites Do Not Support Creating a Public Library Exception to the First Amendment ......................................................................... 4

B. The Board's Policy Arguments Misunderstand the Law .................... 10

II. REMOVING A BOOK FROM A PUBLIC LIBRARY IS REGULATION OF PRIVATE SPEECH, NOT GOVERNMENT SPEECH .................................................................................. 14

III. PLAINTIFFS-APPELLANTS ARE ENTITLED TO SUMMARY JUDGMENT IN THEIR FAVOR BASED ON THE UNDISPUTED RECORD ................................................................................... 20

IV. LEGISLATIVE PRIVILEGE DOES NOT APPLY .................................... 25

CONCLUSION ................................................................................................ 28

CERTIFICATE OF COMPLIANCE ................................................................. 30

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ....................11, 12

*Adderley v. Florida*,
385 U.S. 39 (1966)....................4

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....................5, 6, 18

*Associated Press v. Budowich*,
2025 WL 1649265 (D.C. Cir. June 6, 2025) ....................7

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) ....................6

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)....................7, 8

*Bryant v. Jones*,
575 F.3d 1281 (11th Cir. 2009) ....................25, 26, 28

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*,
115 F.4th 1266 (11th Cir. 2024) ....................14, 15

*Catoosa Cnty. Republican Party v. Catoosa Cnty. Bd. of Elections and Voter Registration*,
2025 WL 1662455 (11th Cir. June 12, 2025)....................15

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984)....................10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....................10

*Crymes v. DeKalb Cnty., Ga.*,
923 F.2d 1482 ....................26, 28

*DeSisto Coll., Inc. v. Line*,
888 F.2d 755 (11th Cir. 1989) ....................................................................28

*Ellis v. Coffee Cnty. Bd. of Registrars*,
981 F.2d 1185 (11th Cir. 1993) ..................................................................27

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)....................................................................................23

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984)....................................................................................18

*Finch v. City of Vernon*,
877 F.2d 1497 (11th Cir. 1989) ..................................................................26

*Greer v. Spock*,
424 U.S. 828 (1976)......................................................................................4

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)....................................................................................18

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981)....................................................................................10

*Hernandez v. City of Lafayette*,
643 F.2d 1188 (5th Cir. Unit A May 1981)...................................................26

*Jarrard v. Sheriff of Polk Cnty.*,
115 F.4th 1306 (11th Cir. 2024) ...............................................................4, 18

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001)......................................................................................4

*M.N.C. of Hinesville, Inc. v. U.S. Dep't of Def.*,
791 F.2d 1466 (11th Cir. 1986) ...............................................................6, 18

*Marks v. United States*,
430 U.S. 188 (1977)......................................................................................8

*Matal v. Tam*,
582 U.S. 218 (2017).................................................................................13, 16

*McGriff v. City of Miami Beach*,
84 F.4th 1330 (11th Cir. 2023) ....................................................................19, 20

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..............................................................................................18

*Muir v. Ala. Educ. Television Comm'n*,
688 F.2d 1033 (Former 5th Cir. 1982) ....................................................................8

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)..................................................................................................4

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009)..............................................................................................19

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)......................................................................................4, 18, 20

*Searcey v. Harris*,
888 F.2d 1314 (11th Cir. 1989) .............................................................................23

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)........................................................................................14, 15, 17

*Stanley v. Georgia*,
394 U.S. 557 (1969)..................................................................................................8

*Thornburgh v. Abbott*,
490 U.S. 401 (1989)..................................................................................................4

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)..............................................................................................23

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
862 F.2d 1517 (11th Cir. 1989) .............................................................................12

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)..............................................................................................19

*Wells v. City & Cnty. of Denver*,
257 F.3d 1132 (10th Cir. 2001) ...............................................................................7

*Whiteland Woods, L.P. v. Twp. of W. Whiteland*,
193 F.3d 177 (3d Cir. 1999) ....................7

*Yeldell v. Cooper Green Hosp., Inc.*,
956 F.2d 1056 (11th Cir. 1992) ....................27, 28

## PRELIMINARY STATEMENT

Defendant-Appellee the Escambia County School Board ("the Board") asks this Court to hold that "First Amendment rights do not apply to a school board's decision to remove a book from public school libraries." Answer Brief of Defendant-Appellee School Board of Escambia County, Florida ("AB") 11. That proposition—effectively a "public library exception" to the First Amendment, notwithstanding the Board's resistance to that label, *see* AB 13—is foreclosed by controlling precedent establishing that when the government maintains a forum for private speech, such as a library, it may not discriminate based on viewpoint.

The Board urges the Court to treat public libraries differently from any other setting in which the government facilitates private speech. But there is no meaningful difference. A public library is a place where readers encounter works presenting many authors' messages. Because an elementary school library serves elementary-age students, the government may adopt rules ensuring that materials are age-appropriate. But it may not use that authority to mask viewpoint discrimination.

The Board insists that courts are incapable of distinguishing between a good-faith determination that a book is age-inappropriate and a pretextual assertion used to suppress a disfavored viewpoint. But courts have drawn similar distinctions for decades, and here the line is easy to draw. No rational reader could conclude that *And Tango Makes Three* is age-inappropriate. That conclusion is apparent from

reading the book, which takes only a few minutes, and the implausibility of the Board's assertion that it contains "sexual" content. The Board members' own explanations confirm the point: they focus either on the book's positive and factually accurate depiction of two male, adoptive parents raising a baby penguin or on the plainly pretextual claim that the book, which contains only friendly expressions of familial affection, is "sexual." These straightforward facts dispel the myth that courts cannot distinguish between the implementation of lawful educational discretion and unlawful viewpoint-based censorship. The district court therefore erred in adopting a blanket rule that the First Amendment does not apply to the removal of books from public school libraries. *See* Part I, *infra*.

The Board's fallback argument—that its decision is insulated by the government speech doctrine—fails as well. That argument rests on misidentifying the expression at issue. The relevant expression is *Tango*—a book written by private authors and made available to students in a public school library. The Board instead focuses on the message supposedly conveyed by its process for selecting and removing books from library shelves. But that misapplies the government speech doctrine. At most, the Board's argument establishes that the government exercises regulatory control over its library collections. Yet the Supreme Court and this Court have repeatedly held that such control does not transform private expression into

government speech. Proper application of the government speech factors therefore confirms that the doctrine does not apply here.

Because the undisputed record straightforwardly establishes viewpoint discrimination based on the absence of any sexual content in *Tango* and the otherwise viewpoint-oriented statements of the Board members, this Court should reverse and direct entry of summary judgment for Plaintiffs-Appellants. Many cases may require courts to defer to educators' judgment. This is not one of them. In the alternative, the Court should vacate the district court's protective order and permit discovery into the Board members' reasons for removing *Tango*, because legislative privilege does not shield the administrative decision challenged here.

## ARGUMENT

### I. DEFENDANT-APPELLEE'S ARGUMENTS DO NOT SUPPORT CREATING A PUBLIC LIBRARY EXCEPTION TO THE FIRST AMENDMENT

The Board's incorrect assertion that Plaintiffs-Appellants demand an affirmative "right to speak through the library," AB 13, and its misplaced hypotheticals should not distract the Court from the straightforward application of foundational First Amendment principles to this case, which require reversal of the district court's erroneous endorsement of viewpoint discrimination.

### A. The Board Ignores Controlling Precedent and the Cases It Cites Do Not Support Creating a Public Library Exception to the First Amendment

The Supreme Court's First Amendment jurisprudence reflects a consistent rule: when the government maintains or administers a setting in which private speech and the free exchange of ideas are permitted, it may impose reasonable regulations consistent with the specific purpose of that forum, but it may not discriminate based on viewpoint. *See* Opening Brief of Plaintiffs-Appellants ("OB") 20–25. Public libraries are a government-maintained and administered setting in which privately authored books and the free exchange of ideas are both permitted and encouraged. They are not meaningfully different from other settings in which the government facilitates private speech—such as government-controlled spaces or programs open to private speakers. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983). Even in the most tightly controlled government spaces, such as prisons and military bases, the First Amendment still prohibits viewpoint discrimination. *See Greer v. Spock*, 424 U.S. 828 (1976); *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Adderley v. Florida*, 385 U.S. 39, 47–48 (1966); *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306 (11th Cir. 2024).

The Board points out that none of these cases are specifically about "library shelves." AB 14–15 n.6; *see also id.* at 19. But the Board offers no reason why these

crucial institutions are different from any other forum in which the government facilitates private speech. The Board's inability to distinguish controlling case law underscores the novelty—and indefensibility—of the exception it urges this Court to create, particularly given that the prohibition on viewpoint discrimination is the most fundamental principle of the First Amendment, *see* OB 15–17, a point the Board does not refute.

The Board's attempt to place public school libraries beyond the prohibition on viewpoint discrimination by characterizing them as "not a forum at all," AB 17 & n.8, misunderstands the law and defies common sense. The Board relies heavily on *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998); AB 17 & n.8, but that case did not hold that the government may establish settings for private speech in which viewpoint discrimination is permitted. On the contrary, *Forbes* upheld a public television station's decision to exclude a candidate from a televised presidential debate *only because* the station's reasons were viewpoint neutral. *Id.* at 682–83. That is exactly the analysis that should have happened here: the district court was required to examine whether the Board's reasons for excluding *Tango* from the library were viewpoint-neutral or viewpoint-based. Instead, it improperly avoided that question altogether.

The Board's citation to language in *Forbes* in which the majority observes that public broadcasting "as a general matter does not lend itself to scrutiny under

the forum doctrine" and might be "not a forum at all," 523 U.S. at 675, 678; AB 17, takes that language out of context. The majority was clearly referring to the inappropriateness of applying the heightened scrutiny required in traditional public forums (like streets and parks) to public broadcasting. The Court was not suggesting that there are circumstances in which the government may engage in viewpoint discrimination when facilitating private speech; in fact, the Court clearly states that "the requirement of neutrality remains; a broadcaster cannot grant or deny access to a candidate debate on the basis of whether it agrees with a candidate's views." 523 U.S. at 676.

This Court reaffirmed the viewpoint-neutrality rule in *Barrett v. Walker County School District*, noting that nonpublic fora and what *Forbes* described as "not fora at all" are treated the same for constitutional purposes—that is, regardless of the label, viewpoint discrimination is prohibited. 872 F.3d 1209, 1224–25 (11th Cir. 2017).[1] This Court has consistently applied that rule as well, *see* OB 16–17, 21, and several of the cases the Board cites reaffirm this point. *See, e.g.*, *M.N.C. of Hinesville, Inc. v. U.S. Dep't of Def.*, 791 F.2d 1466 (11th Cir. 1986) (holding that

[1] The Court's analysis of *Forbes* in *Barrett* is not dicta, *contra* AB 17 n.8, because the Court relied on that analysis to reach its holding. *See Barrett*, 872 F.3d at 1224–26. In any event, this Court's analysis of *Forbes* is correct.

the prohibition on viewpoint discrimination applies to the Army's selection of which privately published newsletters to distribute on military bases).[2]

The Board's theory that school library book removal decisions are categorically exempt from the First Amendment also cannot be reconciled with *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). The Board emphasizes that *Pico* produced no majority opinion and did not establish a comprehensive standard governing school library disputes. *See* AB 26–27. But it does not, and cannot, contest that no Justice in *Pico* endorsed the rule the Board urges here. The Board suggests that Justice White's concurrence should be considered controlling, AB 27, but it is wrong to assert that Justice White "said nothing about the First Amendment." *Id.* To the contrary, while Justice White saw "no necessity" for what he characterized as the plurality's "dissertation on the extent to which the First Amendment limits the discretion of the school board to remove

[2] The out-of-circuit cases cited in footnote 8 of the Board's brief do not reflect any disagreement with the settled rule that viewpoint discrimination is impermissible. In *Wells v. City & County of Denver*, 257 F.3d 1132 (10th Cir. 2001), the Tenth Circuit held that a city holiday display is not a traditional public forum subject to heightened scrutiny but reaffirmed that the city was required to act in a viewpoint-neutral manner. *Id.* at 1145–46. In *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177 (3d Cir. 1999), the Third Circuit upheld a viewpoint-neutral ban on videotaping certain public meetings and did not address viewpoint discrimination at all. *Id.* at 183. *Associated Press v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6, 2025), is a government-speech case concerning unique "presidential spaces," such as the Oval Office, and does not endorse viewpoint discrimination in a government-managed forum for private speech. *See id.* at *1, *9.

books from the school library," *Pico*, 457 U.S. at 883 (White, J., concurring), his proposed remand for further factual development necessarily contemplated that the First Amendment imposed limits on such decisions. Plaintiffs-Appellants made this point, OB 18, and the Board offers no response.[3] Nor does it address the fact that *even the dissenters* recognized that viewpoint discrimination is unconstitutional. *Pico*, 457 U.S. at 907–08 (Rehnquist, J., dissenting) ("cheerfully conced[ing]" that "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students.").[4]

Binding authority also forecloses the Board's claim that students like Plaintiff B.G. have no applicable right to receive information in public school libraries to enable them to challenge viewpoint discrimination. The Board never meaningfully grapples with *Stanley v. Georgia*, 394 U.S. 557 (1969), which found that right to be "well established" more than fifty years ago. *Id.* at 564. The Board's related

---

[3] Indeed, Justice White's concurrence could only supply the controlling rule under *Marks v. United States*, 430 U.S. 188 (1977), as the Board suggests, if the general applicability of a prohibition on viewpoint discrimination is the "narrower ground" logically encompassed within the reasoning of other opinions supporting the judgment. *Id.* at 193. The Board does not identify any other common ground.

[4] The Board's reliance on *Muir v. Alabama Educational Television Commission*, 688 F.2d 1033 (Former 5th Cir. 1982) (en banc) (plurality op.), *see* AB 26–27, likewise fails because that case addressed *Pico*'s lack of a controlling standard for *applying* the First Amendment, not whether the First Amendment applies *at all*. *See Muir*, 688 F.2d at 1045 n.30.

suggestion that B.G. could obtain the book elsewhere, *see* AB 24, proves too much: by that logic, the government could censor viewpoints from any forum so long as the same ideas remain available somewhere else.

The Board attempts to avoid this issue by recharacterizing Plaintiffs-Appellants' claim as a demand for a "positive libert[y]" to force the Board to guarantee "a standing right to access" to "desired materials" and a "freestanding right to compel the Board to carry" particular books. AB 18, 22–25. That distortion also propels several of the hypotheticals raised in both the Board's opposition and the brief of *amicus curiae*, including that applying the First Amendment would require libraries to close their doors. AB 20. Plaintiffs-Appellants have already disclaimed such a right. *See* OB 26. The negative right to be free from viewpoint discrimination is distinct from a positive entitlement to be heard or to receive information on demand. Enforcing the First Amendment's prohibition on viewpoint discrimination in the government's regulation of libraries would not create an affirmative right for authors to compel libraries to acquire or retain their books, nor does it imply an affirmative right of readers to compel libraries to purchase particular books.

The Board also seeks to avoid controlling precedent by suggesting that this appeal turns on a factual dispute about whether "the Board's library shelves are a forum for [Plaintiffs'] speech." AB 14. But whether the First Amendment applies here is a legal question, and the Board identifies no factual dispute material to that

determination. Its cited cases, *see* AB 13–14, 16, do not help it: *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), and *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788 (1985), concern regulations directed at conduct rather than speech, and *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), involved a viewpoint-neutral time, place, and manner restriction, *see id.* at 648. None suggests that the government may remove speech because it disagrees with its viewpoint.

### B. The Board's Policy Arguments Misunderstand the Law

The Board and *amicus curiae* claim that enforcing a prohibition on viewpoint discrimination would embroil judges in educational policymaking and compel the retention of inappropriate materials. *See* AB at 18, 20, 24, 33–35, 46; Am. First L. Found. Br. 7–10, 14–16. Not so. Elementary school libraries are permitted to select and exclude materials on forum-appropriate, content-based grounds, such as objective educational criteria, age-appropriateness, or audience interest. That latitude flows from the government's power to define the purpose of a forum and the parties' general agreement that the purpose of elementary school libraries is to provide reading material suitable for elementary school-age children. A First Amendment claim arises only where direct or circumstantial evidence exposes such decisions as viewpoint discrimination, including evidence that proffered non-viewpoint-based rationales are pretextual. This is familiar ground for federal courts, which are called upon

to distinguish between appropriate neutral regulation and impermissible discrimination in many contexts. *See* OB 26–27.

The contrast between this case and the Board's hypotheticals illustrates the point. In this case, the Board members' statements were focused on the fact that the penguin parents were both male, and the Board's claim that *Tango* was removed for containing age-inappropriate sexual material is obviously pretextual both from reading *Tango* and from the Board's retention of books about the animal world with indistinguishable content but for the implication that the parental figures are both male. *See* OB 6–8. It is not difficult to distinguish this decision from another board's decision to remove or decline to shelve racist or pornographic materials based on objective educational purposes or age-appropriateness. *Contra* AB 33–34, 45–46; Am. First L. Found. Br. 8–10, 15–16. Where schools apply viewpoint-neutral criteria, such as determining that certain age groups are too young to be exposed to certain sexual images, books involving illicit drug use, or the ideology of *Mein Kampf*,[5]

[5] The Board cites to a portion of an oral argument below to misrepresent Plaintiffs-Appellants' position on removing *Mein Kampf* or a "pro-segregation book." AB 45–46 (citing D.E. 251, 40:08–40:14; D.E. 251, 39:17–40:09). Whether those hypothetical removals violate the First Amendment would depend on the facts, including, for example, whether such books are being banned from the library in a public elementary school or in a public university's history department. The Board also accuses Plaintiffs-Appellants of seeking to "force public libraries to have a Flat Earth Section," *id.*, but that ignores the settled rule, which Plaintiffs-Appellants do not dispute, that a library can remove books for factual inaccuracy. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* ("*ACLU*"), 557 F.3d 1177, 1202 (11th Cir. 2009).

the school will have little difficulty identifying the aspect of the material that troubled them and a plaintiff could not plausibly allege the absence of any rational basis for the school's determination alongside the kind of evidence present here, including contemporaneous statements revealing hostility to the book's specific viewpoint combined with inconsistent treatment of otherwise materially indistinguishable books, most notably, *The Emperor Lays an Egg*:

| *The Emperor Lays an Egg* | *Tango* |
|---|---|
|  "Then *shuffle, shuffle, scoop*. The father uses his beak to quickly move the egg to his own feet. He cuddles it against the bare spot on his fat body. Tucked into his brood pouch, the egg is safe and warm" |  "Until one day they heard a sound coming from inside their egg. *Peep, peep. Peep, peep*, it said. Roy and Silo called back, *Squawk, squawk*. *Peep, peep*, answered the egg." |

*See* ECF 220-1 at ¶ 30.

More difficult cases may require deference to educators' judgment that this Court counseled for in *ACLU*, 557 F.3d at 1227 (noting that judges should not "substitute their own findings and opinions about educational suitability for those of a school board whenever the board's motive for an action is questioned"); *cf. Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1522–25 (11th Cir. 1989)

(deferring to educator judgment where, unlike here, the parties "stipulated" that "the motivation for the Board's removal of" certain materials from the curriculum was legitimately "related to the explicit sexuality and excessively vulgar language in the selections"). This case is not one of those difficult cases, and their existence does not warrant creating a blanket First Amendment exception.

By contrast, the Board fails to rebut the sweeping consequences of its censorship theory. Exempting public libraries from the First Amendment's prohibition on viewpoint discrimination—whether through the government speech doctrine or the district court's novel rule—would permit officials to remove library books based on their political, religious or ideological objections. *See* OB 34–36. The Board offers no explanation for how its theory would place any constraint on this outcome. *See* AB 37. Its only response is a passing reliance on *Matal v. Tam,* 582 U.S. 218 (2017), which does not address the consequences of the Board's proposed rule.

The Constitution does not force a choice between unreviewable censorship and abdication of educational standards. When the government maintains a forum for private expression, it may not purge disfavored ideas under the guise of responsible regulation. Courts have long enforced that rule while still accommodating deference to educators' professional judgment. The Board's contrary approach would place decisions to remove private expression from government-maintained libraries beyond First Amendment scrutiny, allowing political actors to excise disfavored

viewpoints from collections of private speech. Nothing in the First Amendment requires that result. The district court's decision should be reversed.

## II. REMOVING A BOOK FROM A PUBLIC LIBRARY IS REGULATION OF PRIVATE SPEECH, NOT GOVERNMENT SPEECH

The Board's fallback effort to recast its removal decision as "government speech" fails. The expression at issue here is *Tango*. *See* OB 31. The Board's failure to recognize that leads it to misapply the government speech factors set forth in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), and *Cambridge Christian School, Inc. v. Florida High School Athletic Association*, 115 F.4th 1266 (11th Cir. 2024). *See* AB 29–36. Properly applied, those factors confirm that the Board's process for selecting and removing library books is regulatory conduct, not "government speech."

In *Shurtleff*, the Supreme Court stated the relevant factors for establishing government speech as "the history of the expression at issue; the public's perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." 596 U.S. at 252. If the "expression at issue" is the speech contained in *Tango*, those factors weigh decisively against finding government speech here. The Board does not meaningfully dispute that library books (including *Tango*) are privately authored expression and that public school libraries historically have been understood, not as places

where the government communicates its own message, but as places where students independently access a range of privately authored ideas, such as those presented in *Tango*. *See* OB 31–34. Yet the Board largely ignores these considerations in applying the *Shurtleff* factors. Instead, it attempts to redefine the "expression at issue" as the Board's "selection and curation" process, which supposedly conveys a message that the books on library shelves are "fit for reading." AB 28–32.

That is wrong, or at least incomplete. In a case like this, which challenges censorship of a book, the "expression at issue" is the book. That is plain from *Shurtleff* and *Cambridge Christian*: in *Shurtleff*, the Supreme Court classified the "expression at issue" as the flags, discussing the historical use of flags to convey specific messages and, in assessing the control factor, holding that "it is Boston's control over the flags' *content and meaning* that here is key." 596 U.S. at 256 (emphasis added). In *Cambridge Christian,* this Court classified the "expression at issue" as the "pregame speech over the PA system at FHSAA football championship games" not merely the FHSAA's process for deciding what speech to permit. 115 F.4th at 1288. In this Court's recent decision in *Catoosa County Republican Party v. Catoosa County Board of Elections and Voter Registration*, the Court classified the expression at issue as the content of the ballot questions, not merely the state's process for approving ballot questions. 2025 WL 1662455, at *5–6 (11th Cir. June 12, 2025). Even if aspects of the Board's book selection and removal process are

relevant to the government speech analysis, the Board's *exclusive* focus on that process and its decision to ignore the expression being censored is fatal to its government speech argument and demonstrates that it has not carried its burden.

Moreover, the Board's argument that the message of its selection process trumps other considerations was expressly rejected by the Supreme Court in *Matal*. 582 U.S. at 234–38. If, as the Board suggests, the mere existence of longstanding government regulation of a program or forum to facilitate private speech satisfies the government speech test, then the government can discriminate based on viewpoint in any forum for private expression that is administered or regulated by the government. *Matal* expressly rejected that, holding that allowing the government to convert disputes about privately authored expression into disputes about government speech based on control or approval alone would "constitute a huge and dangerous extension of the government-speech doctrine." *Id.* at 239.

A more granular examination of the Board's arguments about history, endorsement, and control underscores this point. As to the history prong, the Board and the State of Florida's longstanding history of selecting and purchasing books, *see* AB 31–32, is not distinguishable from the Patent and Trademark Office's longstanding history of approving trademarks, *see Matal*, 528 U.S. at 235–38, or from municipalities' longstanding history of issuing permits for street performers and protests in public parks. The focus must also be on the history of the messages

conveyed by library books, which historically convey a wide range of ideas and opposing viewpoints, OB 32–33, a point the Board ignores.

As to the endorsement prong, the fact that the public understands that librarians or other government employees "select library materials for a purpose," AB 33, is not meaningfully different from the public's understanding that Patent and Trademark Office employees approve trademarks for a purpose or that municipal employees issue park permits for a purpose. The relevant question is what message the public understands the speech itself to convey. Here, library books convey the messages of their authors. No reasonable observer encountering shelves filled with privately authored works expressing a wide range of ideas would conclude that those books convey a specific message from the government. *See* OB 33–34.

The same logic defeats the Board's analysis of the control prong. *Shurtleff* makes clear that the relevant inquiry is whether the government controls the content and meaning of the expression itself. *See* 596 U.S. at 256. The Board does not write the books on its shelves, adopt their messages as its own, or control the ideas they express. Its role is limited to selecting which privately authored works to make available. That kind of gatekeeping authority is a familiar feature of government-managed forums for private speech and does not transform the underlying expression into government speech. *See* OB 33–34.

The Board cites *M.N.C. of Hinesville, Inc. v. U.S. Department of Defense*, 791 F.2d 1466 (11th Cir. 1986); AB 14, but that case supports Plaintiffs-Appellants' position. There, this Court rejected the Army's argument that its control over the content and distribution of a privately published newsletter placed the dispute entirely beyond the First Amendment. *M.N.C.*, 791 F.2d at 1471–72. The Board's theory here is no different. The Board's position is also inconsistent with decades of Supreme Court decisions involving government-regulated forums for private speech, including *Rosenberger*, 515 U.S. at 834–35; *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271–73 (1988); *Forbes*, 523 U.S. at 672–73; *FCC v. League of Women Voters of California*, 468 U.S. 364, 375-76, 395 (1984); and *Jarrard*, 115 F.4th at 1319, all of which would have been government speech cases under the Board's approach. Plaintiffs-Appellants raised this point, OB 29–30, and the Board has no response.

The Board argues that stocking a public library is "expressive activity" akin to "presenting a curated compilation of speech originally created by others," which the Supreme Court held is protected when done by private actors. AB 29 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024)). But that selective quotation misreads *NetChoice*. The Supreme Court explained that private actors' curation of speech is protected because "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *NetChoice*, 603 U.S. at 741. The

decision protects private speakers from government interference; it does not give the government authority to impose its own ideological preferences on forums for private speech that it administers.

The remainder of the Board's government speech argument rests on unpersuasive analogies to cases that only highlight the weakness of its position. In those cases, the government "speaks" by conveying a message it has itself crafted or adopted, not merely by creating a space in which readers encounter works expressing others' ideas. In *Pleasant Grove City, Utah v. Summum*, the park monuments were government speech because the Court found that each monument, once selected and installed, conveyed the city's message. 555 U.S. 460, 470 (2009). By contrast, the Board expressly disavows adopting the message of every book in its libraries. *Walker v. Texas Division, Sons of Confederate Veterans, Inc.* held that specialty license plates were government speech because the state owned the plate designs—*i.e.*, the content itself, akin to taking copyright in the books on the District's library shelves—turning them into "essentially, government IDs." 576 U.S. 200, 212 (2015). Similarly, in *McGriff v. City of Miami Beach*, this Court upheld the city's removal of certain public art only because the art at issue was commissioned for a government exhibition specifically designed to convey the government's message of "inclusion" and "[a]ll rights previously possessed by the [artists were]

relinquished." 84 F.4th 1330, 1334 (11th Cir. 2023). The stark differences between those cases and this one confirm the inapplicability of government speech here.

## III. PLAINTIFFS-APPELLANTS ARE ENTITLED TO SUMMARY JUDGMENT IN THEIR FAVOR BASED ON THE UNDISPUTED RECORD

At a minimum, the Court should reverse and remand based upon the legal errors identified above. But the undisputed record also establishes that the Board removed *Tango* because of disagreement with its viewpoint. Viewpoint discrimination occurs when the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." AB at 39 (quoting *Rosenberger*, 515 U.S. at 829). That is established here by two undisputed facts: (1) what each member of the three-person majority said about why they removed *Tango*; and (2) the content of the book itself, which establishes the implausibility of the Board's claim of age-inappropriate sexual content, leaving no rationale for the decision other than viewpoint discrimination. *See* OB 38–40.

The content of *Tango* is undisputed and appears in the record before this Court. *Tango* is a picture book about two penguins at the Central Park Zoo who form a pair bond, care for an egg, and raise a chick together. The illustrations are simple and innocent and contain no sexual material of any kind. The Board conceded below that the book is not sexually explicit, and it is undisputed that the Escambia School

District's professional review committee unanimously concluded that it is appropriate for elementary students. OB 7; *see* ECF 221 at 7, 14.

The Board does not explain how *Tango* differs in any relevant respect from the many children's books that remain on the District's shelves depicting opposite-sex parents kissing, marrying, or welcoming babies, *see* OB 7; ECF 220-1 at ¶¶ 30, 40, including *The Emperor Lays an Egg*, another book about penguins:

| *The Emperor Lays an Egg* | *Tango* |
|---|---|
| <br>"In July, in the middle of the worst winter blizzard, the emperor's egg is ready to hatch. Chip, chip, crack! Out pops a bedraggled gray chick. The father lets the baby peek out while he cleans up the shell, but then he tucks the baby right back under. In the coldest, windiest, driest place on Earth, the father has taken care of the egg for 65 days. He is running out of energy. In his throat, he can make only a small amount of the nutritious liquid called penguin's milk to spit up for the baby. With the tiny emperor still on his feet, the father waits and waits for the mother to return." | <br>"Out came their very own baby! She had fuzzy white feathers and a funny black beak. Now Roy and Silo were fathers. "We'll call her Tango," Mr. Gramzay decided, "because it takes two to make a Tango."" |
| <br>"After another cold week, the father finally hears the trumpet song of his mate. Toodoo, twoo? In the frigid darkness, the mother waddles back from the sea with food for the baby. The father lets the tiny emperor out onto the ice. It is a dangerous moment. In just two minutes of exposure, the baby can freeze to death. Whoosh…whish. The chick shivers in the wind. But the mother scoops it up quickly and covers it with a warm flap of skin. The chick reaches into her throat to gobble the meal of fish and squid that she has spit up. She toodles to the baby and the baby whistles back as they learn each other's songs." | <br>"Roy and Silo taught Tango how to sing for them when she was hungry. They fed her food from their beaks. They snuggled her in their nest at night.<br>Tango was the very first penguin in the zoo to have two daddies." |

*See* ECF 220-1 at ¶ 30.

The record likewise shows that each member of the majority relied on the same viewpoint-based rationale. *See* OB 38–40. Their statements speak for themselves. *Id.* Each member objected to the book's portrayal of two male penguins raising a family. None identified any feature of the book that could plausibly be

considered sexual content. *Id.* References to penguins being "sexualized via innuendo," AB 41, are implausible and obviously pretextual. *See* OB 38–40. Thus, the Board's own statements confirm their decision focused solely on the fact that the penguins are male and on transparent pretext, leaving no rationale but for viewpoint discrimination. *See* OB 8–9; ECF 220-24 at 88:8–14, 88:13–89:14. This record requires no "speculation," *contra* AB 39; the Board members' own words make their rationale clear. The undisputed fact that *Tango* was removed following a petition and public testimony attacking the book's message about same-sex parents is simply confirmatory circumstantial evidence. OB 6–7, 39.

Recognizing the weakness of its argument, the Board ultimately shifts position. It contends that even if *Tango* contains no sexual content, the Board could still deem the book "age-inappropriate" simply because it presents a positive image of gay parents. *See* AB 45–46. That theory stretches deference to educational judgment beyond what the First Amendment permits. Elementary school students have First Amendment rights. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969); *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989). Labeling disfavored viewpoints inappropriate for children cannot become a license for ideological censorship. *Cf. Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (rejecting a state's claim that a broad restriction on films containing nudity was necessary to protect minors). The Board has never articulated any reason why portraying

loving, same-sex parents caring for an adopted child would be inappropriate for children. And if that rationale were blindly accepted, nothing would prevent another school board from deeming books portraying any disfavored political, religious, or social viewpoint "age-inappropriate," leaving students with no First Amendment rights. The Constitution does not authorize such censorship, even in schools.

The Board is also wrong to suggest that Plaintiffs-Appellants must prove personal animus toward LGBTQ+ individuals. *Contra* AB 40. Disagreement, or a desire to censor, can be motivated by benign intent. Whatever the Board members' personal feelings, their stated reasons for removing *Tango* focused entirely on the idea that elementary school students should not encounter a book portraying two male parents raising a baby together, coupled only with blatant pretext about non-existent sexual content. That is disagreement with the book's message—in other words, viewpoint discrimination.

The Board's reliance on its decision to retain a different book for middle and high school libraries, *see* AB 43 (discussing the book *Drama*), is likewise beside the point. Plaintiffs-Appellants do not rely on a "pattern" of discrimination across titles; they challenge the Board's stated reasons for removing *Tango* itself. *Id.* Whether the Board treated other books differently in other contexts does nothing to justify removing this one for viewpoint-based reasons.

On this undisputed record, no reasonable factfinder could conclude that concerns about "sexual" content or age-inappropriateness were valid reasons for removing *Tango*. There is, therefore, no educational judgment to defer to here. The absence of any valid justification for removal and the direct and circumstantial evidence that the Board members objected to the book's message about same-sex parents, therefore, entitle Plaintiffs-Appellants to judgment as a matter of law.

## IV. LEGISLATIVE PRIVILEGE DOES NOT APPLY

If this Court declines to direct entry of judgment, it should at minimum vacate the district court's protective order and permit discovery into the Board members' reasons for removing *Tango*. The Board's assertion of legislative privilege provides no basis for shielding that information. The Board's argument, AB 47–53, rests on the flawed premise that its decision was legislative simply because it was made by elected officials after deliberation and adopted by vote. But the controlling factor here is the nature of the act, not the identity of the actors or the procedure used. Legislative privilege protects acts that formulate policy of general applicability or prescribe rules with future applications. It does not extend to decisions applying existing standards to a discrete dispute involving a particular subject, even if those decisions are reached through a vote of elected officials. *See Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009).

The Board's lead authorities, *Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir. Unit A May 1981), and *Finch v. City of Vernon*, 877 F.2d 1497 (11th Cir. 1989), do not suggest otherwise. Those cases simply recognize that legislators are entitled to immunity or privilege when acting in a legislative capacity; they do not establish that every action taken by an elected body, or every vote cast by a public official, is legislative,[6] nor do they displace the settled functional inquiry into the nature of the challenged act. *See Bryant*, 575 F.3d at 1306. Functionally speaking, the Board was not legislating, it was deciding whether one particular book, *Tango*, should remain on library shelves under an already-existing statutory and policy framework. *See* AB 49–52; ECF 221 at 21–22.

The Board argues that it was acting "pursuant to a state mandate regarding library book challenges." AB 50. But administrative acts frequently occur under statutory authority. A zoning board acts pursuant to ordinance when it denies a permit, *see Crymes v. DeKalb Cnty., Ga.*, 923 F.2d 1482, 1484; a local government's Chief Executive Officer acts pursuant to statute when he removes and appoints county employees pursuant to an executive order, *see Bryant*, 575 F.3d at 1290; a school

---

[6] *See Hernandez*, 643 F.2d at 1193–94 (holding city council members immune for their participation in legislative deliberations and votes concerning municipal governance, including council consideration of measures affecting the structure and operation of the city government); *Finch*, 877 F.2d at 1505–07 (recognizing legislative immunity where city council members voted to abolish the municipal police department as part of a governmental restructuring decision).

board acts pursuant to policy when it disciplines a student. Those decisions remain administrative even though the governing body acts under authority conferred by law. The same is true here.

Nor does the fact that the Board voted on the matter transform the decision into legislation. *Contra* AB 51–52. Voting is a form of decision-making, not a test for legislative privilege.[7] If the mere existence of a vote were sufficient, a wide range of quintessentially administrative decisions would become "legislative," including (contrary to the authority cited herein) a school board's vote to expel a student, terminate an employee, or deny a transfer request. So too would a city council's vote on an individual permit denial or license revocation. Legislative privilege does not rise or fall on whether a formal roll call occurred.

The Board's other authorities, *see* AB 50–52, do not support a contrary conclusion. In *Ellis v. Coffee County Board of Registrars*, this Court addressed generally applicable policies governing county employment and compensation, not the application of existing standards to a single case. *See* 981 F.2d 1185, 1189–93 (11th Cir. 1993). Likewise, *Yeldell v. Cooper Green Hospital, Inc.*, involved countywide personnel policies and structural decisions governing public employment that affected

---

[7] The Board acknowledges that voting is not dispositive, suggesting instead that it is merely "a factor to consider." AB 52. But it repeatedly treats voting as the principal indicator that the decision was legislative. *See id.* at 50–53.

a broad class of individuals prospectively. 956 F.2d 1056, 1061–63 (11th Cir. 1992). And in *DeSisto College, Inc. v. Line*, this Court addressed general policies governing student discipline and school administration—rules setting standards for future conduct across an entire school system. 888 F.2d 755 (11th Cir. 1989). None of these cases involved the resolution of an individualized dispute under an existing policy framework, as this case does.

That distinction matters because legislative privilege protects only acts that formulate a policy of general applicability for the future. *See Bryant*, 575 F.3d at 1306. The Board asserts that its decision to remove *Tango* was "prospective" because the removal affected all District libraries going forward. AB 51. But every administrative decision has prospective consequences in that sense. Terminating an employee, denying a permit, or expelling a student affect future conduct, yet those acts remain administrative. *See Bryant*, 575 F.3d at 1306; *Crymes*, 923 F.2d at 1484. The relevant question is not whether a decision has future effects on the subject of that decision, but whether it establishes a policy of general applicability for future subjects. *See Bryant*, 575 F.3d at 1306. Removing *Tango* did not; it applied existing standards to adjudicate a specific challenge to a single book.

## CONCLUSION

The Court should reverse the district court's grant of summary judgment to Defendant-Appellee and direct entry of judgment for Plaintiffs-Appellants; or,

alternatively, reverse the district court's grant of summary judgment to Defendant-Appellee and vacate the protective order that prevented Plaintiffs-Appellants from completing discovery on the Board members' rationale for removing *Tango*.

Dated: March 10, 2025

Respectfully submitted,

SELENDY GAY PLLC

By: /s/ *Corey Stoughton*

Faith E. Gay
Corey Stoughton
Joshua W. Bean
Joshua M. Cockream
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
cstoughton@selendygay.com
jbean@selendygay.com
jcockream@selendygay.com

Anna T. Neill
SPERLING KENNY NACHWALTER,
P.A. 1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
aneill@sperlingkenny.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(A) and Eleventh Circuit Rule 32-4 because it contains 6,376 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

The undersigned further certifies that this Brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface of Times New Roman 14-point font.

*/s/ Corey Stoughton*
Corey Stoughton